Michael R. Reese (SBN 206773)
*mreese@reesellp.com*
Carlos Ramirez (*pro hac vice* to be filed)
*cramirez@reesellp.com*
**REESE LLP**
100 West 93rd Street, 16th Floor
New York, New York 10025
Telephone: (212) 643-0500
Facsimile: (212) 253-4272

George V. Granade (SBN 316050)
*ggranade@reesellp.com*
**REESE LLP**
8484 Wilshire Boulevard, Suite 515
Los Angeles, California 90211
Telephone: (310) 393-0070
Facsimile: (212) 253-4272

Hassan A. Zavareei (SBN 181547)
*hzavareei@tzlegal.com*
Kristen G. Simplicio (SBN 263291)
*ksimplicio@tzlegal.com*
**TYCKO & ZAVAREEI LLP**
1828 L Street, Northwest, Suite 1000
Washington, District of Columbia 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950

Sabita J. Soneji (SBN 224262)
*ssoneji@tzlegal.com*
V Chai Oliver Prentice (SBN 309807)
*vprentice@tzlegal.com*
**TYCKO & ZAVAREEI LLP**
1970 Broadway, Suite 1070
Oakland, California 94612
Telephone: (510) 254-6808
Facsimile: (202) 973-0950

*Counsel for Plaintiffs Ronald Chinitz, Sarah Bumpus, Alain Michael,*
*and Rosemary Rodriguez and the Proposed Classes*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| RONALD CHINITZ, SARAH BUMPUS, ALAIN MICHAEL, *and* ROSEMARY RODRIGUEZ, *individually, and on behalf of a class of similarly situated persons*,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>REALOGY HOLDINGS CORP., REALOGY INTERMEDIATE HOLDINGS LLC; REALOGY GROUP LLC; REALOGY SERVICES GROUP LLC; REALOGY BROKERAGE GROUP LLC (f/k/a NRT LLC), *and* MOJO DIALING SOLUTIONS, LLC,<br><br>　　　　　Defendants. | Case No. 3:19-cv-03309-JD<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiffs Ronald Chinitz, Sarah Bumpus, Alain Michael, and Rosemary Rodriguez (collectively, "Plaintiffs"), through their undersigned attorneys, on behalf of themselves and all persons similarly situated, bring the following class action complaint against Realogy Holdings Corp., Realogy Intermediate Holdings LLC, Realogy Group LLC, Realogy Services Group LLC, Realogy Brokerage Group LLC (formerly known as NRT LLC) (collectively, "Realogy Defendants"), and Mojo Dialing Solutions, LLC ("Mojo") (collectively, the Realogy Defendants and Mojo are "Defendants"). Plaintiffs allege as follows:

## INTRODUCTION

1.    The Realogy Defendants operate one of the country's largest real estate conglomerates, owning brands such as Coldwell Banker and Sotheby's International Realty.

2.    The Realogy Defendants contract with tens of thousands of real estate agents across the country (collectively, the "Agents" or "Realogy Agents"), who drive business for the Realogy Defendants by identifying leads and turning those leads into home sales under the Coldwell Banker brand name.

3.    One way the Realogy Agents drive home sales for the Realogy Defendants is to "cold call" residential and cellular telephone numbers directly to market their real estate services and the Coldwell Banker brand to the call recipients.

4.    Realogy Defendants not only authorize and ratify the Agents' practice of cold calling residential and cellular telephone numbers to market Realogy Defendants' real estate services, they also welcome the financial benefits of the increased home sales that the cold calls generate.

5.    In their zeal to find clients and get more commissions, the Realogy Defendants have failed to take sufficient precautions to ensure their Agents do not engage in harassing telephone practices.

6.    In particular, the Realogy Defendants have failed to: (1) adopt sufficient procedures to ensure their Agents do not call potential customers who are on the National Do Not Call Registry ("NDNCR"); (2) maintain an adequate and up-to-date company-specific do-not-call list; or (3) prohibit their Agents from illegally using artificial or prerecorded messages. Each of these practices violates the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227 ("TCPA"), and its implementing

1  regulations.

2        7.     To increase their revenues, the Realogy Defendants encourage and permit their Agents

3  to partner with autodialing companies including Defendant Mojo, which in turn provide the Realogy

4  Agents with the capacity to harass a larger number of people with unwanted calls, including calls using

5  spoofed phone numbers and prerecorded messages.

6        8.     In violation of the TCPA, Mojo also fails to: (1) adopt sufficient procedures to ensure

7  its users, including the Agents, do not call potential customers who are on the NDNCR; or (2) prohibit

8  the Agents from illegally using artificial or prerecorded messages.

9        9.     The Realogy Defendants have thus far evaded accountability for their egregious

10  violations of the TCPA for reasons including that they (1) utilize a complicated corporate structure, by

11  which they abuse the corporate form through a vast network of shell companies, wholly owned

12  subsidiaries, purported franchises, and other entities, and (2) claim their Agents are "independent

13  contractors."

14        10.    While the Realogy Defendants maintain that each Agent is an independent operator

15  who makes cold calls solely on behalf of the individual Agent and/or the shell company with which the

16  Agent is affiliated, the cold calls are in fact on behalf of the Realogy Defendants for reasons including

17  but not limited to the following:

18             a.     The Realogy Defendants profit from every home sale made by each Realogy

19                   Agent and have a financial interest in ensuring the Agents can market

20                   themselves widely and quickly.

21             b.     It is the Realogy Defendants—not their shells or subsidiaries or Agents—that

22                   design the Realogy Agents' cold calling policies and oversee Agent training, and

23                   they have designed and weakly implemented an insufficient process for

24                   "compliance" with the TCPA, which they know the Agents fail to follow. The

25                   Realogy Defendants have authorized and ratified the Agents' failure to follow

26                   the TCPA "compliance" process they designed.

27             c.     The Realogy Defendants know of, approve, and ratify the Agents' conduct in

28                   connection with making the cold calls at issue, including the following: (1) the

Agents' use of Realogy Defendants' intellectual property, such as the "Coldwell Banker" brand name, in making the calls; (2) the Agents holding themselves out during the calls as being affiliated with the Realogy Defendants; and (3) the Agents' use of autodialers and prerecorded messages to make the calls.

    d.    The Realogy Defendants utilize subsidiaries that are undercapitalized and are shell companies.

11.    Plaintiffs and thousands of people nationwide are victims of Defendants' reckless cold calling practices. They received numerous unwanted marketing calls that were for the purpose of advertising the Realogy Defendants' Coldwell Banker real estate business, many of which were initiated by Mojo. These calls were placed without regard to anyone's status on the NDNCR and without regard to prior complaints made to any Defendant. And many of the calls made on behalf of the Realogy Defendants and directed to the Plaintiffs and other victims were automated and utilized prerecorded messages, using dialing software and lead generation lists provided to Realogy Agents by Defendant Mojo.

12.    Because the Realogy Defendants engage in and profit from pervasive cold calling that results in violations of the TCPA and because Mojo willfully enables the Agents' cold calls and spoofing of telephone numbers as well as other tactics that make it difficult for victims of these unwanted calls to stop them, Plaintiffs bring this action to hold Defendants accountable and enjoin their repeated and systemic violations of the TCPA. Plaintiffs bring this class action complaint for damages, restitution, injunctive relief, and any other available legal or equitable remedies, resulting from Defendants' unlawful calls to their residential and mobile telephone lines, in violation of the TCPA and California's Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200 *et seq* ("UCL").

## JURISDICTION AND VENUE

13.    This Court has original jurisdiction over this class action pursuant to 28 U.S.C. § 1332(d) because Plaintiffs and the members of the Classes have suffered aggregate damages exceeding $5,000,000, exclusive of interest and costs, and this case is a class action in which a member of the Classes is a citizen of a state different from Defendants.

14.    This Court also has federal question jurisdiction over this case pursuant to 28 U.S.C. §

1331, on account of Defendants' violation of the TCPA.

15.    Venue is proper in this District under 28 U.S.C. § 1391(b) because significant events giving rise to this case took place in this District.

## PARTIES

### Plaintiffs

16.    Plaintiff Ronald Chinitz is a California citizen residing in Santa Cruz, California.

17.    Plaintiff Sarah Bumpus is a California citizen residing in Shingle Springs, California.

18.    Plaintiff Alain Michael is a California citizen residing in Thousand Oaks, California.

19.    Plaintiff Rosemary Rodriguez is a California citizen residing in Roseville, California.

### Defendant Realogy Holdings Corp.

20.    Defendant Realogy Holdings Corp. ("Realogy Parent") claims to be "the largest full-service residential real estate services company in the United States."[1]

21.    The Realogy Parent is incorporated in the State of Delaware, and its principal place of business is at 175 Park Avenue, Madison, New Jersey 07940 ("Realogy Headquarters").

22.    The Realogy Parent owns and controls a variety of subsidiaries, franchises, shell companies, and other entities, as well as the Coldwell Banker brand, all of which are alter-egos of the Realogy Parent as set forth in Paragraphs 98-116.

### Defendant Realogy Brokerage Group LLC (formerly known as NRT LLC)

23.    Defendant Realogy Brokerage Group LLC ("RBG") was known as NRT LLC until February 2020.

24.    RBG is incorporated in the State of Delaware, and its principal place of business is at the Realogy Headquarters.

25.    RBG is one subsidiary and alter-ego of the Realogy Parent.

26.    RBG owns and controls a variety of subsidiaries, franchises, shell companies, and other entities, as well as the Coldwell Banker brand, all of which are alter-egos of both RBG and the Realogy Parent as set forth in Paragraphs 98-116.

---

[1] *Realogy Announces Strategic Organizational Changes*, WWW.REALOGY.COM (Sept. 5, 2019), https://www.realogy.com/news/2019/09/05/realogy-announces-strategic-organizational-changes (last accessed Apr. 8, 2020).

**Other Realogy Defendants**

27. Defendant Realogy Services Group LLC is incorporated in the State of Delaware, and its principal place of business is at the Realogy Headquarters. It is the owner of RBG.

28. Defendant Realogy Group LLC is incorporated in the State of Delaware, and its principal place of business is at the Realogy Headquarters. It is the owner of Realogy Services Group LLC.

29. Defendant Realogy Intermediary Holdings LLC is incorporated in the State of Delaware, and its principal place of business is at the Realogy Headquarters. It is the owner of Realogy Group LLC, and is owned by Realogy Parent.

30. The legitimate business purposes of Realogy Services Group LLC, Realogy Group LLC, and Realogy Intermediary Holdings LLC (collectively "Realogy Intermediaries") are unknown, and the companies appear to operate as shell companies and alter-egos of RBG and Realogy Parent, as set forth in Paragraphs 98-116.

**Defendant Mojo Dialing Solutions, LLC**

31. Defendant Mojo Dialing Solutions, LLC, is an autodialing system and lead generation platform.

32. Mojo's principal place of business is in Caguas, Puerto Rico.

## FACTUAL BACKGROUND

### A. Overview of the TCPA

33. The TCPA exists to prevent harassing and unwanted calls like the ones described within this complaint and to protect the privacy of citizens like Plaintiffs. "Voluminous consumer complaints about abuses of telephone technology—for example, computerized calls dispatched to private homes—prompted Congress to pass the TCPA." *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 744 (2012).

34. When it passed the TCPA, Congress intended to provide consumers a choice as to how telemarketers may call them and found that "[t]echnologies that might allow consumers to avoid receiving such calls are not universally available, are costly, are unlikely to be enforced, or place an inordinate burden on the consumer." Pub. L. No. 102–243, § 11. Congress also found that "the evidence presented to the Congress indicates that automated or prerecorded calls are a nuisance and an

1    invasion of privacy, regardless of the type of call . . . ." *Id.* at §§ 12-13.

2        35.    Congress also authorized the Federal Communications Commission ("FCC") to

3    establish a national database of consumers who object to receiving "telephone solicitations," which the

4    act defined as commercial sales calls. *Id.* at § 3.

5        36.    In 2003, the FCC promulgated regulations that created the National Do Not

6    Call Registry. *See* 47 C.F.R. § 64.1200(c)(2). The NDNCR is a list containing the residential and cellular

7    telephone numbers of individuals who affirmatively indicate they do not wish to receive

8    unsolicited calls from commercial telemarketers. Do not call registrations must be honored indefinitely.

9    *Id.*

10        37.    In addition to its broad prohibition on calls to any number listed on the NDNCR, the

11    TCPA prohibits *any* telemarketing call "unless such [entity] has  instituted procedures for maintaining a

12    list of persons who request not to receive telemarketing calls by or on  behalf of that [company]." §

13    64.1200(d). The "minimum standards" for these procedures include training of personnel engaged in

14    marketing on the existence and use of an internal do-not-call list, placing an individual's phone number

15    on that internal do-not-call list, and honoring that request within no more than 30 days of its receipt.

16    *Id.* An entity violates the TCPA if it initiates a phone call without having implemented the minimum

17    procedures.

18        38.    The FCC has also expressed concern about the costs that unwanted telemarking calls to

19    cellular phones impose on people, explaining:

20        The Commission has long recognized, and the record in this proceeding supports the
          same conclusion, that wireless customers are charged for incoming calls whether they
21        pay in advance or after the minutes are used. Wireless subscribers who purchase a large
          "bucket" of minutes at a fixed rate nevertheless are charged for those minutes, and for
22        any minutes that exceed the "bucket" allowance. This "bucket" could be exceeded more
          quickly if consumers receive numerous unwanted telemarketing calls.
23
     *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* 18 F.C.C. Rcd. 14014,
24
     14115, ¶ 165 (2003) ("2003 FCC Order").
25
26        39.    Today, 230 million telephone numbers are on the National Do Not Call Registry.[2]

27    _____

28    [2] Simon van Zuylen-Wood, *How Robo-callers Outwitted the Government and Completely Wrecked the Do Not Call List*, WASH. POST (Magazine), Jan. 11, 2018, *available at* https://www.washingtonpost.com/lifestyle/magazine/how-robo-call-moguls-outwitted-the-

40.     Despite the widespread embrace of the NDNCR, companies like Defendants flagrantly ignore the Registry and invade the privacy of consumers with unwanted calls.

