1    Sabita J. Soneji (SBN 224262)
     *ssoneji@tzlegal.com*
2    **TYCKO & ZAVAREEI LLP**
     1970 Broadway, Suite 1070
3    Oakland, California 94612
     Telephone: (510) 254-6808
4    Facsimile: (202) 973-0950

5    Hassan A. Zavareei (SBN 181547)
     *hzavareei@tzlegal.com*
6    Kristen G. Simplicio (SBN 263291)
     *ksimplicio@tzlegal.com*
7    **TYCKO & ZAVAREEI LLP**
     1828 L Street, Northwest, Suite 1000
8    Washington, District of Columbia 20036
     Telephone: (202) 973-0900
9    Facsimile: (202) 973-0950

Michael R. Reese (SBN 206773)
*mreese@reesellp.com*
**REESE LLP**
100 West 93rd Street, 16th Floor
New York, New York 10025
Telephone: (212) 643-0500
Facsimile: (212) 253-4272

George V. Granade (SBN 316050)
*ggranade@reesellp.com*
**REESE LLP**
8484 Wilshire Boulevard, Suite 515
Los Angeles, California 90211
Telephone: (310) 393-0070
Facsimile: (212) 253-4272

Rachel E. Kaufman (SBN 259353)
*rachel@kaufmanpa.com*
**KAUFMAN P.A.**
400 NW 26th Street
Miami, FL 33127
Telephone: (305) 469-5881

*Counsel for Plaintiffs Ronald Chinitz, Sarah Bumpus, David Gritz, Micheline Peker, Nathan Rowan, Cheryl Rowan, Daniel Caruso, Paramjit Lalli, and the Proposed Classes*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONALD CHINITZ, SARAH BUMPUS, DAVID GRITZ, MICHELINE PEKER, NATHAN ROWAN, CHERYL ROWAN, DANIEL CARUSO, *and* PARAMJIT LALLI, *individually, and on behalf of a class of similarly situated persons,*<br><br>           Plaintiffs,<br><br>    v.<br><br>REALOGY HOLDINGS CORP., REALOGY INTERMEDIATE HOLDINGS LLC, REALOGY GROUP LLC, REALOGY SERVICES GROUP LLC, REALOGY BROKERAGE GROUP LLC (f/k/a NRT LLC), *and* MOJO DIALING SOLUTIONS, LLC,<br><br>           Defendants. | Case No. 3:19-cv-03309-JD<br><br>**OPPOSITION TO DEFENDANT MOJO DIALING SOLUTIONS, LLC'S MOTION TO DISMISS THIRD AMENDED COMPLAINT**<br><br>Date:  April 22, 2021<br>Time: 10:00 a.m.<br>Courtroom:  11, 19th Floor<br>Judge:  Hon. James Donato |

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

STATEMENT OF FACTS....................................................................................................2

ARGUMENT .........................................................................................................................3

    A.     Plaintiffs Plausibly Allege that Mojo Violated the TCPA. ...........................4

        1.     The FCC and multiple courts have ruled that calling platforms like Mojo can be liable under the TCPA for the conduct alleged here. .................4

        2.     Plaintiffs allege that they received calls from Mojo in violation of the TCPA..............................................................................................................11

CONCLUSION....................................................................................................................12

# **TABLE OF AUTHORITIES**

## CASES

*Adzhikosyan v. Callfire, Inc.,*
    No. 19-cv-246, 2019 WL 7856759 (C.D. Cal. Nov. 20, 2019) ................................................ 8

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ................................................................................................................ 4

*Bauman v. Saxe Mgmt. LLC,*
    14-cv-01125-RFB-PAL, 2019 WL 591439 (D. Nev. Feb. 13, 2019) ...................................... 7

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ................................................................................................................ 3

*Brown v. Collections Bureau of Am., Ltd,*
    183 F. Supp. 3d 1004 (N.D. Cal. 2016) ............................................................................... 11

*Cahill v. Liberty Mut. Ins Co.,*
    80 F.3d 336 (9th Cir. 1996) .................................................................................................... 4

*Caldwell v. Caldwell,*
    No. C 05-4166 PJH, 2006 U.S. Dist. LEXIS 13688, at *11 (N.D. Cal. Mar. 13, 2006) ...... 3

*Campbell-Ewald Co. v. Gomez,*
    136 S. Ct. 663, 193 L. Ed. 2d 571 (2016) .............................................................................. 5

*De La Cabada v. Ytel, Inc.,*
    19-cv-07178-JSC, 2020 WL 1156909 (N.D. Cal. March 10, 2020) .................................. 5, 8

*Edwards v. Juan Martinez,,*
    No. 2:20-cv-00570-JAD-EJY, 2020 U.S. Dist. LEXIS 232262 (D. Nev. Dec. 10, 2020) ...... 8

*Gomez v. Campbell-Ewald Co.,*
    768 F.3d 871 (9th Cir. 2014) *aff'd,* 577 U.S. 153 (2016) ...................................................... 5

*Hurley v. Messer,*
    No. CV 3:16-9949, 2018 WL 4854082 (S.D.W. Va. Oct. 4, 2018) ........................................ 7

*In re Dish Network, LLC,*
    28 FCC Rcd. 6574 (2013) ........................................................................................................ 4