41.     In 2015, in an effort to address abuses by autodialers like Mojo, the FCC stated that a person or entity that "initiates" a telephone call under the TCPA may be a person or entity that "take[s] the steps necessary to physically place a telephone call" or that is "so involved in the placing of a specific telephone call as to be deemed to have initiated it." *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act 1991*, 30 FCC Rcd. 7961, 7980, ¶ 30 (2015) ("2015 FCC Order"). To determine violations of the TCPA in the face of this evolving technology, the FCC explained it will:

> look to the totality of the facts and circumstances surrounding the placing of a particular call to determine: 1) who took the steps necessary to physically place the call; and 2) whether another person or entity was so involved in placing the call as to be deemed to have initiated it, considering the goals and purposes of the TCPA.

*Id.* (internal citation omitted).[3]

42.     In applying the second part of that test to determine whether an entity "initiated" the call, the FCC considers (i) the extent to which the entity "willfully enables fraudulent spoofing of telephone numbers" or "assists telemarketers in blocking Caller ID" by offering that functionality to clients and (ii) whether the entity "knowingly allowed [their] client(s) to use that platform for unlawful purposes." *Id.*

43.     The TCPA also provides that liability should be imposed when calls are made on behalf of an entity or person. 47 U.S.C. § 227(c)(5). In its implementing regulations and interpretations, the FCC has determined that this statutory mandate is broad, and that vicarious liability applies where there is apparent authority, actual authority, ratification, or, under the express terms of § 227(c), when unlawful calls are placed "on behalf of" the seller. *In re Joint Pet. Filed by Dish Network*, 28 FCC Rcd. 6574 (2013).

---

government-and-completely-wrecked-the-do-not-call-list/2018/01/09/52c769b6-df7a-11e7-bbd0-9dfb2e37492a_story.html?utm_term=.d13dcc7f7fc6 (last accessed Apr. 8, 2020).

[3] According to the FCC, Congress's goal and purpose in enacting the TCPA was "to protect consumers from the nuisance, invasion of privacy, cost, and inconvenience that auto-dialed and prerecorded calls generate . . . ***regardless of content or the initiator of the call***." 2015 FCC Order, at 7978 ¶ 29 (emphasis added).

**B.    Defendants Have Executed a Nationwide Cold Calling Scheme That Has Unlawfully Harassed People Around the Country**

    **1.    The Realogy Defendants Operate a Large Real Estate Conglomerate That Directs and Supervises Agents to Sell Real Estate Under Their Coldwell Banker Brand on Their Behalf**

44.    The Realogy Defendants are one of the country's largest real estate conglomerates.

45.    Under the RBG umbrella, the Realogy Defendants operate real estate offices under the Coldwell Banker brand, as well as other brands including Coldwell Banker Commercial, Sotheby's International Realty, ZipRealty, The Corcoran Group, and Citi Habitats.

46.    As of April 8, 2020, the Realogy Defendants represented that the RBG subsidiary operates 725 offices nationwide, a large portion of which the Realogy Defendants operate under the "Coldwell Banker" brand name ("Offices" or "Coldwell Banker Offices").[4]

47.    Each Realogy Agent affiliates with one or more of the Coldwell Banker Offices and holds herself out as a real estate agent under one of the brands. For example, the Realogy Defendants operate a Coldwell Banker Office in the Pacific Heights neighborhood of San Francisco, California; that Office has a couple dozen Realogy Agents affiliated with it. The Realogy Defendants, through RBG, to allow each of the Realogy Agents in the Pacific Heights Coldwell Banker Office to have a designated webpage that lists the Agent's contact information, short biography, and the homes for which they represent Coldwell Banker. People interested in buying and selling homes in the San Francisco Bay Area can find a Realogy Agent on the Pacific Heights Coldwell Banker Office website to help them do so. When a home is sold, the payment is purportedly received by one of the shell companies that is an alter-ego of and controlled by the Realogy Defendants; that shell company then pays the Agent a commission while the Realogy Defendants also receive a portion of the profit.

48.    To become a Realogy Agent and be able to help to people buy and sell homes through the Coldwell Banker brand, a person must first apply and be accepted for such a role by the Realogy Defendants, including one or more of their alter-egos. In other words, individuals cannot just simply decide to hold themselves out as being a Coldwell Banker representative; instead, every Realogy Agent has received an affirmative authorization from Realogy Defendants, including one or more of their

---

[4] NRT, *About*, LINKEDIN, https://www.linkedin.com/company/nrt/about/ (last accessed Apr. 8, 2020).

alter-egos, to hold themselves out as such.

49.    Because homeowners typically only contract with one real estate brokerage to assist them in selling their homes, and competition in the real estate market is fierce, Realogy Defendants have an incentive to obtain as many home listings as possible to increase their profits.

50.    Moreover, if a real estate brokerage has a large share of the listings for homes for sale in a given geographic market at a given time, it can use its market power to raise the prices on the homes it has for sale, since fewer competing listings can undercut the real estate brokerage with lower home prices. Due to the Realogy Defendants' large portfolio of brands, they are able to capture large shares of the market in given regions, and they have tremendous incentive to obtain more and more home listings to be able to keep real estate prices high.

51.    The Coldwell Banker Offices do not operate independently. Rather, each one is run in accordance with the Realogy Defendants' policies and procedures to ensure continuity in customer service from Office to Office, and to protect the reputation of the Coldwell Banker brand, which, in turn, ensures more profits for the Realogy Defendants. Each Coldwell Banker Office is run by a managing broker ("Realogy Manager"), who reports to the Realogy Defendants or one or more of the subsidiaries and alter-egos and takes steps to ensure that each Coldwell Banker Office is run in accordance with RBG's policies and procedures. While in some instances, the Offices are separately incorporated, all are nested under RBG, which in turn is nested under Realogy Parent, and are alter-egos of the Realogy Defendants, as set forth in Paragraphs 98-116.

52.    The Realogy Defendants' process for onboarding Realogy Agents is the same across the Coldwell Banker brand, and it is directed by RBG in connection with the Realogy Parent and/or its alter-egos. Individual Realogy Managers at the Coldwell Banker Offices do not handle onboarding, but, rather, the process is done online through a system developed by RBG, with the supervision, knowledge, and/or ratification of the other Realogy Defendants, at the Realogy Headquarters in New Jersey. The entire process takes about an hour.

53.    When new Realogy Agents join the Realogy Defendants by becoming affiliated with a Coldwell Banker Office, they receive access to a password-protected intranet, extranet.nrtinc.com, which is managed and operated by RBG ("RBG Intranet") and can only be accessed by those affiliated

with RBG. The Realogy Agents also receive standardized onboarding packages that are prepared by RBG. The package includes information such as the commission schedule, information on how to use RBG's technology, and RBG policies on compliance with fair housing regulations. The onboarding package also includes a short "Do Not Contact Policy" that is prepared and periodically updated by RBG, discussed in more detail in Paragraphs 85-87.

**2.    The Realogy Defendants Know That the Realogy Agents Engage in Cold Calling to Sell Real Estate on Their Behalf**

54.    The Realogy Defendants know that it is standard practice in the real estate field to use cold calling and telephone solicitation to generate new business, and they know and expect that their Realogy Agents will employ these strategies when selling real estate on their behalf.

55.    As is typical to the industry and known to Realogy Defendants and their alter-egos, Realogy Agents often scan real estate listings that are from competitors, are for sale by owner ("FSBO"), or are expired to identify individuals who might be in the market for a new real estate agent, and they cold call these homeowners to try to convince them to retain the Agent to list the property.

56.    Realogy Agents can also sign up for services that provide them with listings and contact information. As is common to the industry, Realogy Agents will mine other sources of information for potential home buyers' or sellers' phone numbers, for example, by forming relationships with third parties, such as Cole Realty, who supply the Realogy Agents with phone numbers.

57.    Realogy Agents, like others in the industry, also search for prospective homebuyers, often buying lists of prospective customers from real estate aggregator services, such zillow.com or realtor.com.

58.    And as discussed in more detail in Paragraphs 75-78, Realogy Agents use autodialer systems to generate leads under RBG's supervision.

59.    In making cold calls, either directly or through autodialers as discussed in Paragraph 75-78, Realogy Agents affiliated with the Coldwell Banker brand always identify that they are calling on behalf of Coldwell Banker. The Realogy Defendants know that the Coldwell Banker brand is a critical piece of information to prospective customers. Real estate is a massive investment that involves the exchange and disclosure of highly sensitive personal information. The Realogy Defendants know the

Coldwell Banker brand is essential to building client trust with such a sensitive transaction. Thus, the Realogy Defendants know that to increase their profits, they must authorize the Realogy Agents to hold themselves out as calling on the Realogy Defendants' behalf by referencing the Coldwell Banker brand, and they have in fact so authorized and ratified. Accordingly, in every answered call placed by a Realogy Agent affiliated with Coldwell Banker, the Realogy Agent identifies the Coldwell Banker brand, on whose behalf they have placed the call, under the knowing approval of the Realogy Defendants.

60.    Realogy Defendants also know that while trust in the Coldwell Banker brand is a critical component to a potential client's willingness to utilize their services, so is a personal connection with the real estate agent. Thus, Realogy Defendants know that if a potential customer rejects one of their Agents on a cold call, that same customer might hire a different Realogy Agent who calls a day later if the customer clicks better with that person. Thus, to increase their chances of obtaining a listing or potential buyer and thereby profiting, Realogy Defendants have a financial incentive to ensure that potential customers receive calls about Coldwell Banker from more than one Realogy Agent.

61.    Because the Coldwell Banker brand is mentioned in every call received, reasonable people who receive these calls believe and understand that the call is being placed by, and on behalf of, Coldwell Banker and not only by the individual Realogy Agent with whom they are speaking. Realogy Defendants know that this is how call recipients understand who the caller is.

### 3.    Realogy Defendants Know, Ratify, and Authorize Their Agents to Use Autodialing Software by Mojo to Dial Millions of Numbers

62.    Because placing individual calls one by one can often be cumbersome and time consuming, those working to drive business in the real estate industry often use autodialer platforms.

63.    Autodialers provide software that permits businesses to: (1) increase the number of people they call in a given time period, (2) deliver prerecorded messages on a widespread basis to large numbers of recipients over the phone; and (3) modify the phone number that will appear on the recipient's caller identification display, as described in more detail in Paragraphs 71-74.

64.    By using autodialing, callers can reach far more people than they would if they were directly calling.

65.    As a result, the use of autodialers is common in the real estate industry.

a.    **The Mojo Autodialer Allows Realogy Agents to Reach a Multitude of Targets Over the Phone Using Shady Practices.**

66.    Defendant Mojo provides autodialing software to Realogy Agents so that some of the calls to Plaintiffs and the members of the Classes could be made at a high rate of volume through the use of an automatic telephone dialing system on behalf of the Realogy Defendants.

67.    Mojo's system provides the Agents working on behalf of the Realogy Defendants with the ability to autodial up to 300 calls per hour per agent with its multi-line dialer and up to 85 calls per hour with its single line dialer.

68.    Mojo also sells lists of phone numbers to Realogy Agents, who purchase these leads to quickly identify possible customers on behalf of the Realogy Defendants. The telephone lists offered for sale to real estate agents such as Realogy Agents include Expired Property Leads, For Sale By Owner Leads, For Rent By Owner Leads, Neighborhood Search for Just Listed/Just Sold Cold-Calling Data, and Reverse Look-up Phone Services ("Mojo Lists" or "Lists"). These Lists provide telephone numbers and other contact information for homeowners and residents with specific characteristics. For example, the Expired Property Leads service provides telephone numbers for homeowners who listed a property but did not complete a sale. The Neighborhood Search and related Free Form Search services provide telephone numbers for homeowners or residents living within user-specified bounds. Because the Lists are curated around target audiences, they are a commonly used sales tool in the real estate industry.

69.    When a Realogy Agent uses Mojo's autodialer system, it works as follows. After signing up for Mojo's services, Mojo provides the Realogy Agent with a designated phone number and access to Mojo's web-based platform. When Realogy Agents want to initiate autodialing, they log into Mojo's platform and call the designated phone number. Once connected, Mojo's autodialer begins dialing phone numbers for the caller, pulling those numbers directly from the Mojo Lists (or phone number lists from other sources) purchased by the Realogy Agent. This practice speeds up the number of calls the Realogy Agent is able to make in a given period of time. Because Mojo designed its autodialer system to be able to maintain three calls at once for a single caller, it is able to bypass time spent hanging up and starting over each time there is a busy signal or nobody answers and easily and quickly

connect the Realogy Agents to live people. The result is that a Realogy Agent is continuously being connected to people on the Mojo List without losing time. When a call recipient hangs up on the Realogy Agent, Mojo's autodialer immediately and seamlessly connects the Agent to a new recipient. The result is that Realogy Agents are able to dial hundreds of people in a fraction of the time they would without Mojo's services.

70.     Because Mojo dials three numbers at once, occasionally, two recipients answer at the same time. Mojo permits Realogy Agents to record a prerecorded voice message, which Mojo automatically plays to one recipient while the Realogy Agent is on a call with another person. Mojo saves and stores the prerecorded voice messages in its system for these scenarios.