*In re Rules and Regulations Implementing the Tel. Consumer Prot. Act 1991,*
    30 FCC Rcd. 7961 (2015) ........................................................................................................ 5

*In the Matter of Call-Em-All, LLC, Federal Communications Commission Citation and Order,*
    30 FCC Rcd. 4532, 2015 WL 2064523 (May 4, 2015) .......................................................... 7

*In the Matter of Dialing Services, LLC, Notice of Apparent Liability for Forfeiture,*
    29 FCC Rcd. 5537, 2014 WL 1871109 (May 7, 2014) ............................................ 7, 9, 10, 11

*Komaiko v. Baker Techs., Inc.,*
    No. 19-CV-03795-DMR, 2020 WL 1915884 (N.D. Cal. Apr. 20, 2020) ............................ 6, 9

*Kramer v. Autobytel, Inc.,*
    759 F. Supp. 2d 1165 (N.D. Cal. 2010) ................................................................................ 11

*Linlor v. Five9, Inc.,*
    No. 17CV218-MMA (BLM), 2017 U.S. Dist. LEXIS 108162, 2017 WL 2972447 (S.D. Cal. July
    12, 2017) ................................................................................................................................. 8

*Meeks v. Buffalo Wild Wings, Inc.,*
    No. 17-cv-7129, 2018 WL 1524067 (N.D. Cal. April 30, 2018) ............................................ 8

*Nunes v. Twitter, Inc.,*
    194 F.Supp.3d 959 (N.D. Cal. 2016) ..................................................................................... 6

*Wick v. Twilio, Inc.,*
    No. C16-00914RSL, 2017 WL 2964855 (W.D. Wash. July 12, 2017) .................................. 6

**STATUTES**

47 U.S.C. § 227(b)(1)(B) ............................................................................................................ 10

47 U.S.C. § 227(b)(2) .................................................................................................................. 5

Plaintiffs Ronald Chinitz, Sarah Bumpus, David Gritz, Micheline Peker, Nathan Rowan, Cheryl Rowan, Daniel Caruso, and Paramjit Lalli ("Plaintiffs"), through their undersigned counsel, respectfully submit the following opposition to the motion filed by defendant Mojo Dialing Solutions, LLC ("Mojo") to dismiss the claims against Mojo (Dkt. 120) ("Motion" or "Mot.").

## **INTRODUCTION**

Several years ago, the Federal Communications Commission ("FCC") faced a difficult problem that continues to plague the nation to this day. A new generation of web-based robocalling platforms was on the rise, enabling never-before-seen levels of Internet-enabled robocalling and texting. Recognizing the problem, the FCC—in a series of Orders in 2013, 2015, and 2016—clarified that the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, *et seq.*, imposes liability on the entities that facilitate illegal robocalling on their platforms.

Mojo provides such a web-based calling platform, used by violators of the TCPA such as co-defendants Realogy Holdings Corp., Realogy Intermediate Holdings LLC, Realogy Group LLC, Realogy Services Group LLC, Realogy Brokerage Group LLC f/k/a NRT LLC, and their agents (collectively, "Coldwell Banker").

Mojo's main argument with respect to plaintiff's TCPA claim is that Mojo was not the maker or initiator of the calls at issue in this case. But Mojo fails to address FCC rulings and on-point precedent from this Court that have established that the Court must look "to the totality of the facts and circumstances surrounding the placing of a particular call to determine . . . whether another person or entity was so involved in placing the call as to be deemed to have initiated it, considering the goals and purposes of the TCPA." Here, Mojo offered and promoted a service to real estate agents that allowed them to robocall up to three numbers at a time from a list of numbers that Mojo provided, and to deliver prerecorded messages in a variety of circumstances, including if an agent is not ready to attend to an answered call or an answering machine picks up. Instead of taking measures to ensure that the lists excluded numbers on the National Do Not Call Registry ("NDNCR"), Mojo gave its clients the ability to include and call NDNCR phone numbers provided by Mojo. Mojo also provided Coldwell Banker agents the option to "mask" or "spoof" their real phone numbers when the calls are placed in order to give its clients "a level of anonymity that will allow you to cycle the lead multiple

times before showing up on their 'irritation' meter." Third Amended Complaint ("Complaint" or "TAC"), Dkt. 118, ¶¶ 78-79. Under these facts and circumstances, where Mojo knowingly facilitated violations of the TCPA, Mojo was the maker or initiator of the calls attributed to it in the Complaint.

Mojo also argues Plaintiffs have not alleged that some of the calls they received from Mojo used prerecorded messages. This argument fails in the face of Plaintiffs' detailed allegations regarding the facts and circumstances surrounding the calls – including that they were sent from a dialing platform that promotes the use of prerecorded messages to maximize real estate agents' efficiency – from which the Court may reasonably infer that fact.

Mojo's arguments should be rejected and its Motion to Dismiss should be denied.

## STATEMENT OF FACTS

As alleged in the Complaint, Mojo is an autodialing, robocalling platform that generates and provides lists of telephone numbers to its clients. TAC, ¶¶ 11, 35, 71-81. Mojo provided autodialing services to Coldwell Banker, so that calls to the named plaintiffs and other members of the proposed classes could be made at a high rate of volume through the use of an automatic telephone dialing system. *Id.*, ¶¶ 71-72. Mojo's system has the ability to autodial up to 300 calls per hour with its multi-line dialer function and up to 85 calls per hour with its single-line dialer. *Id.*, ¶ 72.