71.     Because caller ID services are increasingly common, and it is common knowledge that most people do not answer calls from phone numbers that look suspicious or unfamiliar, Mojo provides Realogy Agents the option to "mask" or "spoof" their real phone numbers when the calls are placed. In other words, Mojo enables the Realogy Agent to cause an alternative or fake number to appear on the recipient's caller ID display.

72.     Indeed, Mojo touts the lack of traceability of phone masking as a selling point:

> We STRONGLY suggest this method when calling on Expired listings right now, inventory is short and these lead types are being called on heavily. Rotating your office number, home number and cell number gives you a level of anonymity that will allow you to cycle the lead multiple times before showing up on their 'irritation' meter. Oh, and if you call a lead who is already irritated with you because of all the other agents calling them, simply let them know the calls will stop after you list their home![5]

73.     Autodialers such as Mojo also permit users to select what appears on the call recipients' caller ID display. Thus, instead of, or in conjunction with spoofing their number, Agents can request that the words "Coldwell Banker" be displayed on caller IDs in connection with the calls they place through autodialing software. Realogy Defendants have never instructed Agents not to use the Coldwell Banker trademark in this way; instead they know, ratify, and approve this usage by their Agents on their behalf.

---

[5] Mojo, *How Realtors are using our Real Estate Dialer, Mojo Voice and Mojo ID to maximize their prospecting efforts*, WWW.MOJOSELLS.COM (June 13, 2013), https://www.mojosells.com/blog/realtors-are-using-mojo-dialer-mojo-voice-and-mojo-id-to-maximize-their-prospecting-efforts/ (last accessed Apr. 8, 2020).

74.     All Defendants know that masking numbers is an unfair, and arguably illegal, practice, but Mojo provides this service to Realogy Agents with the Realogy Defendants' knowledge, ratification, and approval. Indeed, in a blogpost on its website, Mojo notes, "Sure, there is an argument among prospectors that spoofing (displaying bogey CID) your caller ID is the better method because ultimately, the goal is to land live contacts while dialing, so worrying about the call back shouldn't be important and at a minimum, you won't get all the angry people calling you back."[6]

### b.     Realogy Defendants Know, Ratify, and Authorize the Use of Mojo by Realogy Agents to Increase Their Profits

75.     The Realogy Defendants know, authorize, and ratify the Realogy Agents' usage of Mojo and other autodialing systems, as well as the Mojo Lists and other pre-packaged lists of phone numbers available for purchase by entities such as Cole Realty.

76.     First, as set forth in Paragraphs 63-68, use of autodialers is common in the sales and real estate industries. The Realogy Defendants, as leaders in the real estate field, are familiar with sales practices and this trend. Nevertheless, the Realogy Defendants have never prohibited the Agents from using autodialers, nor have the Realogy Defendants ever instructed their alter-egos, including the Coldwell Banker Offices, to prohibit the Realogy Agents from this practice.

77.     Moreover, as set forth in Paragraph 59 and 73, the Realogy Defendants also know that when using the autodialers, the Realogy Agents identify themselves as being associated with the Coldwell Banker brand, both when speaking directly to a caller and when leaving pre-recorded messages. The Realogy Defendants have never prohibited Realogy Agents from engaging in this practice, despite knowing it is widespread, and continue to allow the practice to continue, as they profit when the Realogy Agents secure leads that result in a purchase or sale of real estate.

78.     Next, the Realogy Defendants, and in particular, RBG, promote training programs to the Realogy Agents, while knowing those training programs encourage the use of autodialers. In particular, in the real estate industry, agents looking to boost their leads frequently attend lead generation workshops, the most popular of which are run by brothers Mike and Tom Ferry. These

---

[6] *Id.*

workshops encourage participants to use autodialers, such as Mojo. RBG knows its agents attend these workshops, and the Realogy Defendants (by and through their alter-ego subsidiaries) have even partnered or sponsored these workshops or suggested that Realogy Agents attend. For example, in 2015, RBG partnered with Tom Ferry to develop a series of coaching programs for the Realogy Agents working on behalf of the Coldwell Banker brand.[7]

### 4.     RBG and Mojo Routinely Violate the TCPA.

79.     Defendants' business practices violate the TCPA, as they cause people: (1) to be called, often repeatedly, notwithstanding the fact that their numbers are listed on the NDNCR; (2) to be called, often repeatedly, despite the fact that they requested that RBG or one of its alter-egos no longer call them; and (3) to receive pre-recorded messages.

### a.     Defendants' Practices Result in Harassing Phone Calls to People on the National Do Not Call Registry.

80.     The FCC's regulations at 47 C.F.R. § 64.1200(c)(2) prohibit Defendants from placing calls to numbers on the NDNCR, but Defendants do nothing to ensure that the Realogy Agents do not place any such calls. Defendants know that their cold-calling practices have caused and will cause unwanted calls to people on the NDNCR but allow the calls to continue to increase their profits.

81.     When Realogy Agents place calls through the Mojo autodialer platform, including but not limited to situations when they use the Mojo Lists (or other similar lists), Mojo calls people on the NDNCR in violation of 47 U.S.C. § 64.1200(c)(2). Mojo does not vet lists provided by Realogy Agents for Mojo to dial by comparing them to the NDNCR. And the Mojo Lists that Mojo prepares are being continuously prepared from information culled from a wide variety of sources, and Mojo does not consult the NDNCR for every number it includes in those Lists. Even if Mojo does consult the NDNCR, it does not always do so in the 31-day period before it dials a given number.

82.     Instead, Mojo tells its customers, including the Realogy Agents, to investigate the numbers before dialing. Mojo knows, however, that its customers rarely, if ever, consult the Registry

---

[7] Coldwell Banker Real Estate LLC, *Coldwell Banker Real Estate Partners with Tom Ferry to Provide a Variety of Customized Agent Coaching Programs*, WWW.PRNEWSWIRE (Sept. 22, 2015), https://www.prnewswire.com/news-releases/coldwell-banker-real-estate-partners-with-tom-ferry-to-provide-a-variety-of-customized-agent-coaching-programs-300146449.html (last accessed Apr. 8, 2020).

before calling and using its autodial platform. Nevertheless, Mojo has no written procedures, training programs, list of numbers not to call, or any other method for preventing access to numbers on NDNCR through its platform, and as such, routinely violates the TCPA by initiating calls to people on the Registry.

83.     Moreover, the Realogy Defendants have not taken adequate steps to prevent Realogy Agents from calling people on the NDNCR generally, regardless of whether the Realogy Agents use Mojo. In particular, given what the Realogy Defendants know about the tools their Agents use to place calls, the Realogy Defendants have not adopted sufficient written procedures, training programs, or a process that they know will actually prevent Realogy Agents from calling numbers on the NDNCR.

84.     First, the Realogy Defendants' written procedures are inadequate and do not comply with 47 U.S.C. § 64.1200(c)(2)(i)(A). These procedures, including the Do Not Contact Guide, are developed by RBG with the knowledge, approval, and/or ratification of the other Realogy Defendants, who benefit from the lax and inadequate policies.

85.     The Do Not Contact Guide is brief and merely presents a few screen shots of how an agent is to check phone numbers to see if they were designated on the NDNCR or if they are on the company's Do Not Call lists. The Guide does not explain to Realogy Agents why this step is critical or advise them that such calls would be illegal.

86.     The Realogy Defendants' Do Not Call Guide also does not discuss the use of autodialers. Not only do the Realogy Defendants fail to prohibit their use in that Guide or anywhere else, but they do not even provide training to Realogy Agents on how to comply with the Do Not Call guidelines if using autodialers such as Mojo.

87.     And while the Realogy Defendants' Do Not Contact Guide includes some boilerplate about how Realogy Agents are to check the guide for all numbers they call, the Realogy Defendants do not actually do anything to enforce violations of this rule. Indeed, RBG has never made it a practice to terminate agents for failing to comply with the procedures set forth in the Do Not Contact Guide or for calling someone on the NDNCR. As the Realogy Defendants' business model makes it all but certain that every Realogy Agent has called someone on the NDNCR on multiple occasions, RBG has never made it a practice to reprimand offenders of these policies. The other Realogy Defendants know,

1    authorize, and/or ratify RBG's ongoing failure to enforce its weak policies.

2        88.    Second, the Realogy Defendants' training is inadequate and does not comply with 47

3    U.S.C. § 64.1200(c)(2)(i)(B). While the Realogy Defendants require onboarding sales associates to

4    certify at the end of the onboarding process that they have read the Do Not Contact Policy and Do

5    Not Contact Guide, the Realogy Defendants do not require the Realogy Managers or anyone else at the

6    company to speak with the new Realogy Agents about the Policy or Guide. Nor do the Realogy

7    Defendants require that the Realogy Agent be supervised during the onboarding process, *i.e.*, nobody at

8    the company ensures that the Realogy Agent has in fact read the Do Not Contact Policy or the Do Not

9    Contact Guide. This training is developed by RBG with the knowledge, approval, and/or ratification of

10   the other Realogy Defendants, who benefit from the lax and inadequate policies.

11       89.    Third, none of the Realogy Defendants maintain and record a list of telephone numbers

12   that their Agents may not contact pursuant to 47 U.S.C. § 64.1200(c)(2)(i)(C). While the Realogy

13   Defendants, through RBG, maintain a cumbersome process by which Agents may enter numbers that

14   requested not to be called into the internal Do Not Call list, the Realogy Defendants know that Realogy

15   Agents routinely do not actually input numbers from people who request not to call.

16       90.    Finally, the Realogy Defendants do not use any process to prevent telephone

17   solicitations of any number on the NDNCR and do not maintain records documenting their process

18   pursuant to 47 U.S.C. § 64.1200(c)(2)(i)(D), or to the extent they attempt to use such processes, they

19   remain out of compliance with NDNCR regulations.

20              **b.    Realogy Defendants Place Cold Calls Despite Not Having Written
21                     Procedures for Maintaining a List of People Who Request Not to
                       Receive Such Calls**

22       91.    Realogy Defendants are required under 47 C.F.R. § 64.1200(d)(1) to institute procedures

23   for maintaining a list of people who request not to receive telemarketing calls, but none of the Realogy

24   Defendants comply with this requirement.

25       92.    Because of the nature of Mojo's autodialing software, it cannot actually maintain such a

26   list, as it does not ever speak to call recipients directly, and recipients would not know to call Mojo to

27   request to be placed on any internal Mojo do not call list.

28       93.    As discussed in Paragraphs 85-87, the Realogy Defendants have adopted only

1    inadequate procedures to comply with 47 U.S.C. § 64.1200(d).

2        94.    Accordingly, individuals or entities making a call for telemarketing purposes for or on

3    behalf of the Realogy Defendants, including through Mojo, do not record any request from a telephone

4    subscriber not to receive calls and do not place the subscriber's name and number on an internal do not

5    call list pursuant to 47 U.S.C. § 64.1200(d)(3), or to the extent such requests are recorded, the Realogy

6    Defendants remain out of compliance with the FCC's regulations.

7            **c.    Defendants Use Prerecorded Messages**

8        95.    Mojo and the Realogy Defendants both violate 47 U.S.C. § 227(b)(1)(B) when Realogy

9    Agents use Mojo's autodial service to leave prerecorded messages, as described in Paragraph 69-70.

10        96.    The Realogy Defendants also violate § 227(b)(1)(B) when their Agents use other

11    autodial platforms to cold call potential leads.

12        97.    The calls described herein are not placed for emergency purposes.

13        **C.    The Realogy Defendants Have Abused the Corporate Form, and Piercing the Corporate Veil Is in The Interest of Justice**

14

15        98.    The Realogy Defendants utilize a complicated web of divisions, subsidiaries, franchises,

16    and shell companies and rely heavily on the Coldwell Banker brand and the Realogy Agents to conduct

17    business. They operate as alter-egos of each other and their related subsidiaries, divisions, franchises,

18    and shell companies, and together these entities authorize and ratify the work, including the cold call

19    strategies, of the Realogy Agents performed on their behalf for their profits.

20        99.    The Realogy Defendants' public materials provide little information to be able to

21    discern how exactly they are structured. But what is known suggests that they abuse the corporate form,

22    and unless the corporate veil is pierced, the Realogy Defendants might successfully avoid accountability

23    for their TCPA violations through their use of shell companies, confusing nomenclature, and/or the

24    attempted classification of their affiliated agents, the Realogy Agents, as "independent contractors."

25        100.    As detailed herein, the Realogy Defendants appear to operate through a variety of

26    undercapitalized shell corporations and wholly owned subsidiaries that exchange resources and do not

27    observe the corporate form. To accomplish this, the Realogy Defendants share the same base of

28    operations at the Realogy Headquarters with most, if not all, of their subsidiary companies. In sharing

-19-

an address, employees of one can work for all, which allows the companies to share officers and directors, procure services and resources from one another without adequate consideration, and maintain shared records.

101.    For example, a search for "Realogy" LLCs on the California's Secretary of State's business search reveals five such entities: RBG, Realogy Franchise Group LLC, Realogy Global Services LLC, Realogy Operations LLC, and Realogy Title Group LLC. All five are listed as being located at the Realogy Headquarters, and in the most recent filing for each, all five identify Seth I. Truitt as their Senior Vice President and Assistant Secretary. Seth I. Truitt however, is employed by the Realogy Parent; he identifies himself on his LinkedIn page as the "Senior Vice President and Assistant Corporate Secretary at Realogy Holdings Corp."[8] Given that Mr. Truitt holds himself out as an officer of RBG and other Realogy shells and alter-egos, it is unlikely that the operations of any of these companies requires any time, suggesting they are shells or are merely alter-egos and extensions of the Realogy Parent. To the extent time is spent, it is unknown whether the entities compensates Mr. Truitt for his time. If they did, the mere fact that each does not have its own officers indicates a lack of corporate independence and disregard for corporate form, and if they did not, it suggests that each is undercapitalized in that they cannot pay for officers.