Mojo also provided and sold lists of telephone numbers to be called through its robocalling service, including (1) Expired Property Leads, (2) For Sale By Owner Leads, (3) For Rent By Owner Leads, and (4) Neighborhood Search for Just Listed/Just Sold Cold-Calling Data. *Id.*, ¶ 73. These lists included telephone numbers and other contact information for homeowners and residents with specific characteristics. *Id.* For example, Mojo's Expired Property Leads service provides telephone numbers for homeowners who listed a property but did not complete a sale. *Id.* The Neighborhood Search and a related Free Form Search services provided telephone numbers for homeowners or residents living within user-specified bounds. *Id.*

Mojo's multi-line dialer system dials up to three phone numbers at the same time, allowing the system to work through calling lists rapidly. *Id.*, ¶¶ 72-76. In the event that two called phone numbers are answered at the same time, Mojo suggests that users of its multi-line dialer (such as Coldwell Banker agents) record a voice message that Mojo's service automatically plays if the caller is on another

line with another person. *Id.*, ¶ 77. Mojo saves and stores users' prerecorded voice messages in its system. *Id.* Mojo also has the ability to deliver prerecorded voice messages when an answering machine picks up. https://www.mojosells.com/blog/how-mojo-makes-it-easy-to-leave-messages/ (a hard copy of which is attached as Exhibit 1).[1]

Finally, Mojo's dialing service gave Coldwell Banker agents the option to mask the identity of the source of their calls by providing them with the ability to use an alternative or fake number that they could use as their "caller ID." *Id.*, ¶ 78. Mojo advertises this feature to clients by highlighting that altering caller ID information provides "a level of anonymity that will allow you to" call the same consumers "multiple times before showing up on their 'irritation' meter." *Id.*, ¶ 79. In other words, Mojo knows the purpose and use of this feature are to confuse consumers as to who is calling. *See id.*, at ¶¶ 78-81.

And as is readily apparent from the records Mojo has produced in this litigation that Plaintiffs relied upon in preparing the TAC, all of Mojo's functionalities were used to call Plaintiffs Lalli, Gritz, and Peker. In fact, despite having no relationship with Coldwell Banker or Mojo, and having never consented to their calls, Plaintiff Peker received at least five calls, including at least two generic, commercial, prerecorded messages, from two different Coldwell Banker agents using Mojo's system; Plaintiff Lalli received at least three calls from two different Coldwell Banker agents using Mojo's system; and Plaintiff Gritz received at least four calls, including at least one generic, commercial, prerecorded message, from a Coldwell Banker agent using Mojo's system. *Id.*, ¶¶ 180-190, 198-211. (These facts are not reasonably in dispute, as they are verifiable from Mojo's own records.)

## **ARGUMENT**

A complaint survives a Rule 12(b)(6) motion to dismiss when it contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Detailed factual allegations are not required, and "[a] claim has facial plausibility when the plaintiff

---

[1] "[W]ebsites and their contents may be proper subjects for judicial notice" in evaluating a motion to dismiss if they are referenced or the source of allegations in the complaint, and a hard copy of the website is provided. *E.g.*, *Caldwell v. Caldwell*, No. C 05-4166 PJH, 2006 U.S. Dist. LEXIS 13688, at *11 (N.D. Cal. Mar. 13, 2006). Plaintiffs both reference and rely on Mojo's website as the primary source for their allegations regarding Mojo's dialing platform's functionalities. *See also* Declaration of Mark A. Romance (ECF 120-1), relying on Mojo's website.

pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In evaluating a Rule 12(b)(6) motion, a court accepts as true all allegations of material fact and construes them in the light most favorable to the plaintiff. *Cahill v. Liberty Mut. Ins Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996).

The gist of Mojo's motion is that, no matter how many hundreds of millions of calls were sent over Mojo's calling platform, the company was none the wiser and had no role in the calls. Mojo arrives at this conclusion by ignoring numerous allegations in the TAC to the contrary, as well as critical FCC Orders and court decisions establishing that Mojo is liable for its knowing role in a third-party's TCPA violations. Mojo's other argument concerning the sufficiency of Plaintiffs' allegations of the use of a prerecorded voice message also fails. As such, the Court should reject Mojo's arguments and deny its motion.

## A. Plaintiffs Plausibly Allege that Mojo Violated the TCPA.

### 1. The FCC and multiple courts have ruled that calling platforms like Mojo can be liable under the TCPA for the conduct alleged here.

Mojo argues that the Complaint fails to allege "that Mojo made a single call," as is required for liability under the TCPA. As such, Mojo claims it should not be held "accountable for calls its customers [such as Coldwell Banker] made for their own benefit using Mojo's dialing software." Mot. at 1.

As an initial matter, it is ludicrous for Mojo to claim the phone calls it placed were merely for the benefit of others, as if Mojo were some sort of non-profit charity. Mojo made these calls because it receives money in exchange for doing so. It also makes money by providing lists of telephone numbers to be called and by allowing its users to spoof other telephone numbers. More critically, recent, binding Orders from the FCC together with on-point decisions from this Court and others establish that Mojo did in fact make and initiate the calls at issue and that they are liable under the TCPA, which prohibits calling platforms such as Mojo from "initiating" TCPA violative calls, including pre-recorded marketing calls, without obtaining prior express consent.