102.    The Intermediary Realogy Defendants' standalone legitimate business purpose is unknown, and there is no public evidence that any operate as separate entities. Rather, their use of a shared address and shared employees suggest that they commingle assets and/or are undercapitalized.

103.    The Realogy Defendants also operate a variety of  shells and subsidiaries, including those described in the preceding paragraphs, and the entity NRT West, Inc. ("NRT West"). The Realogy Defendants claim NRT West is an RBG-owned subsidiary that operates in the Northern California region only, in contrast to other RBG-owned subsidiaries or Coldwell Banker franchises operating in other geographic regions. NRT West lists its mailing address as the Realogy Headquarters, though it has not registered to do business in New Jersey.[9] As is typical of an undercapitalized shell company, until 2018, NRT West's leadership was largely individuals based at the Realogy Headquarters

---

[8] https://www.linkedin.com/in/seth-truwit-426795162/ (last accessed April 11, 2020).

[9] NRT West's headquarters are in Concord, California.

and who held other jobs for other subsidiaries in the Realogy Defendants' portfolio of shell companies. In its most recent filing with the Secretary of State of California, like the Realogy Defendants and their other shell companies and alter-egos, Seth I Truitt is identified as the Secretary. And in 2018its president was M. Ryan Gorman, which Realogy Parent describes as the President and CEO of Coldwell Banker Real Estate LLC, the President and CEO of RBG, and the former Senior Vice President, Strategic Operations, of RBG.[10] Given that Mr. Truitt and Mr. Gorman hold themselves out as officers of various Realogy entities, it is unlikely that the operations of all of these companies requires any time, suggesting they are shells or are merely alter-egos and extensions of the Realogy Parent and/or RBG. To the extent time is spent, it is unknown whether the entities compensates these people for their time. If they did, the mere fact that each does not have its own officers indicates a lack of corporate independence and disregard for corporate form, and if they did not, it suggests that each are undercapitalized in that they cannot pay for officers.

104.    The Realogy Defendants have operated a variety of other entities in California, including 26 corporations containing the name "Coldwell Banker," seven LLCs containing the name "Coldwell Banker," nine corporations containing the name "Realogy," five LLCs containing the name "Realogy," as well as NRT Realvitalize Inc., NRT California Inc., NRT West Rents Inc., NRT Arizona LLC, NRT New York LLC, NRT Property Management California LLC, NRT Property Management Texas LLC, NRT Property Care LLC, and many more. Each of these entities appears to be an alter-ego of the Realogy Defendants, and many list Seth I. Truitt as their Senior Vice President and/or Secretary, and many operate from the Realogy Headquarters. Though their owners cannot be completely discerned, nearly all appear to be in the sole control of one or more of the Realogy Defendants. Of course, despite telling the State of California that they located at the Realogy Headquarters in New Jersey, at least a few do not appear to be registered to do business in New Jersey, per a search there on April 11, 2020.

105.    In a deposition that was taken pursuant to Federal Rule of Civil Procedure 30(b)(6) in *Chinitz v. NRT West, Inc.*, No. 5:18-cv-06100-NC (N.D. Cal.) ("*NRT West*"), defendant NRT West produced as its person most knowledgeable Lynn Murtagh, an employee of RBG (then NRT LLC), not

---

[10] *M. Ryan Gorman: President and Chief Executive Officer, Coldwell Banker*, WWW.REALOGY.COM (2020), https://www.realogy.com/about/leadership-team/executive-officers/ryan-gorman (last accessed Apr. 8, 2020).

NRT West.

106.    Ms. Murtagh in turn stated that NRT West had a president, Mike James.

107.    If Mike James was in fact the NRT West president in 2019, that role is not apparent from his Coldwell Banker webpage, which contains no reference to NRT West.[11] Instead, that webpage states at the bottom that the company involved is "Coldwell Banker Real Estate LLC," which it describes as "A Realogy Company."

108.    The Realogy Defendants' employees' lack of understanding of their corporate operations was apparent in other ways in Ms. Murtagh's deposition. For example, she could not name all of the companies controlled by RBG, nor could she say with certainty where geographically NRT West operated. While this lack of knowledge may have been blamed on it being outside of the scope, if NRT West had real officers and employees, surely they would have known the states in which a small, regional subsidiary operated. And when she was asked to explain what NRT West did, she stated that NRT West "operates as Coldwell Banker in Northern California." But while there are several Coldwell Banker offices in the City of San Francisco, searches for "NRT" and "NRT West," on San Francisco County's Fictitious Business database do not reveal that NRT West has ever taken steps to actually operate as Coldwell Banker there. And a search for the real entity controlling "Coldwell Banker" in that same database turns up nothing.

109.    At the time of her 2019 deposition, Ms. Murtagh was the National Director of Independent Contractor Relations for RBG (then named NRT LLC). Her role was to be a liaison between RBG and the Realogy Agents. She stated that RBG prepares its Do Not Call Guide and other training and background information for all Realogy Agents authorized to sell homes under the Coldwell Banker brand, and maintains the certifications that all Realogy Agents must sign, as described in Paragraph 88. Thus, the Realogy Agents do not take direction or training from the Coldwell Banker Offices, or from Realogy and RBG subsidiaries such as NRT West, but instead obtain their instructions from RBG and/or other entities at the Realogy Headquarters operating as the Realogy Defendants' alter-egos on behalf of the Realogy Defendants.

---

[11] *Mike James*, WWW.COLDWELLBANKER.COM (2020) https://www.coldwellbanker.com/Coldwell-Banker-Residential-Brokerage-_-Northern-California-12607c/Mike-James-4864223a (last accessed Apr. 8, 2020).

1    110.    The Realogy Defendants' corporate structure recently became even more confusing. On

2    September 5, 2019, the Realogy Defendants announced a reorganization, stating that the Realogy Parent

3    would undertake "strategic organizational changes designed to accelerate growth for all agents and

4    franchises affiliated with its seven well-known brands."[12] Among the changes made would be "the

5    integration of the Coldwell Banker® affiliate network and company-owned brokerage."[13]

6    111.    On February 25, 2020, in a press release regarding its "On-going Corporate

7    Simplification Efforts," the Realogy Parent stated that it would use a "new naming convention" that

8    would focus on amplifying the parent brand, including changing names from NRT LLC to "Realogy

9    Brokerage Group," the subsidiary which the Realogy Parent describes as operating the company's

10   brands.[14] The Realogy Parent also revealed that it would retain the "broker-to-broker business as well as

11   the Realogy Broker Network, which generate high-quality, high-converting leads for Realogy's affiliated

12   agents and franchise."[15] The February 25, 2020, release stated that the Realogy Parent controls yet

13   another subsidiary or division – the "Realogy Broker Network" – that is separate from RBG (aka the

14   new Realogy Brokerage Group) – and that it is the Realogy Broker Network, and not RBG, that

15   supports the lead generation efforts of the Realogy Agents.[16] Thus, this confusing structure and

16   statement suggest that it is possible that the Realogy Agents might be working on behalf of RBG

17   (Realogy Brokerage Group) in some capacity, but also might be working on behalf of the Realogy

18   Parent subsidiary the Realogy Broker Network when generating leads. Moreover, the goal of

19   "simplification" further suggests that the Realogy Defendants may be rearranging business functions

20   across subsidiaries and alter-egos or otherwise shedding certain intermediary and/or shell companies,

21   and that the overall corporate form, including the identities of the companies controlling the Agents,

22   training and overseeing the Agents, and profiting from their work is a state of flux.

23   112.    Like Ms. Murtagh a year ago, Realogy Defendants in general appear to be confused as to

24

25   [12] *Realogy Announces Strategic Organizational Changes, supra* note 1.
     [13] *Id.*

26   [14] *Realogy Renames Operating Segments: Amidst On-going Corporate Simplification Efforts, New Naming Highlights Core Businesses and Amplifies Parent Brand,* www.Realogy.com (Feb. 25, 2020),

27   https://www.realogy.com/news/2020/02/25/realogy-renames-operating-segments (last accessed Apr. 8, 2020).

28   [15] *Id.*
     [16] *Id.*

how their business is structured in light of this reorganization. Consumers who visit the Coldwell

Banker brand's websites are presented with a dizzying array of corporations and subsidiaries, suggesting

that even Realogy Defendants do not know which entity controls what.

113.    For example, a person who wants to complain about harassing calls from "Coldwell

Banker" who conducted research on the company would not be able to identify the responsible party.

First, if they visited the Coldwell Banker website at www.coldwellbanker.com, they would be presented

with myriad entities. For example:

- each webpage at Coldwellbanker.com contains a line at the bottom that states (emphasis added):

  > Coldwell Banker and the Coldwell Banker logos are trademarks of **Coldwell Banker Real Estate LLC**. The Coldwell Banker® System is comprised of company owned offices which are owned by a **subsidiary of Realogy Brokerage Group LLC** and franchised offices which are independently owned and operated.

- The privacy policy on the Coldwellbanker.com website states that it is the policy of "**Coldwell Banker LLC** and our **affiliate and subsidiary companies**," the latter of which are not identified.[17]

- On the webpage that is accessible when a person visits the link called "Do Not Sell My Info" on Coldwellbanker.com, the person is directed to the privacy policy on the **realogy.com** website; that policy is a policy of **Realogy Holdings Corp.** and unnamed "**affiliate and subsidiary companies**."

- The Terms of Use page on Coldwellbanker.com provides an individual no further clues as to who is involved; that agreement appears to be between the user and "**Affiliated Entities**" which Realogy Defendants have vaguely defined as "collectively, us, Brand and our and Brand's parent, subsidiaries, affiliates, and, where applicable, our and their service providers and licensors."[18] And despite the capitalization, "Brand" is not defined."[19]

- On the accessibility statement provided to people with disabilities, they are advised to contact ***accessibility@realogy.com***, not an email address using the Coldwellbanker.com domain.[20]

- The "About Us" page, like most of the pages on the website, does not contain the name of a single legal entity, using only the Coldwell Banker brand.

If that person then went to research on the holder of the domain www.coldwellbanker.com on the

---

[17] *Privacy Policy*, WWW.COLDWELLBANKER.COM (Dec. 19, 2019) (emphasis added), https://www.coldwellbanker.com/footer_pages/privacy.jsp (last accessed Apr. 8, 2020).
[18] *Terms of Use*, WWW.COLDWELLBANKER.COM (Oct. 25, 2016) (emphasis added), https://www.coldwellbanker.com/footer_pages/terms_of_use.jsp (last accessed Apr. 8, 2020).
[19] *Id.*
[20] *Accessibility Statement*, WWW.COLDWELLBANKER.COM (2020) (emphasis added), https://www.coldwellbanker.com/footer_pages/ada.jsp (last accessed Apr. 8, 2020).

1  domain lookup tool who.is, they would see that the domain is owned by **Coldwell Banker Real**
2  **Estate LLC**, which is located at the Realogy Headquarters, and contains the contact email address of
3  *rfgdns@realogy.com*. The realogy.com domain in turn is registered to the **Realogy Group LLC**, also
4  located at the Realogy Headquarters. And if that person looked up "Coldwell Banker" on California's
5  Secretary of State's business search website, they would find **over 30 Coldwell Banker entities**. And as
6  noted in Paragraph 108, that person would not be able to successfully search fictitious name directories
7  in San Francisco (and presumably in other cities) for any more information on what "Coldwell Banker"
8  means. If that person further narrowed in on **Coldwell Banker Real Estate LLC** and **Coldwell**
9  **Banker LLC,** they would see that they too are located at the Realogy Headquarters and list Seth I.
10  Truitt as their Senior Vice President and Secretary in their most recent filings to the California Secretary
11  of State, which ultimately suggests that his employer, the Realogy Parent, is who actually controls these
12  entities.

13      114.    Any recipient of a call from a Realogy Agent who identified himself as calling on behalf
14  of Coldwell Banker would have no way to identify which entity was responsible. There is simply no way
15  to tell if the call was on behalf of Realogy Holdings Corp., Coldwell Banker Real Estate LLC, Coldwell
16  Banker LLC, the Realogy Brokerage Group LLC, the unnamed subsidiary of Realogy Brokerage Group
17  LLC, the dozens of other Coldwell Banker entities, or any other unnamed affiliate and subsidiary
18  companies.

19      115.    The Realogy Defendants' confusing structure appears to be, at least in part, intentionally
20  designed to confuse and obfuscate and thereby limit liability and exposure. It makes it impossible or
21  near impossible for a victim of a tort committed under the Coldwell Banker brand name to identify the
22  responsible party. It directs those victims only to small subsidiaries that appear to be undercapitalized,
23  as they share offices with and/or borrow their primary officer – Seth I. Truitt – from the Realogy
24  Parent, suggesting they are not capitalized in such a way so as to permit them to maintain their own
25  offices and officers, and that the corporate form is abused as they do not appear to have any true
26  independence from the Realogy Parent. The Realogy Defendants then have those subsidiaries either
27  directly retain "independent contractors," or alternatively, create even more subsidiaries underneath
28  them, which in turn retain those "independent contractors." Those "independent contractors," i,e, the

Realogy Agents, then commit tens of thousands of torts when they engage in autodialing and harassing calls in violation of the TCPA on the behalf of the Realogy Defendants. And the Realogy Defendants have created this confusing corporate structure while knowing that neither the individual Agents making the calls on their behalf, nor the subsidiaries and shells with which those Agents contract, have the capital to reimburse victims of those TCPA violations. Thus, by structuring their enterprise in this way, the Realogy Defendants have created a structure which permits them to profit from the legal violations for which they maintain they should not be held responsible.