As the FCC first noted in 2013, the TCPA does not define the term "initiate." *In re Dish Network, LLC*, 28 FCC Rcd. 6574, 6583 ¶ 26 (2013). The FCC expanded on this term in a 2015 ruling, explaining that "initiat[ing]" a telephone call may include a variety of factual circumstances. The FCC

established a fact-intensive test that required the decision-maker to "look to the totality of the facts and circumstances surrounding the placing of a particular call to determine: 1) who took the steps necessary to physically place the call; and 2) whether another person or entity was so involved in placing the call as to be deemed to have initiated it, considering the goals and purpose of the TCPA." *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act 1991*, 30 FCC Rcd. 7961, 7980 ¶ 30 (2015) ("2015 FCC Order").

Because the TCPA is within the FCC's jurisdiction to administer, and because Congress has delegated to the FCC authority for "prescrib[ing] regulations to" implement it, 47 U.S.C. § 227(b)(2), these regulations are entitled to deference from this Court. *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 878 (9th Cir. 2014), *aff'd*, 577 U.S. 153 (2016) ("Because Congress has not spoken directly to this issue and because the FCC's interpretation was included in a fully adjudicated declaratory ruling, the interpretation must be afforded *Chevron* deference.").

Subsequent court decisions have elaborated on these FCC Orders, demonstrating circumstances where a robocalling entity such Mojo can be held liable. In a recent decision, a court in this district examined whether an entity could be held liable under the TCPA for providing the platform for its customers to engage in mass dissemination of text messages to cell phones. *De La Cabada v. Ytel, Inc.*, No. 19-cv-07178-JSC, 2020 WL 1156909 (N.D. Cal. March 10, 2020) ("*Ytel*").[2] The court held that even though the facts pled in that action did not allege that the defendant—Ytel, Inc.— had physically initiated sending the messages itself, Ytel was still culpable because: "[t]he FCC 'look[s] to the totality of the facts and circumstances surrounding the placing of a particular call to determine . . . whether another person or entity was so involved in placing the call as to be deemed to have initiated it, considering the goals and purposes of the TCPA.'" *Id.* at *3 (quoting 2015 FCC Order, 30 FCC Rcd. at 7980). The court then looked at the following four factors to determine whether Ytel made the calls:

> (1) who create[d] the content of the messages; (2) who decide[d] "whether, when or to whom" a message is sent; (3) "the extent to which a person willfully enables fraudulent spoofing of telephone numbers or assists telemarketers in blocking Caller

---

[2] A text message falls within the meaning of "to make any call" under the TCPA. *See Campbell-Ewald Co. v. Gomez*, 136 S. Ct. at 667, as revised (Feb. 9, 2016).

ID, by offering either functionality to clients"; and (4) "whether a person who offers a calling platform service for the use of others has knowingly allowed its client(s) to use that platform for unlawful purposes."

*Id.* at *4 (quoting and citing 2015 FCC Order, 30 FCC Rcd. at 7980-81). The court concluded that because two of the factors were met (while two were not met), this was sufficient to defeat a motion to dismiss because "based on the totality of the circumstances, Plaintiffs still plausibly allege that Ytel was so involved with the communications as to be deemed to have made them." *Id.*

Even more recently, a court in this district examined the TCPA liability of a company that operates a platform that "allows clients to send customers text messages through an automatic telephone dialing system ('ATDS')." *Komaiko v. Baker Techs., Inc.*, No. 19-CV-03795-DMR, 2020 WL 1915884, at *2 (N.D. Cal. Apr. 20, 2020). Relying in part on the *Ytel* decision, the Court applied the totality of the circumstances test and found that the platform operator was the initiator or maker of text messages that its clients sent out to their customer using the platform. *Id.* at *16-17.[3]

In reaching this conclusion, the *Komaiko* court also relied on the decision in *Wick v. Twilio, Inc.*, No. C16-00914RSL, 2017 WL 2964855, at *4 (W.D. Wash. July 12, 2017). In *Wick*, the court considered whether a messaging platform could be held liable for providing texting services to a TCPA violator. *Id.* at *4. The court found that under the totality of the circumstances, Twilio could be liable as the initiator of the text messages. *Id.* In a separate case against Twilio, another court similarly held that the texting platform could be liable for the texts of its customers:

> Plaintiffs state a claim for Twilio's liability under the TCPA that is plausible on its face. Accepting the facts in Plaintiffs' complaint as true, Twilio took steps necessary to send the automated text messages. Twilio's alleged involvement was to an extent that Twilio could be considered to have initiated the contact, considering the TCPA's goal of limiting the nuisance and invasion of privacy caused by automated calls and text messages. Plaintiffs also allege that Twilio not only knowingly allowed DSP to use their platform for automated text messages but actively helped DSP bypass spam filters. Because the FCC has determined that transmitters can be liable under the TCPA under certain circumstances, and because Plaintiffs allege circumstances under which liability is plausible, Plaintiffs state a claim against Twilio under the TCPA.