116.    Realogy Defendants' confusing corporate structure and use of multiple entities suggests they abuse the corporate form and work as alter-egos of each other. Additional information about the Realogy Defendants' corporate structure and each entity's precise role in the false advertising and misconduct described herein is not within Plaintiffs' knowledge, possession, custody, or control, or to the extent it is, it is unreliable as the recent, ongoing restructuring described in Paragraph 111 makes it impossible to discern what is an accurate depiction absent discovery.

### D.    Numerous Individuals Have Been Harassed by Defendants.

#### 1.    Plaintiff Ronald Chinitz's Experiences

117.    On June 28, 2003, shortly after the creation of the National Do Not Call Registry, Mr. Chinitz placed his residential landline telephone number (831-420-####) on the Registry.

118.    On February 10, 2018, Mr. Chinitz placed a residential VOIP line (408-502-####) on the National Do Not Call Registry.

119.    On or around May 17, 2017, Mr. Chinitz, though his real estate agent, Katy Cowley, listed his home in Santa Cruz, California, for sale.

120.    Ms. Cowley placed the listing on an online real estate listing portal, the Multiple Listing Service ("MLS").

121.    The MLS listing for Mr. Chinitz's home expired on November 1, 2017.

122.    The expired listing included a private instruction to real estate agents that read, "OWNERS HAVE REQUESTED NOT TO BE CONTACTED."

123.    On or shortly after November 1, 2017—the day the MLS listing expired—Mr. Chinitz received a number of unwanted calls, -- more than two – from Realogy Agents who each represented

the calls were from "Coldwell Banker." At least one such call was initiated by and through Mojo's autodialer platform; another went through a third-party call center in the Philippines. At least one such call was a pre-recorded voicemail. One or more Realogy Agents placed these calls to each of Mr. Chinitz's two residential telephone numbers.

124.    Each time he received a call from a Realogy Agent representing that they were calling on behalf of "Coldwell Banker," Mr. Chinitz informed the Realogy Agent that he did not wish to receive any calls from "Coldwell Banker."

125.    Despite his initial requests, Mr. Chinitz continued to receive unwanted marketing calls from Realogy Agents who represented the calls were made by or on behalf of "Coldwell Banker." On more than one occasion, Mr. Chinitz repeated the request to stop calling him.

126.    On more than one occasion, Mr. Chinitz received a call from a Realogy Agent, who used a prerecorded message that stated their affiliation with "Coldwell Banker" and stated there was a bad connection and that the person would call Mr. Chinitz back. After each call with the prerecorded message ended, Mr. Chinitz would then receive a call from a Realogy Agent, who noted an affiliation with "Coldwell Banker." The Realogy Agent placed the initial prerecorded call to determine whether Mr. Chinitz would answer the phone, which would inform the Realogy Agent if a live call would in fact reach a person who would answer the phone.

127.    On at least one occasion after Mr. Chinitz received a prerecorded message, the Realogy Agent who placed that call and the follow up call stated that he was calling on behalf of Coldwell Banker and asked Mr. Chinitz if he wanted to speak with Matt Christensen. Mr. Chinitz responded with a request that the Realogy Agent not call him back. However, Mr. Chinitz continued to receive additional calls following the same pattern: a prerecorded voice call that would get disconnected, followed by a call from a live Realogy Agent stating they were calling on behalf of Coldwell Banker.

128.    Mr. Chinitz received multiple calls from the number (408) 290-8289, which at the time was a telephone number associated with Matt Christensen's Mojo account. Mr. Chinitz is informed that Matt Christensen was an NRT Agent at the time he placed calls to Mr. Chinitz.

129.    On one occasion, after receiving the dual prerecorded message/live calls, Mr. Chinitz asked the live caller whether they were in a call center. The caller informed Mr. Chinitz that they were in

the Philippines and that Mr. Chinitz was not the only person upset about receiving these types of calls. The caller again offered for Mr. Chinitz to speak to Matt Christensen. Mr. Chinitz reiterated his request that they stop calling.

130.    Each of the calls placed to Mr. Chinitz described in Paragraphs 123-29 was initiated with the authorization, knowledge, and/or ratification of the Realogy Defendants, and on behalf of the Realogy Defendants, including their subsidiaries and alter-egos. Moreover, because the Realogy Agent did not identify the full, legal name of the entity on whose behalf the call was placed, the identity of the specific Realogy Defendant, including the subsidiary and alter-ego, is not within Mr. Chinitz's possession, custody, and control. Nor can Mr. Chinitz readily identify that subsidiary and alter-ego of the Realogy Defendants, due to the practices described in 98-116.

131.    Without information in the possession, custody, and control of Realogy Defendants, including their Agents, subsidiaries and alter-egos, and the autodialing services they have retained, including Mojo, a review of Mr. Chinitz's phone records to identify every Realogy Agent who placed an unwanted call to him is not possible in part due to the common practice amongst the Realogy Agents and Mojo to mask or spoof the telephone numbers that appear on the receiver's caller ID and phone records.

132.    In an effort to get the calls to stop, Mr. Chinitz began to conduct research to identify the appropriate corporate entity to direct his complaints. Mr. Chinitz learned that at the time Matt Christensen was calling him, Mr. Christensen worked for the Realogy Defendants in a Coldwell Banker Office managed by John Carman. After many hours of online research and placing outgoing calls from his residential land line to various offices affiliated with the Realogy Defendants, eventually, Mr. Chinitz was able to locate a phone number for an entity with "Realogy" in the name, and lodge an oral complaint. Mr. Chinitz understood that this entity was affiliated with "Coldwell Banker," but does not know the exact corporate entity with which he lodged the complaint.

133.    After complaining to the Realogy Parent or its subsidiary and alter-ego, Mr. Chinitz was contacted by Nancy Robinson. She did not identify the full, legal name of her employer, or the entity on whose behalf the call was placed but she did state that Realogy directed her to call him, and that she was both a representative of Realogy and the regional vice president with "Coldwell Banker."  In the

telephone call, Ms. Robinson told Mr. Chinitz, "This is wrong; this will stop." Ms. Robinson stated that Coldwell Banker took full responsibility for the calls. Ms. Robinson also admitted that the Realogy Agents were reaching out to him because "Coldwell Banker" was low on inventory. She told Mr. Chinitz it was part of the normal business practice of "Coldwell Banker" to generate business by calling expired listings. When she told Mr. Chinitz that "Coldwell Banker" calls expired listings, she asked, in sum and substance (rhetorically), "How else are we supposed to generate business?"

134.    Mr. Chinitz purchases his landline service from AT&T. His plan is a "measured rate service." Under that service, while incoming calls are unlimited, he pays $6.96 a month to obtain a credit to make a fixed number of outgoing calls each month. After he reaches his monthly limit of outgoing calls, AT&T charges him a per call fee. Because Mr. Chinitz's Do Not Call requests were repeatedly not honored by the Realogy Defendants as set forth herein, Mr. Chinitz placed a number of outgoing calls to the Realogy Defendants, including their local "Coldwell Banker" affiliates to get the calls to stop and to complain, as described in Paragraph 132. In placing these calls to the Realogy Defendants as a result of their harassing violations of the TCPA, Mr. Chinitz lost property in the form of purchased outgoing call time that could have been used for other purposes.

135.    Mr. Chinitz filed TCPA claims based on the unwanted phone calls discussed above against Coldwell Banker Real Estate, LLC, and Coldwell Banker Residential Brokerage Company on October 4, 2018. Class Action Complaint, *Chinitz v. Coldwell Banker Real Estate, LLC*, No. 5:18-cv-06100-NC (N.D. Cal. Oct. 4, 2018), ECF No. 1 (also referred to herein as "*NRT West*," as noted above). That case did not include any claims for violations of California's Unfair Competition Law.

136.    Counsel for RBG (formerly known as NRT LLC) in the above-captioned case was also counsel for the defendants in *NRT West*.

137.    Based on the statements of counsel for defendants in *NRT West*, Mr. Chinitz amended his complaint in *NRT West* on December 14, 2018, to name NRT West, Inc., doing business as Coldwell Banker Residential Brokerage Company as the sole defendant. First Amended Class Action Complaint, *Chinitz v. NRT West, Inc.*, No. 5:18-cv-06100-NC (N.D. Cal. Dec. 14, 2018), ECF No. 16.

138.    All parties to *NRT West* consented to proceed before a magistrate judge.

139.    After conducting some discovery in *NRT West*, Mr. Chinitz filed this lawsuit on June 11,

2019, against RBG (formerly known as NRT LLC). Mr. Chinitz did not consent to proceed before a magistrate judge.

140.     The court in *NRT West* denied Mr. Chinitz's motion for class certification on August 30, 2019. Order Denying Plaintiff's Motion for Class Certification, *Chinitz v. NRT West, Inc.*, No. 5:18-cv-06100-NC (N.D. Cal. Aug. 30, 2019), ECF No. 76.

141.     Counsel for NRT West, which are also counsel for RBG, understood prior to the dismissal of *NRT West* (discussed below in Paragraph 143-44) that Mr. Chinitz intended to continue to pursue claims against RBG after dismissing his claims against NRT West.

142.     The Court held a case management conference in this lawsuit on October 24, 2019. At the conference, counsel for Mr. Chinitz stated that the *NRT West* case was originally intended to be filed on a nationwide basis, and that after discussions with defense counsel, Mr. Chinitz's counsel amended his complaint to be against NRT West believing he would have a nationwide case against NRT West. Mr. Chinitz's counsel then stated that in *NRT West*, the defendant offered Ms. Murtagh of RBG (then NRT LLC) as NRT West's Rule 30(b)(6) person most knowledgeable (also discussed above in Paragraphs 105-09), and that Mr. Chinitz's counsel thereby learned that RBG was a nationwide entity, unlike NRT West. Mr. Chinitz's counsel stated that they then sought to stipulate with counsel for NRT West to amend the complaint to add or substitute in RBG, but counsel for NRT West declined to so stipulate, and that Mr. Chinitz then filed the above-captioned action.

143.     At the case management conference of October 24, 2019, the following exchange occurred:

> THE COURT: . . . If you had filed these cases separately, there is no doubt in my mind they would have been promptly related.
>
> There was a complication; because a magistrate judge was involved, consent is required. So every so often, we get "This is different, but the punchline is the same." Every so often we get a situation like this, where a case is -- people have done the smart thing and consented to the magistrate judge for case 1. And for some reason case 2 comes up, and it's basically the same case, and somebody decides they don't want to stipulate to a magistrate judge and it ends up with a district judge.
>
> Here is what do: We typically would stay the district court case and defer to the train that's already left the station with the magistrate judge. That's almost always the best thing to do.
>
> Here is what we don't do: We don't have two judges working on same legal issues for

1   the same parties at the same time.

2   . . .

3   I'm not going to pull the trigger on that yet, but I'm going to recommend that . . . you
    ask for leave to file an amended complaint adding . . . NRT LLC [with Judge Cousins].

4   . . .

5   MS. SONEJI: Can I ask -- just a couple of thoughts?

6   THE COURT: Yes, please. We're collectively working out a game plan.

7   . . .

8   MS. SONEJI: **We have been in discussions with defense counsel about a way to
    stay or dismiss the case in front of Judge Cousins and basically only have apples
9   in this basket.**

10  We think that would resolve one of the issues that Your Honor has raised.

11                              *   *   *   *   *

12  THE COURT: . . . So just thinking out loud, you two know the case much better than I
    do at this stage, of course. But I could kind of see that maybe the case against NRT
13  West is, maybe, dismissed with prejudice and then this one just picks up -- different
    entities, different, I guess, national scope -- enough to make a difference going forward.
14  Is that what you're thinking?

15  MS. SONEJI: That is what we're thinking, Your Honor.

16  And I think in part we have additional plaintiffs that we intend to add who are not
    based in California. We also think that the all of the discovery has been focused on
17  NRT West. And, again, even though defendant -- defense counsel wants to make this
    case about Ron Chinitz, who is located in Santa Cruz, it's not just about him. This
18  practice exists nationwide.

19  So we want the opportunity to go after the right defendant, talk to corporate officers in
    New Jersey, and find out these policies that exist across the country. And we have not
20  had that opportunity.

21  THE COURT: Are you willing to give NRT West a get-out-of-jail-free card, so to
    speak, because this is an atypical procedural posture.
22
    MS. SONEJI: Yes. Our original intention, and we have made this clear from the
23  beginning, was to name the nationwide Coldwell Banker entity, and we were under the
    misimpression that that was NRT West.
24
    THE COURT: Sounds like a pretty good deal, Mr. Rudin.
25

26  Tr. Hearing, Oct. 24, 2019 (emphasis added). The Court then set a schedule under which Mr. Chinitz

27  would send RBG a stipulation for review, RBG would respond, and the parties would file a short

28  statement informing the Court whether a stipulation of dismissal had been filed in *NRT West*. *Id.*; *see also*

Civil Mins., Oct. 24, 2019, ECF No. 19. If the parties did not agree to dismiss *NRT West*, Mr. Chinitz was to file a motion to amend the pleadings in *NRT West* to add RBG as a defendant. Civil Mins., Oct. 24, 2019, ECF No. 19.

144.    The correspondence between counsel for NRT West and RBG and counsel for Mr. Chinitz about the stipulation of dismissal in *NRT West* reflects that counsel for NRT West and RBG was well aware of the discussion held at the case management conference of October 24, 2019.