---

[3] Although not directly on point, the decision in *Nunes v. Twitter, Inc.*, 194 F.Supp.3d 959 (N.D. Cal. 2016), is also instructive. In *Nunes*, the Court found that Twitter was the maker of the relevant text messages—even though it did not have any control over their content—because "Twitter is the one that uses what Nunes alleges to be an 'automatic telephone dialing system' to send the text message to the recipient. And Twitter is the actual sender of the text (after converting the tweet to a format that can be delivered via text)." *Id.* at 962.

*Bauman v. Saxe Mgmt. LLC*, 14-cv-01125-RFB-PAL, 2019 WL 591439, at *3 (D. Nev. Feb. 13, 2019).

In *Hurley v. Messer*, No. CV 3:16-9949, 2018 WL 4854082, at *4 (S.D.W. Va. Oct. 4, 2018), the court considered whether two robocaller platform providers—Callcentric and RingCentral—could be held liable for providing calling services to an alleged TCPA violator. *Id.* at *4. Callcentric and RingCentral argued—as Mojo does here—that they were simply "passive conduit[s]" and could not have initiated the calls at issue. *Id.* The *Hurley* court rejected this argument, relying on allegations that the providers "offered a calling platform for others to use," "knew about the illegal conduct," and "had a right to control the conduct" to an extent, but allowed the robocalls to continue anyway. *Id.*

The FCC has reached similar results in cases presented before it. Specifically, in *In the Matter of Call-Em-All, LLC, Federal Communications Commission Citation and Order,* 30 FCC Rcd. 4532, 2015 WL 2064523 (May 4, 2015), the FCC decided that a company that provided a robocalling platform similar to Mojo's violated the TCPA. The platform "Call-Em-All," offers services almost identical to those provided by Mojo:

> Call-Em-All offers a robocalling service whereby clients use the Company to make artificial or prerecorded voice calls to telephone numbers of the clients' choosing. . . . The Company offers several methods for clients to create prerecorded messages for the Company to send. For example, clients can choose to call a Company telephone number and have the Company's system call the client to record a message. Alternatively, clients can upload an audio file to the Company's website or use the Company's software to convert text into speech for a prerecorded message. Once a prerecorded message is created, the Company will, for a fee, send the prerecorded message to a telephone list provided by the client.

*Id.* at 4533 ¶ 4 (footnotes omitted). Under these facts, the FCC found that Call-Em-All violated the TCPA by facilitating robocalls for its clients. *Id.* 4534-35 ¶¶ 6-8.

Likewise, in *In the Matter of Dialing Services, LLC, Notice of Apparent Liability for Forfeiture*, 29 FCC Rcd. 5537, 2014 WL 1871109 (May 7, 2014), the FCC found that Dialing Services LLC, a company that provides the same type of robocalling services as Mojo, was liable under the TCPA for the calls made using the company's platform:

> In its own words, Dialing Services says that it will "dial the phone numbers provided by Customer and play the recorded message provided by Customer to live answered calls and/or answer machines ...." and that it may, among other things control the numbers to be dialed (*e.g.*, by providing voter lists), and review and edit messages. This

is plainly within the understanding of "making" or "initiating" a call under the *DISH Network* standard.

*Id.* at 5544-45 ¶ 18 (footnotes and citations omitted).

In the face of all this dispositive authority, Mojo relies primarily on the decision in *Meeks v. Buffalo Wild Wings, Inc.*, No. 17-cv-7129, 2018 WL 1524067 (N.D. Cal. March 28, 2018). As an initial matter, the case precedes the more recent decisions in *Ytel* and *Komaiko*. But most importantly, *Meeks* is distinguishable on the facts. The text messages at issue in *Meeks* were made to customers who had asked for a table at the restaurant and provided their telephone numbers to the restaurant. *Meeks*, 2018 WL 1524067 at *4. And in its complaint, "the plaintiff has not alleged any facts that would establish that Yelp initiated the text messages sent to plaintiff." *Meeks*, 2018 WL 1524067, at *4. Here, on the other hand, Plaintiffs have alleged numerous facts that show that under the appropriate standard, Mojo made or initiated the call.[4]

Contrary to Mojo's assertion, the totality of the circumstances alleged in the Complaint are more than sufficient to establish that Mojo placed or initiated robocalls to Plaintiffs Peker, Lalli, and Gritz without their prior consent. Plaintiffs need not allege facts to support all four factors to plausibly allege that Mojo made or initiated calls in violation of the TCPA. *Ytel*, 2020 WL 1156909, at *4 (complaint was sufficient even though it contained "no factual allegations" that defendant created the