145.    Mr. Chinitz and NRT West filed a Stipulation of Dismissal With Prejudice in *NRT West* on October 28, 2019. Stipulation of Dismissal With Prejudice, *Chinitz v. NRT West, Inc.*, No. 5:18-cv-06100-NC (N.D. Cal. Oct. 28, 2019), ECF No. 87.

146.    Mr. Chinitz has never entered into a release or stipulated dismissal of his claims regarding the unwanted telephone calls discussed above with respect to RBG (formerly known as NRT LLC), Realogy Parent, or any other entity other than NRT West.

147.    Before and at the time that Mr. Chinitz and NRT West signed the stipulation of dismissal in *NRT West*, counsel for NRT West and RBG was well aware that Mr. Chinitz never intended to release his claims against RBG (or any entity other than NRT West); Mr. Chinitz gave no indication at any point that he had changed his mind about this; and counsel for NRT West and RBG took no steps to change the scope of the stipulated dismissal that Mr. Chinitz obviously intended in *NRT West*.

### 2.    Plaintiff Sarah Bumpus' Experiences

148.    Ms. Bumpus registered her personal cell number, 916-934-XXXX, with the National Do Not Call Registry on October 29, 2009, and registered her residential landline telephone number, 916-934-XXXX, with the National Do Not Call Registry on July 27, 2005.

149.    In or around September 2018, Ms. Bumpus listed her house for sale.

150.    In or around January 2019, Ms. Bumpus canceled her listing of her house for sale, and the listing was removed from the MLS.

151.    Beginning in or around January 2019, immediately after she canceled her listing, Ms. Bumpus was inundated with marketing calls from real estate agents asking her to use them as her real

estate agent to sell her home. In particular, Ms. Bumpus received two or more unwanted calls from Realogy Agents, who each represented that the calls were from "Coldwell Banker." Occasionally, the Realogy Agents would leave Ms. Bumpus voicemails on identifying themselves as calling from or on behalf of "Coldwell Banker." One or more Realogy Agents placed these calls to each of Ms. Bumpus's two phone numbers.

152.    Each time Ms. Bumpus received a call from a Realogy Agent representing that they were calling on behalf of "Coldwell Banker" in the period after removing her for-sale listing in January 2019, Ms. Bumpus informed each Realogy Agent that she did not wish to receive any calls from "Coldwell Banker," and/or to place her number on Coldwell Banker's Do Not Call List.

153.    Despite her requests, Ms. Bumpus continued to receive unwanted marketing calls from Realogy Agents who represented the calls were made by or on behalf of "Coldwell Banker." On more than one occasion, Ms. Bumpus repeated the request to stop calling her.

154.    Each of the calls placed to Ms. Bumpus described in Paragraphs 151-53 was initiated with the authorization, knowledge, and/or ratification of the Realogy Defendants, and on behalf of the Realogy Defendants, including their subsidiaries and alter-egos. Moreover, because the Realogy Agent did not identify the full, legal name of the entity on whose behalf the call was placed, the identity of the specific Realogy Defendant, including the subsidiary and alter-ego, is not within Ms. Bumpus's possession, custody, and control. Nor can Ms. Bumpus readily identify that subsidiary and alter-ego of the Realogy Defendants, due to the practices described in 98-116.

155.    Without information in the possession, custody, and control of Realogy Defendants, including their Agents, subsidiaries and alter-egos, and the autodialers they have retained, including Mojo, a review of Ms. Bumpus's phone records to identify every Realogy Agent who placed an unwanted call to her is not possible in part due to the common practice amongst the Realogy Agents and Mojo to mask or spoof the telephone numbers that appear on the receiver's caller ID and phone records.

### 3.    Plaintiff Alain Michael's Experiences

156.    Mr. Michael registered his personal cell phone number, 805-732-XXXX, on the National Do Not Call Registry on December 22, 2006.

157.     Beginning approximately in early 2018, Mr. Michael received at least four unwanted calls from Realogy Agents, who each represented that the calls were from "Coldwell Banker," and asked him to use them as their real estate agent to sell his home. One or more Realogy Agents placed these calls to his personal cell phone number, leaving a voicemail each time.

158.     Mr. Michael continued to receive unwanted marketing calls from Realogy Agents who left voicemails and represented the calls were made by or on behalf of "Coldwell Banker" until March or April 2019. On at least one occasion, his caller ID stated that the call was coming from "Coldwell Banker."

159.     Each of the calls placed to Mr. Alain described in Paragraphs 157-58 was initiated with the authorization, knowledge, and/or ratification of the Realogy Defendants, and on behalf of the Realogy Defendants, including their subsidiaries and alter-egos. Moreover, because the Realogy Agent did not identify the full, legal name of the entity on whose behalf the call was placed, the identity of the specific Realogy Defendant, including the subsidiary and alter-ego, is not within Ms. Bumpus's possession, custody, and control. Nor can Mr. Alain readily identify that subsidiary and alter-ego of the Realogy Defendants, due to the practices described in 98-116.

160.     Without information in the possession, custody, and control of Realogy Defendants, including their Agents, subsidiaries and alter-egos, and the autodialers they have retained, including Mojo, a review of Mr. Alain's phone records to identify every Realogy Agent who placed an unwanted call to him is not possible in part due to the common practice amongst the Realogy Agents and Mojo to mask or spoof the telephone numbers that appear on the receiver's caller ID and phone records.

### 4.     Plaintiff Rosemary Rodriguez's Experiences

161.     Ms. Rodriguez registered her residential landline telephone number, 916-786-XXXX, on the National Do Not Call Registry in late 2012, and registered her personal cell phone number, 916-218-XXXX, on the National Do Not Call Registry in late 2015.

162.     Since late 2017, Ms. Rodriguez received at least five unwanted calls from Realogy Agents, who each represented that the calls were from "Coldwell Banker," and asked her to use them as their real estate agent to sell his home. One or more Realogy Agents placed these calls to each of Ms. Rodriguez's two phone numbers.

163.    On at least two occasions, Ms. Rodriguez received a call from a Realogy Agent representing that they were calling on behalf of "Coldwell Banker," Ms. Rodriguez informed each Realogy Agent that she did not wish to receive any calls from "Coldwell Banker," and/or to place her number on Coldwell Banker's Do Not Call List.

164.    Despite her requests, Ms. Rodriguez continued to receive unwanted marketing calls from Realogy Agents who represented the calls were made by or on behalf of "Coldwell Banker." On more than one occasion, Ms. Rodriguez repeated the request to stop calling her.

165.    Each of the calls placed to Ms. Rodriguez described in Paragraphs 162-64 was initiated with the authorization, knowledge, and/or ratification of the Realogy Defendants, and on behalf of the Realogy Defendants, including their subsidiaries and alter-egos. Moreover, because the Realogy Agent did not identify the full, legal name of the entity on whose behalf the call was placed, the identity of the specific Realogy Defendant, including the subsidiary and alter-ego, is not within Ms. Rodriguez's possession, custody, and control. Nor can Ms. Rodriguez readily identify that subsidiary and alter-ego of the Realogy Defendants, due to the practices described in 98-116.

166.    Without information in the possession, custody, and control of Realogy Defendants, including their Agents, subsidiaries and alter-egos, and the autodialers they have retained, including Mojo, a review of Ms. Rodriguez's phone records to identify every Realogy Agent who placed an unwanted call to her is not possible in part due to the common practice amongst the Realogy Agents and Mojo to mask or spoof the telephone numbers that appear on the receiver's caller ID and phone records.

## CLASS ACTION ALLEGATIONS

167.    Plaintiffs bring this action on behalf of themselves and a class of all others similarly situated pursuant to Federal Rule of Civil Procedure 23.

168.    Plaintiffs propose to represent the following classes:

### National Do Not Call Registry Class and Subclasses

a.  **National Do Not Call Registry Nationwide Class**: All persons in the United States who received more than one call made by or on behalf of the Realogy Defendants in connection with the Coldwell Banker brand in a 12-month period on a residential

landline or cell phone number that appears on the National Do Not Call Registry for the time period beginning June 11, 2015, to present.

b. **National Do Not Call Registry California Subclass:** All persons in California who received more than one call made by or on behalf of the Realogy Defendants in connection with the Coldwell Banker brand in a 12-month period on a residential landline or cell phone number that appears on the National Do Not Call Registry for the time period beginning June 11, 2015, to present

c. **National Do Not Call Registry Mojo Nationwide Subclass**: All persons in the United States who received more than one call made by or through Mojo on behalf of the Realogy Defendants in connection with the Coldwell Banker brand in a 12-month period on a residential landline or cell phone number that appears on the National Do Not Call Registry for the time period beginning October 4, 2014, to present.

d. **National Do Not Call Registry Mojo California Subclass:** All persons in California who received more than one call made by or through Mojo on behalf of the Realogy Defendants in connection with the Coldwell Banker brand in a 12-month period on a residential landline or cell phone number that appears on the National Do Not Call Registry for the time period beginning October 4, 2014, to present.

### Internal Do Not Call Class and Subclasses

a. **Internal Do Not Call Class**: All persons in the United States who received one or more calls made by or on behalf of the Realogy Defendants in connection with the Coldwell Banker brand at least 31 days after requesting not to receive RBG calls to their residential landline or cell phone number, for the time period beginning October 4, 2014, to present.

b. **California Residents National Internal Do Not Call Subclass**: All persons in California who received one or more calls made by or on behalf of the Realogy Defendants in connection with the Coldwell Banker brand at least 31 days after requesting not to receive RBG calls to their residential landline or cell phone number, for the time period beginning October 4, 2014, to present.

1  **Artificial or Prerecorded Message Class and Subclasses**

2      a.  **National Artificial or Prerecorded Message Class:** All persons in the United States

3          who received a call on their residential telephone line or cell phone number with an

4          artificial or prerecorded message, initiated by or on behalf of the Realogy Defendants in

5          connection with the Coldwell Banker brand, and without the recipient's prior express

6          consent, for the time period beginning October 4, 2014, to present.

7      b.  **Artificial or Prerecorded Message California Subclass:** All persons in California who

8          received a call on their residential telephone line or cell phone number with an artificial

9          or prerecorded message, initiated by or on behalf of the Realogy Defendants in

10          connection with the Coldwell Banker brand, and without the recipient's prior express

11          consent, for the time period beginning October 4, 2014, to present.

12      c.  **Artificial or Prerecorded Message Mojo Subclass**: All persons in the United States

13          who received a call on their residential telephone line or cell phone number with an

14          artificial or prerecorded message, initiated by or through Mojo on behalf of the Realogy

15          Defendants in connection with the Coldwell Banker brand, and without the recipient's

16          prior express consent, for the time period beginning October 4, 2014, to present.

17      d.  **California Residents Artificial or Prerecorded Message Mojo Subclass**: All

18          persons in California who received a call on their residential telephone line or cell

19          phone number with an artificial or prerecorded message, initiated by or through Mojo

20          on behalf of the Realogy Defendants in connection with the Coldwell Banker brand,

21          and without the recipient's prior express consent, for the time period beginning

22          October 4, 2014, to present.

23  **California Cell Phone User Class and Subclass**

24      a.  **California Cell Phone User Class:** All persons who were residing in California when

25          they received a call on their cellular phone, initiated by or on behalf of the Realogy

26          Defendants in connection with the Coldwell Banker brand, and without the recipient's

27          prior express consent, for the time period beginning October 4, 2014, to present.

28      b.  **California Cell Phone User Mojo Subclass:** All persons who were residing in

California when they received a call on their cellular phone, initiated by or through Mojo
on behalf of the Realogy Defendants in connection with the Coldwell Banker brand,
and without the recipient's prior express consent, for the time period beginning October
4, 2014, to present.

169.   Defendants and their employees or agents are excluded from the Classes.

170.   Plaintiffs reserve the right to alter the Class definitions as they deem necessary at any time to the full extent that the Federal Rules of Civil Procedure, the Civil Local Rules of the U.S. District Court for the Northern District of California, and applicable precedent allow.

171.   Members of the Classes are so numerous that joinder is impracticable. While the exact number of class members is unknown to Plaintiffs, it is believed that the Classes are comprised of thousands of members. The Classes are readily identifiable from information and records in the possession of the Realogy Defendants, Mojo, and third parties.

172.   Common questions of law and fact exist as to all members of the Classes. These questions predominate over questions that may affect only individual class members because Defendants have acted on grounds generally applicable to the Classes. Such common and legal factual questions include:

   a.   Whether Defendants' conduct violates the TCPA;

   b.   Whether Defendants obtained valid prior express consent from artificial or prerecorded voice call recipients;

   c.   Whether Defendants' calls were made for an emergency purpose;

   d.   Whether Defendants' calls were made to collect on a debt;

   e.   Whether Defendants adhered to requests by Class members to stop making calls to their residential telephone numbers;

   f.   Whether Defendants keep records of call recipients who revoked consent to receive calls;

   g.   Whether Defendants have established written procedures to comply with National Do Not Call Registry registrations;

   h.   Whether Defendants train personnel on any procedures to comply with

-38-

1            National Do Not Call Registry regulations;

2     i.     Whether Defendants maintain and record a list of telephone numbers that they

3            may not contact;

4     j.     Whether Defendants use any process to prevent telephone solicitations of any

5            number on the National Do Not Call Registry and maintain records

6            documenting the process;

7     k.     Whether Defendants have any written policies for maintaining an internal do

8            not call list;

9     l.     Whether Defendants inform and train their personnel engaged in telemarking in

10            the existence and the use of any internal do not call list pursuant to 47 U.S.C.