---

[4] Mojo also relies on *Adzhikosyan v. Callfire, Inc.*, No. 19-cv-246, 2019 WL 7856759 (C.D. Cal. Nov. 20, 2019). But the court in that case found that there was no way to find that the texting platform initiated the calls because, "Plaintiff provides no allegations about the relationship between Defendant and its subscribers." 2019 WL 7856759, at *3. That is a far cry from this case, where the Complaint contains detailed allegations about the relationship between Mojo and Coldwell Banker. *See, e.g.,* SAC ¶¶ 66-75, 81-83, 128. Notably, the court in *Adzhikosyan* allowed for leave to replead against the platform provider, noting it was possible to plead facts to show a reasonable inference of the robocalling platform's liability under the TCPA. 2019 WL 7856759, at *4 (citing 2015 FCC Order, 30 FCC Rcd. at 7980 ¶ 30). *See also Edwards v. Juan Martinez*, No. 2:20-cv-00570-JAD-EJY, 2020 U.S. Dist. LEXIS 232262, at *17 (D. Nev. Dec. 10, 2020) (cited in Mot.) (dismissing claims against platform provider, lead provider, and their CEOs, because unlike with Plaintiffs' claims against Mojo asserting that Mojo is an initiator of the calls, the *pro se* plaintiff's theory of liability against these defendants was based on common law vicarious liability principles); *Linlor v. Five9, Inc.*, No. 17CV218-MMA (BLM), 2017 U.S. Dist. LEXIS 108162, 2017 WL 2972447, at *4 (S.D. Cal. July 12, 2017) (finding that, although the *pro se* plaintiff failed to plead a platform provider's vicarious liability, it would be inappropriate "to find as a matter of law, at the pleadings stage, that Defendant is a common carrier exempt from liability under the TCPA," and granting leave to amend the complaint).

content of the communications or determined when, how, or to whom communications were sent). But here, Plaintiffs sufficiently allege facts in support of at least three of the four factors.

First, Plaintiffs sufficiently allege Mojo is involved in determining who is called because Mojo sells lists of numbers for Coldwell Banker and its other clients to call. *See In the Matter of Dialing Services, LLC,* 29 FCC Rcd. at 5544 ¶ 18 & n.48 (provision of call lists indicated involvement in determination of who would be called). Here, Mojo collects and provides its real estate clients with targeted lists of potential real estate buyers and sellers, not just random numbers. TAC, ¶ 73. Its involvement in determining who gets called indicates it is so involved to be deemed as the maker or initiator of the real estate marketing calls here at issue.

Second, Plaintiffs allege that Mojo provides a specific feature that allows its users to alter their caller ID information and block their true identities and phone numbers from appearing. *Id.*, ¶ 78. These allegations plausibly show Mojo "willfully enables fraudulent spoofing of telephone numbers" or "assists telemarketers in blocking Caller ID." 2015 FCC Order, 30 FCC Rcd. at 7980. Mojo seems to claim that the Complaint is factually wrong and that Mojo does not allow spoofing because the Complaint did not include certain lines of text from its website. Mot. at 9-10. Mojo's argument is both incorrect and irrelevant. Although Mojo's website does suggest some innocent uses of the spoofing technology, that does not alter the fact that Mojo allows its clients to change the numbers that show up on the call recipients' caller identification and that Coldwell Banker did so in this case. Moreover, as Mojo's injection of outside evidence indicates, the "court cannot determine, on a motion dismiss, whether such conduct was designed to deceive, since that goes to the merits." *Komaiko*, 2020 WL 1915884, at *16 n.7. At this stage, Plaintiffs adequately allege that the intended purpose of this feature is, at least in part, to help Mojo users confuse consumers regarding who is calling so as to improve the likelihood of live answers. *Id.*; *see also* TAC, ¶¶ 78-81. These allegations concerning Mojo's calls sufficiently support a reasonable inference that Mojo was so involved in the placing of the calls to be deemed the maker or initiator of the calls.

Third, Plaintiffs allege Mojo has knowingly allowed its clients to use its platform in violation of the TCPA. For example, Mojo does not thoroughly vet its lists to ensure that the numbers on the list are not on the NDNCR. *Id.*, ¶¶ 74, 88. Indeed, as Mojo's website makes clear, Mojo allows users

to purchase and call Mojo lists that it knows contain NDNCR numbers. See ECF No. 66-2. Mojo also knows, based on its records of clients' use of its lists and platform, that many clients in fact call numbers on the NDNCR. *See* TAC, ¶ 90. Despite this knowledge, Mojo has no written procedures or training for its clients aimed at preventing those clients from calling numbers that are on the NDNCR. *Id.* Instead, Mojo affirmatively urges its clients to tell complaining call recipients that "the calls will stop after you list their home!" *Id.*, ¶ 79.

In addition, the Mojo platform is designed to allow its clients to bombard massive numbers of people with auto-dialed telephone calls, including by placing multiple calls at the same time. *Id.*, ¶¶ 72, 75. In the event that a consumer answers when the client is on the line with another consumer, Mojo automatically plays a prerecorded message when the second call is answered. *Id.*, ¶ 77. Similarly, in the event that a call is answered by an answering machine, Mojo also provides the ability to transmit prerecorded messages to save the agent time and allow them to move on to the next call. [https://www.mojosells.com/blog/how-mojo-makes-it-easy-to-leave-messages/](https://www.mojosells.com/blog/how-mojo-makes-it-easy-to-leave-messages/). Mojo's clients' prerecorded messages are recorded, saved, and stored on Mojo's platform; and Mojo's platform automatically plays the message to consumers—without considering the consumer's express consent to receive such calls. *Id.* Mojo knowingly provides this feature without regard to the prohibition under 47 U.S.C. § 227(b)(1)(B) against making calls using a prerecorded voice to deliver a message without the prior express consent of the called party. *Id.*, ¶ 102. The provision of this feature thus supports a finding of Mojo's liability as a party "so involved in placing the call as to be deemed to have initiated it."