11            §64.1200(d)(2);

12     m.     Whether individuals or entities making a call for telemarketing purposes for or

13            on behalf of Defendants record any request from a telephone subscriber not to

14            receive calls and place the subscriber's name and number on an internal do not

15            call list pursuant to 47 U.S.C. § 64.1200(d)(1);

16     n.     Whether Plaintiffs and members of the Classes are entitled to damages, costs, or

17            attorney's fees from Defendants;

18     o.     Whether Defendants violated the privacy rights of Plaintiffs and members of the

19            Classes;

20     p.     Whether Defendants' conduct caused Plaintiffs and members of the Classes

21            inconvenience or annoyance;

22     q.     Whether Plaintiffs and members of the Classes are entitled to compensatory

23            damages;

24     r.     Whether Plaintiffs and members of the Classes are entitled to treble damages

25            based on the willfulness of Defendants' conduct; and

26     s.     Whether Plaintiffs and members of the Classes are entitled to a permanent

27            injunction enjoining Defendants from continuing to engage in their unlawful

28            conduct.

173.    The claims of Plaintiffs are typical of the members of the Classes as they are similarly affected by the Defendants' actionable conduct. Defendants' conduct that gave rise to the claims of Plaintiffs and members is the same for all members of the Class.

174.    Plaintiffs will fairly and adequately protect the interests of the Classes because they have no interests antagonistic to, or in conflict with, the Classes that Plaintiffs seek to represent. Furthermore, Plaintiffs have retained counsel experienced and competent in the prosecution of complex class action litigation.

175.    Class action treatment is a superior method for the fair and efficient adjudication of this controversy, in that, among other things, such treatment will permit a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, expense, or the possibility of inconsistent or contradictory judgments that numerous individual actions would engender. The benefits of the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

176.    Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

177.    Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

## CLAIMS FOR RELIEF

## CLAIM I

### Violation of 47 U.S.C. § 227(c)(2) and 47 C.F.R. § 64.1200(c)(2)

### (Against the Realogy Defendants on Behalf of the National Do Not Call Registry Class and Subclasses)

178.    Plaintiffs incorporate by reference all above paragraphs as though fully repeated herein.

179.    Plaintiffs bring this claim on behalf of themselves and other members of the National Do Not Call Registry Class and Subclasses against the Realogy Defendants for violation of 47 U.S.C. §

227(c)(2) and 47 C.F.R. § 64.1200(c)(2).

180.    The TCPA provides that any "person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may" bring a private action based on a violation of said regulations, which were promulgated to protect telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object. 47 U.S.C. § 227(c)(5).

181.    Under 47 C.F.R. § 64.1200(c)(2), "[n]o person or entity shall initiate any telephone solicitation" to "[a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the federal government." This National Do Not Call list provision applies to registered residential landlines and cell phone numbers.

182.    A caller is not liable for violating 47 C.F.R. § 64.1200(c)(2) if it can demonstrate that its violation "is the result of error and that as part of its routine business practice," it meets the following standards:

> (A) Written procedures. It has established and implemented written procedures to comply with the national do-not-call rules;
>
> (B) Training of personnel. It has trained its personnel, and any entity assisting in its compliance, in procedures established pursuant to the national do-not-call rules;
>
> (C) Recording. It has maintained and recorded a list of telephone numbers that the seller may not contact;
>
> (D) Accessing the national do-not-call database. It uses a process to prevent telephone solicitations to any telephone number on any list established pursuant to the do-not-call rules, employing a version of the national do-not-call registry obtained from the administrator of the registry no more than 31 days prior to the date any call is made, and maintains records documenting this process.

47 C.F.R. § 64.1200(c)(2)(i).

183.    The Realogy Defendants initiated, or caused to be initiated, telephone solicitations to residential telephone subscribers like Plaintiffs and other class members who registered their respective residential landline and cell phone numbers on the National Do Not Call Registry, a listing of persons who do not wish to receive telephone solicitations that is maintained by the federal government. Where

calls were initiated by the Realogy Agents, they were done so with the authorization, knowledge, and/or ratification of the Realogy Defendants, and on behalf of the Realogy Defendants, including their subsidiaries and alter-egos.

184.    The Realogy Defendants have no written procedures to comply with National Do Not Call Registry regulations pursuant to 47 U.S.C. § 64.1200(c)(2)(i)(A), or to the extent it has written procedures, it remains out of compliance with National Do Not Call Registry regulations.

185.    The Realogy Defendants do not train their personnel on any procedures to comply with National Do Not Call Registry regulations pursuant to 47 U.S.C. § 64.1200(c)(2)(i)(B), or to the extent it provides training, it remains out of compliance with National Do Not Call Registry regulations.

186.    The Realogy Defendants do not maintain or record a list of telephone numbers that it may not contact, pursuant to 47 C.F.R. § 64.1200(c)(2)(i)(C), or to the extent it maintains a list, it remains out of compliance with National Do Not Call Registry regulations.

187.    The Realogy Defendants do not employ a version of the National Do Not Call Registry obtained from the administrator of the Registry, no more than 31 days prior to the date any call is made, nor do they maintain records documenting this process, pursuant to 47 C.F.R. § 64.1200(c)(2)(i)(D). To the extent the Realogy Defendants obtain the Registry, they remain out of compliance with National Do Not Call Registry regulations.

188.    Because Plaintiffs and other class members received more than one telephone call in a 12-month period made by or on behalf of the Realogy Defendants in violation of 47 C.F.R. § 64.1200(c)(2), as described above, Plaintiffs may bring an action against the Realogy Defendants pursuant to 47 U.S.C. § 227(c)(5).

189.    Pursuant to 47 U.S.C. § 227(c)(5), Plaintiffs and other class members seek an award of $500.00 in statutory damages for each and every negligent violation of 47 U.S.C. § 227(c)(2) and 47 C.F.R. § 64.1200(c)(2) discussed above.

190.    Pursuant to 47 U.S.C. § 227(c)(5), Plaintiffs and other class members seek an award of $1,500.00 in statutory damages for each and every knowing and/or willful violation of 47 U.S.C. § 227(c)(2) and 47 C.F.R. § 64.1200(c)(2) discussed above.

191.    Plaintiffs and other class members also suffered damages in the form of invasion of

1   privacy.

2       192.    Plaintiffs and other class members also seek injunctive relief prohibiting the Realogy

3   Defendants' illegal conduct in the future, pursuant to 47 U.S.C. § 227(c)(5).

4                                    **CLAIM II**

5           **Violation of 47 U.S.C. § 227(c)(2) and 47 C.F.R. § 64.1200(c)(2)**
            **(By Plaintiff Chinitz Against Defendant Mojo on Behalf of National Do Not Call Registry Mojo**
6                    **Nationwide and California Subclasses)**

7       193.    Plaintiffs incorporate by reference all above paragraphs as though fully repeated herein.

8       194.    Plaintiff Chinitz brings this claim on behalf of the National Do Not Call Registry Mojo

9   Nationwide and California Subclasses against Mojo for violation of 47 U.S.C. § 227(c)(2) and 47 C.F.R.

10  § 64.1200(c)(2).

11      195.    The TCPA provides that any "person who has received more than one telephone call

12  within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed

13  under this subsection may" bring a private action based on a violation of said regulations, which were

14  promulgated to protect telephone subscribers' privacy rights to avoid receiving telephone solicitations

15  to which they object. 47 U.S.C. § 227(c)(5).

16      196.    Under 47 C.F.R. § 64.1200(c)(2), "[n]o person or entity shall initiate any telephone

17  solicitation" to "[a] residential telephone subscriber who has registered his or her telephone number on

18  the national do-not-call registry of persons who do not wish to receive telephone solicitations that is

19  maintained by the federal government." This National Do Not Call list provision applies to registered

20  residential landlines and cell phone numbers.

21      197.    A caller is not liable for violating the TCPA if it can demonstrate that its violation "is

22  the result of error and that as part of its routine business practice," it meets the following standards:

23          (A) Written procedures. It has established and implemented written procedures
24          to comply with the national do-not-call rules;

25          (B) Training of personnel. It has trained its personnel, and any entity assisting in
            its compliance, in procedures established pursuant to the national do-not-call
26          rules;

27          (C) Recording. It has maintained and recorded a list of telephone numbers that
            the seller may not contact;

28          (D) Accessing the national do-not-call database. It uses a process to prevent

                                        -43-

> telephone solicitations to any telephone number on any list established pursuant to the do-not-call rules, employing a version of the national do-not-call registry obtained from the administrator of the registry no more than 31 days prior to the date any call is made, and maintains records documenting this process.

47 C.F.R. § 64.1200(c)(2)(i).

198.    Mojo initiated, or caused to be initiated, telephone solicitations to residential telephone subscribers like Plaintiff Chinitz and Mojo Subclass A members who registered their respective residential landline and cell phone numbers on the National Do Not Call Registry.

199.    Mojo has no written procedures to comply with National Do Not Call Registry regulations pursuant to 47 U.S.C. § 64.1200(c)(2)(i)(A), or to the extent it has written procedures, it remains out of compliance with National Do Not Call Registry regulations.

200.    Mojo does not employ a version of the National Do Not Call Registry obtained from the administrator of the Registry, no more than 31 days prior to the date any call is made, nor do they maintain records documenting this process, pursuant to 47 C.F.R. § 64.1200(c)(2)(i)(D). To the extent Mojo obtains the Registry, it remains out of compliance with National Do Not Call Registry regulations.

201.    Because Plaintiff Chinitz and other class members received more than one telephone call in a 12-month period initiated (or caused to be initiated) by Mojo by or on behalf of RBG in violation of 47 C.F.R. § 64.1200(c)(2), as described above, Plaintiff Chinitz may bring an action against Mojo pursuant to 47 U.S.C. § 227(c)(5).

202.    Pursuant to 47 U.S.C. § 227(c)(5), Plaintiff Chinitz and other members of the class seek an award of $500.00 in statutory damages from Mojo for each and every negligent violation of 47 U.S.C. § 227(c)(2) and 47 C.F.R. § 64.1200(c)(2) discussed above.

203.    Pursuant to 47 U.S.C. § 227(c)(5), Plaintiff Chinitz and other members of the class seek an award of $1,500.00 in statutory damages from Mojo for each and every knowing and/or willful violation of 47 U.S.C. § 227(c)(2) and 47 C.F.R. § 64.1200(c)(2) discussed above.

204.    Plaintiff Chinitz and other members of the class also suffered damages in the form of invasion of privacy.

205.    Plaintiff Chinitz and other members of the class also seek injunctive relief prohibiting

1   Mojo's illegal conduct in the future, pursuant to 47 U.S.C. § 227(c)(5).

2                                                **CLAIM III**

3                    **Violation of 47 U.S.C. § 227(c)(2) and 47 C.F.R. § 64.1200(d)**
4              **(By Plaintiffs on Behalf of Internal Do Not Call Nationwide Class**
                    **and California Subclass Against Realogy Defendants**

5          206.    Plaintiffs incorporate by reference all above paragraphs as though fully repeated herein.

6          207.    Plaintiffs bring this claim on behalf of members of the National Internal Do Not Call

7   Class and California Subclass against the Realogy Defendants for violation of 47 U.S.C. § 227(c)(2) and

8   47 C.F.R. § 64.1200(d).

9          208.    The TCPA provides that any "person who has received more than one telephone call

10  within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed

11  under this subsection may" bring a private action based on a violation of said regulations, which were

12  promulgated to protect telephone subscribers' privacy rights to avoid receiving telephone solicitations

13  to which they object. 47 U.S.C. § 227(c)(5).

14         209.    Under 47 C.F.R. § 64.1200(d), "[n]o person or entity shall initiate any call for

15  telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted

16  procedures for maintaining a list of persons who request not to receive telemarketing calls made by or

17  on behalf of that person or entity." The procedures instituted must meet certain minimum standards,

18  including:

19              (3) Recording, disclosure of do-not-call requests. If a person or entity making a
20              call for telemarketing purposes (or on whose behalf such a call is made) receives
                a request from a residential telephone subscriber not to receive calls from that
21              person or entity, the person or entity must record the request and place the
                subscriber's name, if provided, and telephone number on the do-not call list at
22              the time the request is made. **Persons or entities making calls for**
                **telemarketing purposes (or on whose behalf such calls are made) must**
23              **honor a residential subscriber's do-not-call request within a reasonable**
                **time from the date such request is made.** This period may not exceed thirty
24              days from the date of such request . . . .
                (6) Maintenance of do-not-call lists. A person or entity making calls for
25              telemarketing purposes must maintain a record of a consumer's request not to
                receive further telemarketing calls. **A do-not-call request must be honored for**
26              **5 years from the time the request is made.**

27  47 C.F.R. § 64.1200(d)(3), (6) (emphasis added).

28         210.    Plaintiffs and other class members made requests not to receive calls from Defendants.

                                                    -45-

211.   Defendants failed to honor these requests. Where calls that did not honor these requests were initiated by the Realogy Agents, they were done so with the authorization, knowledge, and/or ratification of the Realogy Defendants, and on behalf of the Realogy Defendants, including their subsidiaries and alter-egos.

212.   Upon information and belief, the Realogy Defendants have not instituted procedures for maintaining a list of persons who request not to receive telemarketing calls, pursuant to 47 C.F.R. § 64.1200(d), or if it has attempted to institute such procedures, it has failed to implement them adequately.

213.   Because the Realogy Defendants have failed to institute "procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity" or it has failed implement such procedures adequately, 47 C.F.R. § 64.1200(d) prohibits Defendants or its agents from initiating "any call for telemarketing purposes to a residential telephone subscriber." Thus, all telemarketing calls to residential telephone subscribers that were made by or on behalf of the Realogy Defendants violate 47 C.F.R. § 64.1200(d).