Finally, Mojo's involvement in recording, saving, storing, and automatically playing prerecorded messages on certain calls also indicates that they are involved in determining the content of and physically placing at least some of the calls. *See In the Matter of Dialing Services, LLC*, 29 FCC Rcd. at 5544 ¶ 17 (highlighting as relevant that the dialing platform helps users record the messages, stores the prerecorded messages on its servers, and through its software—not the user's action— actually "plays" the sound recordings to the called party after detecting that the call was answered by a live person). That the making of these prerecorded message calls "takes place through the electronic running of the [Mojo's] computer software—not through a person dialing a phone—is irrelevant" to

the determination that the Mojo "initiated" the calls that played prerecorded messages to consumers. *Id.* at 5545 ¶ 18.

### 2. Plaintiffs allege that they received calls from Mojo in violation of the TCPA.

Mojo further argues that Plaintiffs have not plausibly alleged the use of Mojo's platform for any TCPA violations. *See* Mot. § III.b. But, "a [TCPA] plaintiff need not somehow have inside knowledge of a defendant's operations and equipment to survive dismissal under Rule 12(b)(6) . . . ." *Brown v. Collections Bureau of Am., Ltd*, 183 F. Supp. 3d 1004, 1005 (N.D. Cal. 2016) (concerning allegations of defendant's use of ATDS). Further, "because the TCPA is designed to combat mass unsolicited commercial telemarketing, at times involving thousands of calls or text messages, notice pleading standards do not require a plaintiff to allege details at the pleading stage about the time and context of every text message" or call. *Kramer v. Autobytel, Inc.*, 759 F. Supp. 2d 1165, 1172 (N.D. Cal. 2010). The Complaint is sufficient under these standards; to credit Mojo's argument, the Court would need to ignore well-pled facts and draw inferences in Mojo's favor, instead of Plaintiff's as required. Notwithstanding, the source of Plaintiffs' allegations that they received calls made using Mojo's platform is *Mojo's own records*.

The TAC makes clear that "Mojo calls people on the NDNCR," TAC ¶ 88, and sends prerecorded messages to consumers, *id.*, ¶ 77. And Plaintiffs' facts lend specific support to these allegations. First, Plaintiffs Peker, Gritz, and Lalli each allege that they received numerous calls from Mojo—in particular from the Mojo numbers used by Coldwell Banker agents. TAC, ¶¶ 189, 201, 209. This allegation is made in the context of Mr. Gritz's and Mr. Lalli's allegations that they received multiple unwanted calls from Coldwell Banker agents to phone numbers registered on the NDNCR. *Id.*, ¶¶ 206-211, 198-205. Reading the allegations in the light most favorable to Plaintiffs, and understanding that the calls are specifically identified in Mojo's own records produced in this litigation, it is reasonable to infer that the multiple calls made by Mojo were to the numbers on the NDNCR.

Second, Plaintiffs also plausibly allege Mojo places calls using prerecorded messages. In particular, Ms. Peker and Mr. Gritz allege that they each received calls picked up by their answering machines, resulting in generic, commercial, prerecorded calls soliciting Plaintiffs to list their properties with Coldwell Banker agents despite Plaintiffs having never consented to be contacted by any of the

Defendants. *Id.*, ¶¶183, 210. These facts plausibly allege the use of prerecorded messages as part of Mojo's multi-line dialer system, which can play a prerecorded message to consumers when an answering machine picks up. https://www.mojosells.com/blog/how-mojo-makes-it-easy-to-leave-messages/. The Court should therefore deny Mojo's motion.

## CONCLUSION

For the reasons stated above, Defendant Mojo Dialing Solution's Motion must be denied in its entirety.

Respectfully submitted,

Date: March 26, 2021

By: _/s/ Sabita J. Soneji_

**TYCKO & ZAVAREEI LLP**
Sabita J. Soneji (State Bar No. 224262)
*ssoneji@tzlegal.com*
1970 Broadway, Suite 1070
Oakland, California 94612
Telephone: (510) 254-6808
Facsimile: (202) 973-0950

**TYCKO & ZAVAREEI LLP**
Hassan A. Zavareei (State Bar No. 181547)
*hzavareei@tzlegal.com*
Kristen Simplicio (State Bar No. 263291)
*ksimplicio@tzlegal.com*
1828 L Street, Northwest, Suite 1000
Washington, District of Columbia 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950

**REESE LLP**
Michael R. Reese (State Bar No. 206773)
*mreese@reesellp.com*
100 West 93rd Street, 16th Floor
New York, New York 10025
Telephone: (212) 643-0500
Facsimile: (212) 253-4272

**REESE LLP**
George V. Granade (State Bar No. 316050)
*ggranade@reesellp.com*
8484 Wilshire Boulevard, Suite 515
Los Angeles, California 90211
Telephone: (212) 643-0500
Facsimile: (212) 253-4272

Rachel E. Kaufman (SBN 259353)
rachel@kaufmanpa.com
**KAUFMAN P.A.**
400 NW 26th Street
Miami, FL 33127
Telephone: (305) 469-5881

*Counsel for Plaintiffs*
*and the Proposed Class*

PLAINTIFFS' OPPOSITION TO MOJO DIALING SOLUTION, LLC'S MOTION TO DISMISS TAC
*Chinitz, et al. v. Realogy Holdings Corp., et al.*, No. 3:19-cv-03309-JD

13

# EXHIBIT 1



HOME   MEDIA   PRICING   BLOG   FAQ

ABOUT US    LOGIN     SIGN UP

CONTACT US



# How Mojo Makes It Easy to Leave Messages

OCTOBER 20, 2009

In the past, leaving an answering machine message was cumbersome, repetitive, boring, slow, and failed to yield enough positive results. Nothing could ruin your sales mojo more than hitting answering machine 'speed bumps' every other call.