214.   Because Plaintiffs received more than one telephone call in a 12-month period made by or on behalf of the Realogy Defendants in violation of 47 C.F.R. § 64.1200(d), as described above, Plaintiffs may bring an action against the Realogy Defendants pursuant to 47 U.S.C. § 227(c)(5).

215.   Pursuant to 47 U.S.C. § 227(c)(5), Plaintiffs and other members of the class seek an award of $500.00 in statutory damages for each and every negligent violation of 47 U.S.C. § 227(c)(2) and 47 C.F.R. § 64.1200(d).

216.   Pursuant to 47 U.S.C. § 227(c)(5), Plaintiffs and other members of the class seek an award of $1,500.00 in statutory damages for each and every knowing and/or willful violation of 47 U.S.C. § 227(c)(2) and 47 C.F.R. § 64.1200(d).

217.   Plaintiffs and other members of the class also suffered damages in the form of invasion of privacy.

218.   Plaintiffs and other members of the class also seek injunctive relief prohibiting the Realogy Defendants' illegal conduct in the future, pursuant to 47 U.S.C. § 227(c)(5).

## CLAIM IV

## Violation of 47 U.S.C. § 227(b)(1)(B)

## (By Plaintiff Chinitz on Behalf of Artificial or Prerecorded Message Nationwide Class and California Subclass Against the Realogy Defendants)

219. Plaintiffs incorporate by reference all above paragraphs as though fully repeated herein.

220. Plaintiff Chinitz brings this claim against the Realogy Defendants on behalf of on the National Artificial or Prerecorded Message Class and California Subclass for violation of 47 U.S.C. § 227(b)(1)(B).

221. The TCPA prohibits a caller from initiating any telephone call to a residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the contacted party unless the call is initiated for emergency purposes, is made solely to collect a debt owed or guaranteed by the United States, or is exempted by a FCC rule or order.

222. The Realogy Defendants initiated multiple telephone calls using an artificial or prerecorded voice to deliver a message to residential telephone lines of Plaintiff Chinitz and other members of the class. Where calls were initiated by the Realogy Agents, they were done so with the authorization, knowledge, and/or ratification of the Realogy Defendants, and on behalf of the Realogy Defendants, including their subsidiaries and alter-egos.

223. The Realogy Defendants failed to obtain prior express consent to initiate such calls.

224. By initiating unsolicited telephone calls to Plaintiff Chinitz's other class members' residential telephone lines without prior express consent, and by using artificial or prerecorded voices to deliver messages, the Realogy Defendants have violated 47 U.S.C. § 227(b)(1)(B).

225. As a result of violations of 47 U.S.C. § 227(b)(1)(B) by or on behalf of the Realogy Defendants, Plaintiff Chinitz and other class members seek an award of $500.00 in statutory damages from the Realogy Defendants for each and every negligent violation, pursuant to 47 U.S.C. § 227(b)(3).

226. As a result of violations of 47 U.S.C. § 227(b)(1)(B) by or on behalf of the Realogy Defendants, Plaintiff Chinitz and other class members seek an award of $1,500.00 in statutory damages from the Realogy Defendants for each and every knowing and/or willful violation, pursuant to 47 U.S.C. § 227(b)(3).

227.    Plaintiff Chinitz and other class members also suffered damages in the form of invasion of privacy.

228.    Plaintiff Chinitz and other members also seek injunctive relief prohibiting the Realogy Defendants' illegal conduct in the future, pursuant to 47 U.S.C. § 227(b)(3).

## CLAIM V

### Violation of 47 U.S.C. § 227(b)(1)(B)
### (By Plaintiff Chinitz on Behalf of Artificial or Prerecorded Message Mojo Subclasses Against Defendant Mojo)

229.    Plaintiff Chinitz incorporates by reference all above paragraphs as though fully repeated herein.

230.    Plaintiff Chinitz brings this claim on behalf of members of the Artificial or Prerecorded Message Mojo Subclasses against Defendant Mojo for violation of 47 U.S.C. § 227(b)(1)(B).

231.    The TCPA prohibits a caller from initiating any telephone call to a residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the contacted party unless the call is initiated for emergency purposes, is made solely to collect a debt owed or guaranteed by the United States, or is exempted by a FCC rule or order.

232.    On behalf of the Realogy Defendants (or persons acting on behalf of the Realogy Defendants), Mojo initiated multiple telephone calls using an artificial or prerecorded voice to deliver a message to residential telephone lines of Plaintiff Chinitz and other members of classes.

233.    Mojo, the Realogy Defendants, and the Agents lacked prior express consent to initiate such calls.

234.    By initiating unsolicited telephone calls to Plaintiff Chinitz's and other class members' residential telephone lines without prior express consent, and by using artificial or prerecorded voices to deliver messages, Mojo has violated 47 U.S.C. § 227(b)(1)(B).

235.    As a result of violations of 47 U.S.C. § 227(b)(1)(B) by Mojo on behalf of RBG or RBG's agents, Plaintiff Chinitz and other class members seek an award of $500.00 in statutory damages from Mojo for each and every negligent violation, pursuant to 47 U.S.C. § 227(b)(3).

236.    As a result of violations of 47 U.S.C. § 227(b)(1)(B) by Mojo on behalf of RBG or RBG's agents, Plaintiff Chinitz and other class members seek an award of $1,500.00 in statutory

damages from Mojo for each and every knowing and/or willful violation, pursuant to 47 U.S.C. § 227(b)(3).

237.    Plaintiff Chinitz and other class members also suffered damages in the form of invasion of privacy.

238.    Plaintiff Chinitz and other class members also seek injunctive relief prohibiting Mojo's illegal conduct in the future, pursuant to 47 U.S.C. § 227(b)(3).

## CLAIM VI

### Violation of Cal. Bus. & Prof. Code § 17200, *et seq.*
### (By Plaintiff Chinitz on Behalf of
### The California Cell Phone User Class against the Realogy Defendants)

239.    Plaintiffs incorporate by reference all above paragraphs as though fully repeated herein.

240.    Plaintiff Chinitz brings this claim on behalf of members of the California Cell Phone User Class against the Realogy Defendants for violations of the UCL.

241.    Within four (4) years preceding the filing of this lawsuit, and at all times mentioned herein, the Realogy Defendants have engaged, and continue to engage, in unlawful, unfair, and fraudulent trade practices in California by engaging in the unlawful and unfair business practices outlined in this complaint.

242.    In particular, the Realogy Defendants have engaged, and continue to engage, in unfair and unlawful practices by, without limitation, violating the TCPA as described herein. Where the unfair and unlawful practices alleged herein were performed by the Realogy Agents, they were done with the authorization, knowledge, and/or ratification of the Realogy Defendants, and on behalf of the Realogy Defendants, including their subsidiaries and alter-egos.

243.    Plaintiff Chinitz lost money and property as a result of the Realogy Defendants' TCPA violations. In particular, he purchased a set number outgoing calls every month from his landline provider, as set forth in Paragraph 134. Because of the Realogy Defendants' TCPA violations, Mr. Chinitz had to utilize a portion of those outgoing calls to call the Realogy Defendants to complain (including using calls to identify which entity controlled the Realogy Agents and could ensure the calls would stop), reducing the number of calls he had available for legitimate calling purposes.

244.    The Realogy Defendants, including their subsidiaries and alter-egos, engaged in these unfair and unlawful practices to increase their profits. Accordingly, Defendants have engaged in unlawful trade practices, as defined and prohibited by section 17200, et seq. of the California Business and Professions Code.

245.    The aforementioned practices, which Defendants have used to their significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendants' competitors as well as injury to the general public.

246.    As a direct and proximate result of such actions, Mr. Chinitz has suffered and continues to suffer injury in fact and has lost money and/or property as a result of such unfair and/or unlawful trade practices and unfair competition in an amount which will be proven at trial.

247.    As a direct and proximate result of such actions, Realogy Defendants have enjoyed, and continue to enjoy, significant financial gain in an amount which will be proven at trial.

248.    Mr. Chinitz seeks, on behalf of those similarly situated, a declaration that the above-described trade practices are unfair, and/or unlawful.

249.    Mr. Chinitz seeks, on behalf of those similarly situated, an injunction to prohibit the Realogy Defendants from continuing to engage in the unfair and/or unlawful trade practices complained of herein. Such misconduct by the Realogy Defendants, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendants will continue to violate the laws of California, unless specifically ordered to comply with the same. Mr. Chinitz, those similarly situated and/or other consumers nationwide have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

## CLAIM VII

**Violation of Cal. Bus. & Prof. Code § 17200, *et seq.***
**(By Plaintiff Chinitz on Behalf of**
**The California Cell Phone User Mojo Subclass against Defendant Mojo)**

250.    Plaintiffs incorporate by reference all above paragraphs as though fully repeated herein.

251.     Plaintiff Chinitz brings this claim on behalf of members of the California Cell Phone User Class against Mojo for violations of the UCL.

252.     Within four (4) years preceding the filing of this lawsuit, and at all times mentioned herein, Mojo has engaged in, and continues to engage, in unlawful and unfair trade practices in California by engaging in the unlawful and unfair business practices outlined in this complaint.

253.     In particular, Mojo has engaged, and continue to engage, in unfair and unlawful practices by, without limitation, violating the TCPA as described herein.

254.     Plaintiff Chinitz lost money and property as a result of Mojo's TCPA violations. In particular, he purchased a set number outgoing calls every month from his landline provider, as set forth in Paragraph 134. Because of Mojo's TCPA violations, Mr. Chinitz had to utilize a portion of those outgoing calls to call the Realogy Defendants to complain (including using calls to identify which entity controlled the Realogy Agents and could ensure the calls would stop), reducing the number of calls he had available for legitimate calling purposes..

255.     Mojo engaged in these unfair and unlawful practices to increase its profits. Accordingly, Mojo has engaged in unlawful trade practices, as defined and prohibited by section 17200, et seq. of the California Business and Professions Code.

256.     The aforementioned practices, which Mojo has used to its significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Mojo's competitors as well as injury to the general public.

257.     As a direct and proximate result of such actions, Mr. Chinitz has suffered and continue to suffer injury in fact and have lost money and/or property as a result of such unfair and/or unlawful trade practices and unfair competition in an amount which will be proven at trial.

258.     As a direct and proximate result of such actions, Mojo has enjoyed, and continue to enjoy, significant financial gain in an amount which will be proven at trial.

259.     Mr. Chinitz seeks, on behalf of those similarly situated, a declaration that the above-described trade practices are unfair, and/or unlawful.

260.     Mr. Chinitz seeks, on behalf of those similarly situated, an injunction to prohibit the Mojo from continuing to engage in the unfair and/or unlawful trade practices complained of herein.

1   Such misconduct by Mojo, unless and until enjoined and restrained by order of this Court, will continue

2   to cause injury in fact to the general public and the loss of money and property in that Defendants will

3   continue to violate the laws of California, unless specifically ordered to comply with the same. Mr.

4   Chinitz, those similarly situated and/or other consumers nationwide have no other adequate remedy at

5   law to ensure future compliance with the California Business and Professions Code alleged to have

6   been violated herein.

7

8                                   **PRAYER FOR RELIEF**

9          WHEREFORE, Plaintiffs and the Classes demand judgment as follows:

10         1.       Statutory damages of $500.00 for each negligent violation of the TCPA over the last

11   four years;

12         2.       Statutory damages of $1,500.00 for each knowing or willful violation of the TCPA over

13   the last four years;

14         3.       Actual and punitive damages arising from Defendants' wrongful and illegal conduct;

15         4.       A permanent injunction prohibiting the unlawful and unfair conduct set forth herein,

16   including, but not limited to, prohibiting Defendants from using artificial or prerecorded messages to

17   make calls without recipients' prior express consent;

18         5.       Attorney's fees;

19         6.       Litigation expenses and costs of the instant suit; and

20         7.       Such other or further relief as the Court deems proper.

21                                   **JURY DEMAND**

22         Plaintiffs and the Classes demand trial by jury on all claims for which a jury trial is permitted.

23   Date: April 13, 2020                              Respectfully submitted,

24                                          By:   */s/ Michael R. Reese*
                                                 Michael R. Reese (SBN 206773)
25                                               *mreese@reesellp.com*
                                                 Carlos Ramirez (*pro hac vice* to be filed)
26                                               *cramirez@reesellp.com*
                                                 **REESE LLP**
27                                               100 West 93rd Street, 16th Floor
                                                 New York, New York 10025
28                                               Telephone: (212) 643-0500

Facsimile: (212) 253-4272

George V. Granade (SBN 316050)
*ggranade@reesellp.com*
**REESE LLP**
8484 Wilshire Boulevard, Suite 515
Los Angeles, California 90211
Telephone: (310) 393-0070
Facsimile: (212) 253-4272

Hassan A. Zavareei (SBN 181547)
*hzavareei@tzlegal.com*
Kristen G. Simplicio (SBN 263291)
**TYCKO & ZAVAREEI LLP**
1828 L Street, Northwest, Suite 1000
Washington, District of Columbia 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950

Sabita J. Soneji (SBN 224262)
*ssoneji@tzlegal.com*
V Chai Oliver Prentice (SBN 309807)
*vprentice@tzlegal.com*
**TYCKO & ZAVAREEI LLP**
1970 Broadway, Suite 1070
Oakland, California 94612
Telephone: (510) 254-6808
Facsimile: (202) 973-0950

*Counsel for Plaintiffs Ronald Chinitz, Sarah Bumpus, Alain*
*Michael, and Rosemary Rodriguez and the Proposed Classes*

SECOND AMENDED CLASS ACTION COMPLAINT, No. 3:19-cv-03309-JD