Many agents do not believe in leaving messages. On average, only about 5% of their answering machine messages ever get returned so, for every 100 people, five call back and you may get one or two solid leads from it. On the average, calling a lead, listening to their message, and then dropping yours would take about a minute and a half, if not longer. For those two leads, you spent a couple hours, said the same thing over and over 100 times, and lost a bit of sanity in the process.

Finally, Mojo has leveled the playing field. Now you can leave quality messages without wasting your time, energy, or sanity. Leaving a message now is as easy as clicking a button, actually it IS clicking a button. Our program has the ability to pre-record your messages and as soon as you hear an answering machine pick up, all you do is click a button, no waiting for the Beep, and you are already off to the next call. And you can bank multiple messages for use in different calling stages.

Now here are some tips on how to leave that perfect message.

1. **Treat it like a radio commercial**
   Do you Remember that radio commercial from the local auto dealer you heard on your drive to work today? You may not be in the market for a car, but the pitch stayed with you. Many of the elements that work for radio commercials apply with

answering machine messages. So think about what resonates with you from these ads when you compose your answering machine script.

2. **K. I. S. S. (Keep It Short & Simple)**

The message you leave should not last more than 30 seconds. Get to the basic point of why you're calling. Some machines out there have a cutoff of 30 seconds. Nothing is worse than giving a great pitch and having the machine cut off you're contact numbers.

3. **Speak clearly and evenly**

You want to make sure that your message is heard. And we all know that answering machines are not the most sophisticated recording devices out there. Make sure your message is clear and even. This may take a couple of tries before it's perfected, but once you get it right, you don't have to do again, ever.

4. **Hit the 'Hot Buttons'**

Commercial writers know that every word counts. They also know that some words carry a lot more weight than others. The most effective ads use â€œhot buttonâ€ words. â€œFreeâ€ and â€œaffordableâ€ are powerful words because they grab peopleâ€™s attention. But these â€œhot buttonâ€ words may not apply to your particular business. You need to use the right words for your specific audience. Other examples are: Low Price, Quick, Easy, Guaranteed, and Trusted.

5. **Offer the solution to their problem**

Make sure to mention how you can be the solution to a problem that they have. It may not look like a problem on the outside, but you are calling because you have a solution to something in their life. A Real Estate Agent is solving their problem of buying or selling a home. An Insurance Agent is solving their problem of not having coverage or lowering high premium costs. A Mortgage Broker is solving their problem by getting them a mortgage or a better rate. Think of how you can solve their problem and incorporate it into your message.

6. **'But Wait, There's More'**

You always want to leave them wanting more. It makes them want to call you to find out more information. Your message should tell basically what you can do for them, but if they want specifics, they will need to call. You may also want to tell them that they will receive a free gift when they call, such as a free home evaluation, or a free health insurance quote.

7. **Put a Time Stamp on it.**

You can also give them a sense of urgency by reinforcing that they need to get back

to you in a short amount of time. By setting a deadline, they may feel more inclined to call if they feel that to offer wont stay on the table for long.

8. **Double Up Your Contact Numbers**

    Your message should have your point of contact mentioned at least twice. If they are writing your number down, now they don't have to keep playing the message over and over to get your number.

9. **Get up! Stand Up!**

    Standing up when you are leaving your message is old sales trick that works well. By Standing, it naturally gets your energy up. Therefore it will show in your message. The more enthusiastic you will sound. A good rule of thumb is that if you think you're pitch is too upbeat or 'over the top', then you've probably got it just right.

10. **Write Down Your Message and Practice the Script**

This one goes without saying, but I am mentioning it anyway. Write down your message and practice. Practice makes perfect, and you don't want to sound like you are reading a script. You want to own these words. The more you own the words, the more natural and conversational you will sound.

This may sound like a lot of information that you need to cram into a thirty second time frame but it can be done. Start timing your message before you record it. And once it's recorded, all you need to do is keep pressing the message button and cashing in on all the extra leads that start coming in!

---

**Related**



Prevent Prospecting's 'Silent Killer' with Mojo's Updated Neighborhood Search
June 6, 2019
In "Cold Calling in Real Estate"

Sync Mojo with Commissions Inc.
This past year we've been on a big push to connect Mojo with the major Real Estate CRM platforms. We are very excited to announce completion of our
October 17, 2017
In "Integrations"



Meet the New Must-Have Circle Prospecting Tool
April 17, 2020
In "Real Estate Data"

---

« ANSWERING MACHINE DETECTION TECHNOLOGY          ANSWERING MACHINE TIPS »

## ONE COMMENT

 **Sales Training** says:

March 27, 2010 at 4:54 am

Thank you for your help!

---

You must log in to post a comment.

                                                    © 2021