1   Sabita J. Soneji (State Bar No. 224262)        George V. Granade (State Bar No. 316050)
    *ssoneji@tzlegal.com*                          *ggranade@reesellp.com*
2   **TYCKO & ZAVAREEI LLP**                        **REESE LLP**
    1970 Broadway, Suite 1070                      8484 Wilshire Boulevard, Suite 515
3   Oakland, California 94612                      Los Angeles, California 90211
    Telephone: (510) 254-6808                      Telephone: (310) 393-0070
4
    Hassan A. Zavareei (State Bar No. 181547)
5   *hzavareei@tzlegal.com*                         Michael R. Reese (State Bar No. 206773)
    Mark Clifford (*pro hac vice*)                  *mreese@reesellp.com*
6   *mclifford@tzlegal.com*                         **REESE LLP**
    Allison Parr (*pro hac vice*)                   100 West 93rd Street, 16th Floor
7   *aparr@tzlegal.com*                             New York, New York 10025
    **TYCKO & ZAVAREEI LLP**                        Telephone: (212) 643-0500
8   1828 L Street, Northwest, Suite 1000
    Washington, District of Columbia 20036
9   Telephone: (202) 973-0900

10  Rachel E. Kaufman (State Bar No. 259353)
    *rachel@kaufmanpa.com*
11  **KAUFMAN P.A.**
    400 Northwest 26th Street
12  Miami, Florida 33127
    Telephone: (305) 469-5881

13
    *Counsel for Plaintiffs Sarah Bumpus, David Gritz, Micheline*
14  *Peker, and Cheryl Rowan, and the Proposed Classes*

15              **UNITED STATES DISTRICT COURT**
                **NORTHERN DISTRICT OF CALIFORNIA**
16                  **SAN FRANCISCO DIVISION**

17
    SARAH BUMPUS, DAVID GRITZ,            Case No. 3:19-cv-03309-JD
18  MICHELINE PEKER, *and* CHERYL
    ROWAN, *individually, and on behalf of a class of*   **[REDACTED] PLAINTIFFS' NOTICE**
19  *similarly situated persons*,        **OF MOTION AND MOTION FOR**
                                         **CLASS CERTIFICATION;**
20                  Plaintiffs,          **MEMORANDUM OF POINTS AND**
            v.                           **AUTHORITIES**
21
    REALOGY HOLDINGS CORP.;              Date: November 4, 2021
22  REALOGY INTERMEDIATE HOLDINGS        Time: 10:00 a.m.
    LLC; REALOGY GROUP LLC; REALOGY      Place: Courtroom 11, 19th Floor
23  SERVICES GROUP LLC; REALOGY          Judge: Honorable James Donato
    BROKERAGE GROUP LLC (f/k/a NRT
24  LLC); *and* MOJO DIALING SOLUTIONS,
    LLC,
25
                    Defendants.
26

27

28

1

## NOTICE OF MOTION AND MOTION

2   **PLEASE TAKE NOTICE** that on November 4, 2021, at 10:00 a.m., Plaintiffs Sarah

3  Bumpus, Micheline Peker, and Cheryl Rowan, individually, and on behalf of a class of similarly situated

4  persons, will and hereby do move for class certification before the Honorable James Donato, United

5  States District Court for the Northern District of California, San Francisco Courthouse, Courtroom

6  11, 19th Floor, 450 Golden Gate Avenue, San Francisco, California 94102. Plaintiffs request that the

7  Court:

8    (i)    certify the NDNCR Class (defined below in the Memorandum of Points and

9           Authorities) and appoint Plaintiff Sarah Bumpus as the class representative thereof;

10   (ii)   certify the Internal DNC Class (defined below) and appoint Plaintiff Sarah Bumpus as

11          the class representative thereof;

12   (iii)  certify the Prerecorded Message Class (defined below) and appoint Plaintiffs Cheryl

13          Rowan and Micheline Peker as the class representatives thereof;

14   (iv)   certify the Prerecorded Message Mojo Subclass (defined below) and appoint Plaintiff

15          Micheline Peker as the class representative thereof; and

16   (v)    appoint Tycko & Zavareei LLP, Reese LLP, and Kaufman P.A. as class counsel.

17   Plaintiffs respectfully seek class certification pursuant to Rule 23(a), (b)(2), and (b)(3) of the

18  Federal Rules of Civil Procedure. Plaintiffs make this motion on the ground that the numerosity,

19  commonality, typicality, and adequacy of representation requirements of Rule 23(a) are met. Plaintiffs

20  also make this motion on the ground that questions of law and fact common to the Classes

21  predominate over any questions affecting individual members, and a class action is the superior

22  method for adjudicating the dispute. Furthermore, Defendants have acted or refused to act on grounds

23  generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding

24  declaratory relief with respect to each Class as a whole.

25   Plaintiffs base the motion on the following documents: this Notice of Motion and Motion;

26  the accompanying Memorandum of Points and Authorities; the pleadings, record, and other filings in

27  the case; the Declaration of Sabita J. Soneji and its accompanying exhibits, the Corrected Expert

28  Report of Anya Verkhovskaya, the Rebuttal Expert Report of Anya Verkhovskaya, the Declaration of

1   Randall A. Snyder, and the Rebuttal Expert Report of Randall A. Snyder, all filed concurrently

2   herewith; and such other oral and written points, authorities, and evidence as the parties may present

3   at the time of the hearing on the motion.

4

5   Date: August 20, 2021                              **TYCKO & ZAVAREEI LLP**

6                                              By:  _/s/_____
                                                   Sabita J. Soneji (State Bar No. 224262)
7                                                  *ssoneji@tzlegal.com*
                                                   1970 Broadway, Suite 1070
8                                                  Oakland, California 94612
                                                   Telephone: (510) 254-6808
9
                                                   **TYCKO & ZAVAREEI LLP**
10                                                 Hassan A. Zavareei (State Bar No. 181547)
                                                   *hzavareei@tzlegal.com*
11                                                 Mark Clifford (*pro hac vice*)
                                                   *mclifford@tzlegal.com*
12                                                 Allison Parr (*pro hac vice*)
                                                   *aparr@tzlegal.com*
13                                                 1828 L Street, Northwest, Suite 1000
                                                   Washington, District of Columbia 20036
14                                                 Telephone: (202) 973-0900

15                                                 **KAUFMAN P.A.**
                                                   Rachel E. Kaufman (State Bar No. 259353)
16                                                 *rachel@kaufmanpa.com*
                                                   400 Northwest 26th Street
17                                                 Miami, Florida 33127
                                                   Telephone: (305) 469-5881
18
                                                   **REESE LLP**
19                                                 George V. Granade (State Bar No. 316050)
                                                   *ggranade@reesellp.com*
20                                                 8484 Wilshire Boulevard, Suite 515
                                                   Los Angeles, California 90211
21                                                 Telephone: (310) 393-0070

22                                                 **REESE LLP**
                                                   Michael R. Reese (State Bar No. 206773)
23                                                 *mreese@reesellp.com*
                                                   100 West 93rd Street, 16th Floor
24                                                 New York, New York 10025
                                                   Telephone: (212) 643-0500

25

26                                                 *Counsel for Plaintiffs Sarah Bumpus, David Gritz,*
                                                   *Micheline Peker, and Cheryl Rowan, and the Proposed*
27                                                 *Classes*

28

# TABLE OF CONTENTS

I.      Introduction .................................................................................................1

II.     Statement of Issues to Be Decided .............................................................2

III.    Factual Background ......................................................................................2

        A.      The Realogy Defendants Direct Their Agents' Calling Conduct.................2

        B.      The Realogy Defendants' TCPA Related Policies and Procedures Are
                Inadequate ..........................................................................................4

        C.      Realogy Agents Purchased Residential Contact Leads ...........................6

        D.      Realogy Agents Used Dialers to Call Those Leads ................................6

        E.      Realogy Agents Placed Over One Million Illegal Telemarketing Calls on
                Realogy's Behalf to Hundreds of Thousands of Residential Numbers,
                Including Those of Plaintiffs Bumpus, Rowan, and Peker.......................7

        F.      Realogy Agents' Calls to Plaintiff Bumpus...........................................8

        G.      Realogy Agents' Calls to Plaintiff Rowan ............................................8

        H.      Realogy Agents' Calls to Plaintiff Peker ..............................................9

        I.      Mojo Initiated the Calls Made by Realogy Realtors Using the Mojo Dialer .................9

IV.     Statutory Background of the Class Members' Claims ................................. 10

V.      The Court Should Certify the Proposed Classes ....................................... 12

        A.      Common Questions Predominate........................................................ 14

                1.      Common Evidence Will Show That Realogy Agents Made
                        Calls That Violate the TCPA. ................................................ 15

                        a.      Common Evidence Will Show That All Calls Were
                                Made on Behalf of The Realogy Defendants........................ 16

                        b.      Common Evidence Will Show That the Realogy
                                Defendants Knew Or Were Willfully Ignorant of
                                Their Agents' TCPA Violations................................. 17

                        c.      Common Evidence Will Show That Calls Placed by
                                Agents of The Realogy Defendants, Including Those
                                Placed Using Defendant Mojo's Platform, Were
                                Telemarketing Calls. ............................................ 18

                        d.      Common Evidence Will Show That Mojo Initiated
                                the Telemarketing Calls of Realogy Agents Using Its
                                Dialing Platform. ............................................... 19

                        e.      Defendants Will Mount Common Defenses to the
                                Claims of All Class Members. ................................. 19

                        f.      Class-Wide Relief Can Be Proven on a Common
                                Basis. .......................................................... 21

B.   Plaintiffs' Classes and Subclass Satisfy Numerosity.................................... 21

C.   Plaintiffs' Claims Are Typical of the Class Members' Claims ....................... 22

D.   Plaintiffs and Their Counsel Adequately Represent the Class Members.................... 22

E.   The Requirements of Rule 23(B)(2) Are Met ............................................. 23

F.   A Class Action Is a Superior Method for Resolving Plaintiffs' and the Class
     Members' TCPA Claims ........................................................................ 24

VI.  Conclusion...................................................................................................... 25

1

# TABLE OF AUTHORITIES

2

**CASES**

3

*Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*,
  No. 15-CV-6314-YGR, 2017 WL 1806583 (N.D. Cal. May 5, 2017) ................................. 15

4

*Ahmed v. HSBC Bank USA, Nat'l Ass'n*,
  No. 15-cv-02057-FMO-SP, 2017 WL 5720548 (C.D. Cal. Nov. 6, 2017) ........................ 11

5

6

*Barr v. Am. Ass'n of Pol. Consultants*,
  140 S. Ct. 2335 (2020) ................................................................................................ 11

7

8

*Bee, Denning, Inc. v. Cap. All. Grp.*
  310 F.R.D. 614 (S.D. Cal. 2015) ................................................................................ 24

9

*Bennett v. GoDaddy.com LLC*, No. CV-16-3908,
  2019 WL 1552911 (D. Ariz. Apr. 8, 2019) ................................................................ 22

10

*Briseno v. ConAgra Foods, Inc.*,
  844 F.3d 1121 (9th Cir. 2017) ............................................................................... 14, 24

11

12

*Charvat v. GVN Mich., Inc.*,
  561 F.3d 623 (6th Cir. 2009) ..................................................................................... 11

13

*Cherry v. Dometic Corp.*,
  986 F.3d 1296 (11th Cir. 2021) ............................................................................... 24, 25

14

15

*Chinitz v. Intero Real Estate Servs.*
  No. 18-cv-05623-BLF, 2020 WL 7391299 (N.D. Cal. July 22, 2020) ....................... 15, 20

16

*Comcast v. Behrend*
  569 U.S. 27 (2013) ..................................................................................................... 21

17

18

*De La Cabada v. Ytel, Inc.*
  No. 19-cv-07178-JSC, 2020 WL 1156909 (N.D. Cal. March 10, 2020)........................ 12

19

*Dunakin v. Quigley*
  99 F. Supp. 3d 1297 (W.D. Wash. 2015) ................................................................. 22

20

21

*Ellis v. Costco Wholesale Corp.*
  657 F.3d 970 (9th Cir. 2011) ........................................................................... 13, 22, 23

22

*Esparza v. SmartPay Leasing, Inc.*
  No. 17-cv-03421-WHA, 2019 WL 2372447 (N.D. Cal. June 5, 2019) ......................... 14

23

24

*Facebook, Inc. v. Duguid*
  141 S. Ct. 1163 ........................................................................................................... 10

25

*Gager v. Dell Fin. Servs.*
  LLC, 727 F.3d 265 (3d Cir. 2013) ............................................................................... 12

26

27

*Hanlon v. Chrysler Corp.*
  150 F.3d 1011 (9th Cir. 1998) ................................................................................... 23

28

*Hanon v. Dataproducts Corp*
    976 F.2d 497 (9th Cir. 1992) .............................................................................................. 22

*Henderson v. United Student Aid Funds, Inc.*
    918 F.3d 1068, 1073 (9th Cir. 2019) ............................................................................. 12, 21

*Ikuseghan v. Multicare Health Sys.*
    No. C 14-5539 BHS, 2015 WL 4600818 (W.D. Wash. July 29, 2015) ............................... 23

*In re Joint Pet. Filed by Dish Network*
    28 FCC Rcd. 6574 (2013) ................................................................................................. 12

*J.L. v. Cissna*
    No. 18-cv-04914-NC, 2019 WL 415579 (N.D. Cal. Feb. 1, 2019) ...................................... 13

*Jones v. Royal Admin. Servs., Inc.*
    887 F.3d 443 (9th Cir. 2018) ...................................................................................... 19, 20

*Klein v. Commerce Energy, Inc.*
    256 F. Supp. 3d 563 (W.D. Pa. 2017) ................................................................................ 12

*Krakauer v. Dish Network, L.L.C.*
    925 F.3d 643 (4th Cir. 2019) ........................................................................... 15, 17, 19

*Kristensen v. Credit Payment Servs.*
    12 F. Supp. 3d 1292 (D. Nev. 2014) ................................................................................. 15

*Kron v. Grand Bahama Cruise Line*
    LLC, 328 F.R.D. (S.D. Fla. 2018) ...................................................................................... 24

*McCurley v. Royal Seas Cruises, Inc.*
    331 F.R.D. 142 (S.D. Cal. 2019) ................................................................................. 22, 24

*Rodriguez v. Hayes*
    591 F.3d 1105 (9th Cir. 2010) ........................................................................................... 24

*Torres v. Mercer Canyons Inc.*
    835 F.3d 1125 (9th Cir. 2016) ........................................................................................... 14

*Tyson Foods v. Bouaphakeo*
    136 S.Ct. 1036 (2016) ...................................................................................................... 14

*Wagner v. CLC Resorts & Dev,. Inc.*
    32 F. Supp. 3d 1193 (M.D. Fla. 2014) ............................................................................... 11

*Wal-Mart Stores, Inc. v. Dukes*
    564 U.S. 338 (2011) ......................................................................................................... 14

*Walters v. Reno*
    145 F.3d 1032 (9th Cir. 1998) ........................................................................................... 23

*Whitaker v. Bennett Law, PLLC*
    No. 13-cv-03145-L-NLS, 2014 WL 5454398 (S.D. Cal. Oct. 27, 2014) .......................... 15

*Wolin v. Jaguar Land Rover N. Am.,*
  *LLC*, 617 F.3d 1168 (9th Cir. 2010) ............................................................. 14, 22

*Zinser v. Accufix Research Inst., Inc.*
  253 F.3d 1180 (9th Cir. 2001) ........................................................................ 14

**STATUTES**

27 Pub. L. No. 102–243, § 3 ............................................................................. 10

47 C.F.R. § 64.1200(a)-(f) ................................................................. 10, 11, 12, 16

47 U.S.C. § 227(b)-(c) ...................................................................... 11, 12, 16

**OTHER AUTHORITIES**

30 FCC Rcd. at 7980 ........................................................................................ 12

**RULES**

FED. R. CIV. P. 23(a) ............................................................................ 21, 22, 23

FED. R. CIV. P. 23(b) ........................................................................................ 24

FED. R. CIV. P. 23(g) ........................................................................................ 23

**TREATISES**

2 W. Rubenstein, Newberg on Class Actions (5th ed. 2012) ........................... 14

Restatement (Third) Of Agency ................................................................ 20, 21

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   Introduction

Plaintiffs' Telephone Consumer Protection Act ("TCPA") claims against the Realogy Defendants and Mojo are well suited for class certification. To generate new real estate business, Realogy real estate Agents acting in the name of Coldwell Banker (which Realogy owns) made cold, unsolicited telemarketing calls to residential numbers, ignoring whether the calls were unwanted. In their zeal to find more clients and make more money, those Agents purchased leads containing residential telephone numbers aggregated from public records sources and used computer dialers to initiate their telemarketing calls. Defendant Mojo provided the Agents those types of leads and dialers. Neither the Realogy Defendants, their Coldwell Banker-affiliated Agents, nor the companies that sold the leads, including Mojo, had consent of any kind from the consumers in the leads. Moreover, when using these dialers, Realogy Agents called many numbers registered on the National Do Not Call Registry ("NDNCR"), left prerecorded messages, and did not take steps to ensure that individuals who asked never to be called again were placed on a compliant internal do not call list.

Mojo, PhoneBurner, Inc., and WAVV Communications LLC (formerly known as Storm LLC) sold those leads and/or dialers to Realogy's Agents and have produced in this case records of millions of calls made by Realogy Agents using their companies' dialers. Plaintiffs' expert analyzed and aggregated this data, concluding that (1) Realogy Agents made 1,196,835 calls to 245,032 unique residential, NDNCR-registered telephone numbers; (2) Realogy Agents made 264,104 prerecorded or artificial voice calls to 201,001 unique cellular or residential landline telephone numbers, including 163,543 calls to 134,149 unique numbers initiated by Mojo; and (3) Realogy Agents placed all of these calls and others at a time during which Realogy failed to implement adequate policies and procedures for maintaining an internal do not call list.

Notably, although these calls were made by many different Realogy Agents, the manner in which Realogy authorized and/or ratified each Agent's TCPA violative conduct is the same for them all, including by requiring Agents to identify Coldwell Banker as part of every telemarketing call and conduct all business in Coldwell Banker's name and for the Realogy Defendants' benefit; providing all Realogy Agents access to training that promotes purchasing leads and using dialers like those from

1 Defendant Mojo; providing Agents with purchased leads, including leads whose numbers were
2 registered with the NDNCR; failing to implement adequate TCPA-related policies and procedures;
3 and approving or at least willfully ignoring illegal telemarketing conduct.

4       Similarly, Mojo initiated calls for Realogy Agents, in the same way for every call made by a
5 Realogy Agent using its dialer: the software makes each call, sometimes several at once. Additionally,
6 the Mojo dialer provides the ability to mask or spoof caller IDs. It also provides for, and at times
7 requires, the automatic delivery of prerecorded messages. The Mojo dialer incorporates preloaded
8 calling scripts to be used by realtors, which are automatically displayed when a live person answers a
9 call initiated by the Mojo dialer. And, for an additional fee, the Mojo dialer supplies lead lists of
10 residential contact numbers, including numbers on the NDNCR.

11       Plaintiffs seek to certify three classes and one subclass that received calls in violation of the
12 TCPA, including telemarketing calls to NDNCR registered telephone numbers, calls using an artificial
13 or prerecorded voice, and telemarketing calls made absent adequate internal do not call policies,
14 training, and compliance.

15       The common questions in this case are (1) whether Realogy Agents made calls to numbers on
16 the NDNCR; (2) whether the Realogy Defendants complied with the TCPA's internal do not call
17 rules; (3) whether Realogy Agents and Defendant Mojo made calls to residential and mobile numbers
18 using an artificial or prerecorded voice; (4) whether the telemarketing calls and prerecorded messages
19 by Realogy's Agents were intended to encourage the purchase of Realogy's services; and (5) whether
20 the Realogy Defendants are vicariously liable for the telemarketing conduct of their Agents. Answers
21 to these questions will be based on common proof, and resolution of these key questions will drive
22 resolution of this case class-wide, compelling class certification.

23 **II.  Statement of Issues to Be Decided**

24       The issues to be decided are whether the Classes satisfy the requirements for class certification
25 under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3).

26 **III.Factual Background**

27       **A.  The Realogy Defendants Direct Their Agents' Calling Conduct**

28 The Realogy Defendants own and operate the Coldwell Banker real estate brokerage. To

1   conduct their real estate business, the Realogy Defendants affiliate with realtors who act as their

2   Agents. In this case, which Agents the Realogy Defendants affiliated with and when are not reasonably

3   in question; Realogy has produced a list identifying all affiliated Agents and the dates of their affiliation

4   during the class period. Ex. 1 at (RBG005013A). Evidence obtained through discovery demonstrates

5   that each of these Agents entered into a standardized form contract with the Realogy Defendants, was

6   provided access to the same uniform training from the Realogy Defendants, and was subject to

7   mandatory, standardized policies imposed by the Realogy Defendants requiring them to solicit listings

8   exclusively in Coldwell Banker's name and exclusively for the Realogy Defendants' benefit.

9          The Realogy Defendants train their Agents to cold call, and persistently contact, homeowners

10  who list their homes as For Sale By Owner ("FSBOs"), who listed their properties on the market but

11  then withdrew those listings ("cancelled"), and who saw their listings expire without a sale

12  ("expired"),[1] to convince them to bring their business to Coldwell Banker. *E.g.*, Ex. 2 (Get NEW

13  Business NOW) at (RBG028387) (encouraging Agents to call residents with FSBOs and

14  expired/withdrawn listings and including these sources in a list of ████████████████████

15  ████████; *id.* at (RBG028412) (stating, regarding residents with expired and withdrawn listings: ██

16  ████████████████████████████████

17         Relatedly, the Realogy Defendants required all their Agents nationwide to sign a standardized

18  "Do Not Contact" ("DNC") policy at the time the Agents began their affiliation with Coldwell Banker.

19  Ex. 3 (DNC policy updated March 2015) at (RBG056174-83); Ex. 4 (DNC policy updated 2018) at

20  (RBG058082-92); Ex. 5 (DNC policy updated April 2019) at (RBG052094-105); Ex. 6 (Murtagh Tr.)

21  at 31:19-32:7 (all affiliation packets include the DNC policy, which is the same for all Realogy local

22  operating companies nationwide), 35:22-37:25, 40:3-5 (the three versions of the DNC policy listed

23  above are the only three during the period from 2015 to present), 130:8–131:3; Ex. 7 (Crane Tr.) at

24  53:15–17 ████████████████████████████████████████

25  ████████

26
27  _____
    [1] *See* Ex. 8 (Mojo Sales Team Training Manual) at (MOJO-Chinitz - 0023140-42) (defining terms
    related to real estate telemarketing, including, e.g., "expired," "cancelled," and "FSBO"); Ex. 9
28  (Mangold Tr.) at 39:11-40:11 (confirming Mojo Sales Team Training Manual definitions are accurate).

1    Pursuant to the Do Not Contact policy, throughout the period from 2015 to the present, the

2  Realogy Defendants have uniformly required all of their real estate Agents nationwide to state they

3  work with Coldwell Banker at the beginning of every sales telephone call. Ex. 3 (DNC updated March

4  2015) at (RBG056176); Ex. 4 (DNC policy updated 2018) at (RBG058084); Ex. 5 (DNC policy

5  updated April 2019) at (RBG052096); Ex. 6 (Murtagh Tr.) at 48:7–49:2. Consistent with this, the

6  Realogy Defendants train their Agents to identify themselves as working for Coldwell Banker. Ex. 10

7  (Livingstone Tr.) at 118:9–119:24 (testifying that identifying an Agent's Coldwell Banker affiliation on

8  prospecting calls is ███████████████████████

9    Not surprisingly, the Realogy Defendants reap a significant benefit from Coldwell Banker

10  Agents' prospecting activities: for every lead generated and converted into a real estate transaction,

11  Coldwell Banker takes a commission before paying the Agent the remainder. *E.g.*, Ex. 11 (form

12  contracts) at (RBG 063689, 063692, 063700, 063703, 063980, 063995). For many transactions,

13  Coldwell Banker also earns a "franchise fee" paid by the Agent out of their share of the commission.

14  *See, e.g.*, *id.* at (RBG 063710, 063725, 063779). The Realogy Defendants' standardized form contracts

15  with Agents require that *all* real estate listing agreements generated by Coldwell Banker-affiliated

16  realtors be made ██████████████████████████████  and that all such listings

17  are ████████████████████████████████████████████

18  ████████████████████. *See, e.g.*, *id.* at (RBG 063692, 063710, 063725, 063742,

19  063760, 063778–779, 063809, 063817, 063823, 063828). In fact, those contracts prohibit Agents from

20  ████████████████████████████████████████████

21  ████████████████████████  during their affiliation with Coldwell Banker.

22  *E.g.*, *id.* at (RBG 063691, 063702, 063709–10, 063778, 063793, 063827, 063835, 063875).

23    **B. The Realogy Defendants' TCPA Related Policies and Procedures Are**

24    **Inadequate**

25    Although the Do Not Contact policy in effect throughout much of the Class Period stated

26  that Coldwell Banker will monitor its Agents' compliance with the policy, Ex. 3 (DNC policy updated

27  March 2015) at (RBG056174); Ex. 4 (DNC policy updated 2018) at (RBG058082), common evidence

28  shows Coldwell Banker did no such thing. The Realogy Defendants' corporate representatives could

1  not identify any follow up ever conducted with any Agent regarding TCPA compliance or any penalty

2  ever imposed for noncompliance, admit that Coldwell Banker had and has no system for monitoring

3  compliance or tracking violations, and admit the Realogy Defendants offer no dedicated training on

4  TCPA compliance or the Do Not Contact policy. *E.g.*, Ex. 7 (Crane Tr.) at 63:19–22, 64:1–65:1; Ex.

5  10 (Livingstone Tr.) at 101:13–17, 105:9–12, 159:15–24, 205:7–18, 208:22–209:1, 214:15–17, 214:18–

6  20, 214:21–215:1, 237:21–25; Ex. 6 (Murtagh Tr.) at 44:20–45:5; Ex. 12 (Metten Tr.) at 173:4–6.

7      At the same time, the Realogy Defendants provided standardized training that encouraged

8  realtors to use aggressive prospecting tactics to find real estate leads, including gathering telephone

9  numbers from various sources and making cold calls to those numbers. Ex. 13 (Lead Generation

10  Workshop PowerPoint (Ex. 8 to Livingstone Tr.)) at 3 (advising trainees that ███████████████

11  ██████████████ and that ████████████████████████████████████

12  ████████████████████████████████████ *see also id.* at 6, 18, 20 (encouraging

13  trainees to ███████████████ stating that ███████████████ when calling residents and

14  claiming that ████████████████████████████████████████ and

15  telling Agents to call residents with expired or withdrawn listing ███████████████); Ex. 2

16  (Get NEW Business NOW) at (RBG028404) ████████████████████████████████

17  ████████████████████████████████ The Realogy Defendants even paid

18  for and made available to all Agents lead lists of homeowner telephone numbers from its vendor, Cole

19  Realty. Ex. 10 (Livingstone Tr.) at 88:7–8, 89:9–18, 90:3–19. The Realogy Defendants knew that these

20  call lists contained numbers on the NDNCR: rather than scrubbing numbers listed on the Registry

21  from the database, the lists indicated whether numbers were on the Registry but still included them.

22  *Id.* at 101:1–8.

23      The Realogy Defendants approached Coldwell Banker's company-specific do-not-call list with

24  the same willful ignorance. Although Coldwell Banker purports to maintain an internal do-not-call list,

25  the Realogy Defendants have never monitored or enforced use of the list or penalized Agents for

26  calling numbers on it or failing to add numbers of individuals who asked never to be called to it. *See,*

27  *e.g.*, *id.* at 208:22–209:1, 223:3–8, 223:20–224:1; Ex. 7 (Crane Tr.) at 65:3–9, 66:2–10; Ex. 12 (Metten

28  Tr.) at 194:4–9.

### C.  Realogy Agents Purchased Residential Contact Leads

The real estate telemarketing industry includes companies like Defendant Mojo, RedX, Vulcan 7, and the Realogy Defendants' handpicked vendor, Cole Realty Resource,[2] who compile lists of hundreds of thousands of residential telephone numbers that realtors can mine for telemarketing leads, including FSBOs, expireds, and cancelled/withdrawn listings. *See, e.g.*, Ex. 8 (Mojo Sales Team Training Manual) at (MOJO-Chinitz - 0023118-19) (discussing products offered through Mojo Lead Store; Ex. 9 (Mangold Tr.) at 47:7-50:10, 60:11-14 (Mojo added ███████ expired leads to its database in March 2019), 67:1–5 (Mojo's FSBO lead list contained ██████ records in 2019), 70:10-71:10 (discussing Cole, RedX, and Vulcan 7 lead products); Ex. 14 (Mojo Data Layout 2019) at (MOJO-Chinitz–0020919) (describing Mojo's lead-generation services and data sources).

Agents can also search for and obtain lists of homeowner telephone numbers by geographic region. For example, using Mojo's "Neighborhood Search" subscription service, which Mojo refers to as a ██████████████," Ex. 8 (Mojo Sales Team Training Manual) at (MOJO-Chinitz-0023118), realtors obtain the names, addresses, and listed telephone numbers of homeowners in any geographic area specified by the Agent. *See id.*; Ex. 9 (Mangold Tr.) at 48:10–15.

All leads Mojo offers are intended to be residential, not business, telephone numbers. *Id.* at 55:4-14, 60:11-61:5, 67:23-68:7.

### D.  Realogy Agents Used Dialers to Call Those Leads

In the real estate telemarketing industry, dialers like the Mojo, Storm, Vulcan7, and Espresso Agent power dialers "are used by agents to make cold telemarketing calls" to generate real estate business "and not to call personal contacts or established business contacts." Ex. 15 (Verkhovskaya Rebuttal Rep.) at ¶ 11. Indeed, according to Mojo, real estate makes up ██████ of its customer base, Ex. 9 (Mangold Tr.) at 20:20–21:4, 38:10-15, and it refers to its dialing platform as "our Real Estate Dialer," Ex. 16 (June 23, 2013 Mojo Blog Post). These dialers allow realtors to make high-volume calls to homeowners and home buyers whose numbers are on the lead lists discussed above (FSBOs, expireds, cancelled listings), by importing the lead lists directly into the dialers. Ex. 9

---

[2] Ex. 6 (Murtagh Tr.) at 65:9-67:13 (Cole Realty Resource, has been a "preferred vendor" for Realogy Agents on the Realogy Defendants' websites since 2019).

1   (Mangold Tr.) at 50:11-51:2, 69:13-72:16 (Mojo has relationships with real estate telephone lead

2   providers such as RedX, Cole, and Vulcan7 that enable lead data from these providers to be easily

3   imported into the Mojo dialer), Mangold Ex. 6. And, to increase efficiency, Mojo's single-line power

4   dialer enables 89 calls to be dialed per hour, and its triple-line power dialer allows *up to 300 calls per*

5   *hour. See, e.g.*, Ex. 9 (Mangold Tr.) at 38:1-9; Ex. 8 (Mojo Sales Team Training Manual) at (MOJO-

6   Chinitz-0023113)   (describing   Mojo   dialer   and   lead-generation   service   as   ████   █████████

7   ████████████████████████████████████████████████████████████████████████████").

8           Mojo advertised its power dialer on its online company blog as allowing realtors to "maximize

9   their prospecting efforts"[3] by "chang[ing] up" their caller ID and "STRONGLY" suggesting that they

10  do so in order "to cycle the lead multiple times before showing up on their 'irritation' meter." Ex. 16

11  (June 23, 2013 Mojo Blog Post); Ex. 17 (England Tr.) at 42:19-45:9; *see also id.* at 20:2-24, 31:2-25,

12  53:15-54:14.

13          **E. Realogy Agents Placed Over One Million Illegal Telemarketing Calls on**
            **Realogy's Behalf to Hundreds of Thousands of Residential Numbers,**
14          **Including Those of Plaintiffs Bumpus, Rowan, and Peker**

15          In discovery, Plaintiffs received numerous call logs from Mojo, Storm (now called WAVV

16  Communications), and PhoneBurner showing calls made by Realogy Agents. Ex. 18 (corrected

17  Verkhovskaya Rep.) at ¶¶ 45-59; *see* Ex. 19 (Decl. Harman, President of Storm) at ¶¶ 4-6; Ex. 20 (Decl.

18  Rydell, Co-Founder of PhoneBurner) at ¶¶ 4-5, 7-9. Plaintiffs' expert Anya Verkhovskaya analyzed

19  these records using a methodology that has been approved in dozens of other TCPA cases. *See generally*

20  Ex. 18 (Corrected Verkhovskaya Rep.).

21          Ms. Verkhovskaya determined that 245,302 residential telephone numbers received more than

22  one call from Realogy Agents within any 12-month period after being on the NDNCR for 32 days or

23  more, for a total of 1,196,835 telephone calls. *Id.* at ¶¶ 69, 80.

24          Ms. Verkhovskaya also determined that 201,001 telephone numbers received 264,104 calls

25  that used a prerecorded message. *Id.* at ¶¶ 82-84. Of those numbers, 134,149 received a total of 163,543

26  prerecorded message calls initiated by Mojo. *Id.* at ¶ 85.

27  _____

28  [3] The real estate industry often refers to its lead generation efforts as "prospecting."

1    Included in these calls to NDNCR registered numbers and calls made using a prerecorded or

2    artificial voice are repeated calls by Realogy Agents to Plaintiffs Bumpus, Rowan, and Peker, including

3    calls made using the Mojo dialer to Plaintiff Peker.

4    **F.  Realogy Agents' Calls to Plaintiff Bumpus**

5    Plaintiff Sarah Bumpus placed her personal cell phone number ending in 8513 on the NDNCR

6    on October 29, 2009. Ex. 21 (Bumpus NDNCR Registration Verification); Ex 22 (Bumpus Tr.) at

7    24:14-18 (number ending in 8513 is Ms. Bumpus's "personal cell phone number"), 26:24-27:4, 40:18-

8    41:8; Ex. 23 (Bumpus Resps. RBG's First Interrogs.) at Resp. Interrog. No. 6.

9    However, beginning at least as early as January 2019, Ms. Bumpus received numerous

10   unwanted telemarketing calls on her cell phone ending in 8513 by or on behalf of the Realogy

11   Defendants, attempting to get her to list her home for sale with the Realogy Defendants. *E.g.*, Ex. 22

12   (Bumpus Tr.) at 46:5-7, 52:13-25, 53:1-54:13, 108:23-109:3, 112:22-114:19, 115:6-116:13, 117:10-16,

13   117:25-118:13, 119:18-120:1, 120:17-121:3, 121:23-123:5, 124:1-14; Ex. 18 (Corrected Verkhovskaya

14   Rep.) at ¶ 86. Ms. Bumpus found the calls "very bothersome," Ex. 22 (Bumpus Tr.) at 45:1-3, and she

15   testified that "the amount of calls was egregious and very harassing and intimidating" and that she was

16   "very frustrated" with the calls, *id.* at 189:15-18. To no avail, she repeatedly told the Coldwell Banker

17   callers not to call her back. *E.g.*, *id.* at 109:21-110:3, 113:2-7, 114:7-13, 117:10-16, 117:25-118:13, 124:1-

18   14, 132:6-11, 143:20-24, 144:1-4, 149:16-18, 163:22-164:3.

19   Plaintiffs' expert Ms. Verkhovskaya's analysis of the call records confirmed that the phone

20   number ending in 8513 received at least four calls from Realogy Agents within a 12-month period,

21   several years after Ms. Bumpus registered that number on the NDNCR. Ex. 36 (excerpt of

22   Verkhovskaya Ex. M) (showing four calls to number ending in 8513, which places Plaintiff Bumpus

23   in the NDNCR class).

24   **G.  Realogy Agents' Calls to Plaintiff Rowan**

25   Plaintiff Cheryl Rowan has had her personal cell number ending in 5608 for at least 25 years.

26   Ex. 24 (Rowan Tr.) at 39:25-40:1, 41:8-14, 45:20-46:1; Ex. 25 (Rowan Am. Resps. NRT's First

27   Interrogs.) at Resps. Interrogs. Nos. 4, 8. Ms. Rowan built her own home and has lived there for 30

28   years, and she has never taken steps to move or to find a realtor. Ex. 24 (Rowan Tr.) at 36:17-23,

52:19-53:3, 61:14-25, 96:7-24. Nevertheless, Ms. Rowan's cell phone ending in 5608 received two unwanted prerecorded voicemails from Realogy Agent Charlie Lefebvre in March 2017. Ex. 25 (Rowan Am. Resps. NRT's First Interrogs.) at Am. Resp. Interrog. No. 1; Ex. 24 (Rowan Tr.) at 52:19-53:3, 58:15-59:1, 62:1-8, 63:21-64:3, 68:10-15. Plaintiffs' expert Ms. Verkhovskaya confirmed the phone number ending in 5608 received two prerecorded message calls from Realogy Agents. Ex. 26 (Verkhovskaya Tr.) at 223:3–224:9. She concluded those calls were not made using the Mojo dialer. *Id.* at 223:5-24.

Ms. Rowan testified the calls she received from Coldwell Banker were "annoying," "disruptive," and "really unwanted." Ex. 24 (Rowan Tr.) at 51:12-15; *see also id.* at 66:11-15. She further testified she "should not have been called" because she "did not ask for those calls" and that "[o]ther people shouldn't get them," either. *Id.* at 52:19-53:3.

### H. Realogy Agents' Calls to Plaintiff Peker

Plaintiff Micheline Peker received multiple prerecorded messages from or on behalf of Coldwell Banker on her personal cell number ending in 5973, two of which were sent using the Mojo dialer. *E.g.,* Ex. 26 (Verkhovskaya Tr.) at 221:14–223:2; Ex. 27 (Peker's Am. Resp. NRT's First Interrogs.) at Resp. Interrog. No. 4 (Ms. Peker has not used her cell phone number for business purposes from 2009 to the present); Ex. 28 (Peker Tr.) at 28:23-29:5, 32:21-33:5, 43:11-15, 58:15-59:3, 62:5-7. Ms. Peker testified she was "annoyed" by the calls she received and believed the other class members were just as annoyed as she was. *Id.* at 57:24-58:3; *see id.* at 59:4-11.

### I. Mojo Initiated the Calls Made by Realogy Realtors Using the Mojo Dialer

As Plaintiffs' telephony and telecommunications expert Randall Snyder has concluded, "[a]s a power dialer, the Mojo dialing system is equipment which technically and electronically initiates telephone calls." Ex. 29 (Snyder Rep.) at ¶¶ 30-35. The Mojo system "automatically dials telephone numbers thereby initiating calls to the [public switched telephone network]"; "dials numbers and uses access signaling to initiate those calls, just as a human would from a traditional telephone handset"; and "performs call progress analysis, a function that can only be employed when a call is automatically initiated by a computer system." *Id.* at ¶¶ 30-35, 45, 48, 49, 51-57; Ex. 30 (Snyder Rebuttal Rep.) at ¶¶ 13, 21-25.

1    Among the functionalities the Mojo dialer provides "is the ability to choose a Caller ID
2    number displayed when the call is made. This enables users to choose or 'spoof' the Caller ID to any
3    virtual number they wish that will be displayed on the phone of the party being called. *Id.* at ¶¶ 42-43.
4    "Another setting is the ability to add a prerecorded voicemail message that can be left on the phone
5    of the party being called. . . . The power dialing configuration also enables the user to select a
6    prerecorded 'Callback Message' to be used if the dialing system is initiating calls on more than one
7    line (*i.e.*, the multiline dialer)." *Id.* at ¶ 44. "And yet another setting is used to determine the 'Ring
8    Count.' This is the number of times the dialing system will hear a ring-back tone before hanging up."
9    *Id.* at ¶ 46. "In addition, preloaded Calling Scripts can be used for each telemarketing lead type for
10   particular calling campaigns. These scripts can be automatically displayed when a live person answers
11   a call initiated by the Mojo automatic dialing system." *Id.* at ¶ 47.

12   **IV. Statutory Background of the Class Members' Claims**

13   The Telephone Consumer Protection Act exists precisely to stop unwanted telemarketing calls
14   like those described above and to protect the privacy of citizens like Sarah Bumpus, Micheline Peker,
15   Cheryl Rowan, and the Class members. *See, e.g.*, *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1167
16   ("Congress passed the TCPA to address the proliferation of intrusive, nuisance calls to consumers
17   and business from telemarketers." (internal quotation marks omitted)). Congress authorized the
18   Federal Communications Commission to establish a national database of consumers who object to
19   receiving telephone solicitations, the National Do Not Call Registry. 27 Pub. L. No. 102–243, § 3. The
20   NDNCR is a list containing the residential and wireless telephone numbers of individuals who
21   affirmatively indicate they do not wish to receive unsolicited calls from commercial telemarketers. 47
22   C.F.R. § 64.1200(c)(2) and (e). Today, 230 million numbers on are the NDNCR.

23   The TCPA prohibits entities from making telemarketing calls to people who have registered
24   their telephone numbers on the NDNCR. *Id.* An entity can demonstrate it is not liable for calls made
25   to numbers on the NDNCR only if it can show either that (i) the registrant provided prior express
26   consent to receive the calls in a signed, written agreement or (ii) the violation was the result of error,
27   and that, as part of its routine business practice, the entity maintains written procedures to comply
28   with the federal regulations, trains its personnel in these procedures, maintains a list of numbers that

1    may not be called, and uses a version of the national DNC list that is no more than 31 days old. 47

2    C.F.R. § 64.1200(c)(2)(i)-(ii).

3        TCPA regulations also prohibit any telemarketing call to any number "unless such [entity] has

4    instituted procedures for maintaining a list of persons who request not to receive telemarketing calls

5    by or on behalf of that [company]." *Id.* § 64.1200(d) and (e). The "minimum standards" for these

6    procedures include training of personnel engaged in marketing on the existence and use of an internal

7    do-not-call list, placing an individual's phone number on that internal do-not-call list, and honoring

8    that request within no more than 30 days of its receipt. *Id.* An entity violates the TCPA if it initiates a

9    "phone call without having implemented the minimum procedures." *Wagner v. CLC Resorts & Dev,.*

10    *Inc.*, 32 F. Supp. 3d 1193, 1198 (M.D. Fla. 2014) (quoting *Charvat v. GVN Mich., Inc.*, 561 F.3d 623,

11    632 (6th Cir. 2009)).

12        The TCPA also restricts robocalls. *See Barr v. Am. Ass'n of Pol. Consultants*, 140 S. Ct. 2335, 2343

13    (2020) ("Americans passionately disagree about many things. But they are largely united in their disdain

14    for robocalls."). Specifically, 47 U.S.C. § 227(b)(1)(A)(iii) makes it "unlawful" to (1) "make any call"

15    (2) "using . . . an artificial or prerecorded voice" (3) "to any telephone number assigned to a . . . cellular

16    telephone service." For a prerecorded voice call to a cell phone number that "constitutes

17    telemarketing," the TCPA requires a company to obtain the "prior express written consent of the

18    called party" before making the call to avoid liability. 47 C.F.R. § 64.1200(a)(2); *see also* 47 C.F.R. §

19    64.1200(f)(13) ("The term telemarketing means the initiation of a telephone call or message for the

20    purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which

21    is transmitted to any person."). The TCPA's substantively identical prohibition on prerecorded voice

22    calls to "residential lines," 47 U.S.C. § 227(b)(2), also requires a company to obtain the "prior express

23    written consent of the called party" before making a call that "constitutes telemarketing." 47 C.F.R. §

24    64.1200(a)(3).

25        The TCPA "is essentially a strict liability statute" that does not require intent. *Ahmed v. HSBC*

26    *Bank USA, Nat'l Ass'n*, No. 15-cv-02057-FMO-SP, 2017 WL 5720548, at *3 (C.D. Cal. Nov. 6, 2017).

27    And as a remedial statute that was passed to protect consumers from unwanted telemarketing calls,

28    the TCPA is construed broadly to benefit consumers. *Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 271

1  (3d Cir. 2013). "If proposed interpretations of the TCPA are equally plausible, the scales tip in favor

2  of the consumer." *Klein v. Commerce Energy, Inc.*, 256 F. Supp. 3d 563, 576 (W.D. Pa. 2017).

3        Therefore, an entity cannot escape liability by arguing it did not directly place the calls itself.

4  Vicarious liability is well settled under the TCPA for all calls "by or on behalf of the same entity in

5  violation of the regulations." *E.g.*, 47 U.S.C. § 227(c)(5). Under the FCC's regulations, vicarious liability

6  may be based on the principles of apparent authority, actual authority, and ratification, when unlawful

7  calls are placed "on behalf of" the seller. *In re Joint Pet. Filed by Dish Network*, 28 FCC Rcd. 6574 (2013);

8  *Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068, 1073, 1076 (9th Cir. 2019) (finding student

9  loan company vicariously liable under TCPA for debt collector's violations of § 227(b)(1)(A)(iii)

10  because company had actual knowledge of unlawful calls and made no effort to stop them).

11        An entity similarly cannot escape liability by arguing that it was merely the platform used by

12  telemarketers to make calls. The TCPA prohibits an entity from "mak[ing]" or "initiat[ing]" certain

13  telephone solicitations, but neither the statute nor the regulations explicitly define "make" or "initiate."

14  *See* 47 U.S.C. § 227(b)(1); 47 C.F.R. § 64.1200(a)(2)-(3). "The FCC 'look[s] to the totality of the facts

15  and circumstances surrounding the placing of a particular call to determine . . . whether another person

16  or entity was so involved in placing the call as to be deemed to have initiated it, considering the goals

17  and purposes of the TCPA.'" *De La Cabada v. Ytel, Inc.*, No. 19-cv-07178-JSC, 2020 WL 1156909, at

18  *3 (N.D. Cal. March 10, 2020) (quoting 2015 FCC Order, 30 FCC Rcd. at 7980). Based on the FCC's

19  guidance, district courts have concluded that a dialing platform is liable for initiating calls by evaluating

20  (1) who created the content of the calls; (2) who decided whether, when or to whom to make a call;

21  (3) "the extent to which a person willfully enables fraudulent spoofing of telephone numbers or assists

22  telemarketers in blocking Caller ID, by offering either functionality to clients"; and (4) "whether a

23  person who offers a calling platform service for the use of others has knowingly allowed its client(s)

24  to use that platform for unlawful purposes." *E.g.*, *id.*

25  **V.  The Court Should Certify the Proposed Classes**

26        To support their request for certification of the proposed Classes, Plaintiffs must demonstrate

27  "that they have met each of the four requirements of Federal Rule of Civil Procedure 23(a) and at

28  least one of the requirements of Rule 23(b)." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979-80 (9th

Cir. 2011). Rule 23(a) sets forth four conjunctive prerequisites that must be met for any class: (1) commonality, (2) numerosity, (3) typicality, and (4) adequacy of representation. Fed. R. Civ. P. 23(a). Because Plaintiffs seek hybrid damages and injunctive class certification here, each Class must also meet the two additional requirements of 23(b)(3), predominance and superiority, and meet the requirements of 23(b)(2). Fed. R. Civ. P. 23(b)(2)-(3).

In addition, a class definition must allow the court to readily identify the class members by reference to objective criteria. *J.L. v. Cissna*, No. 18-cv-04914-NC, 2019 WL 415579, at *7 (N.D. Cal. Feb. 1, 2019). Plaintiffs seek certification of the following classes under Rule 23(a), (b)(2), and (b)(3):

> **National Do Not Call Registry Nationwide Class ("NDNCR Class")**: All persons in the United States who received two or more calls made by a Coldwell Banker-affiliated Agent using a Mojo, PhoneBurner, and/or Storm dialer in any 12-month period on a residential landline or cell phone number that appeared on the National Do Not Call Registry for at least 31 days for the time period beginning June 11, 2015, to present, and reflected in the call records listed in Appendix A.

> **National Internal Do Not Call Class ("Internal DNC Class")**: All persons in the United States who received, in any 12-month period, two or more calls promoting Coldwell Banker's services and made by a Coldwell Banker-affiliated Agent to their residential landline or cell phone number, for the time period beginning June 11, 2015, to present. These persons seek only injunctive relief.

> **National Artificial or Prerecorded Message Class ("Prerecorded Message Class")**: All persons in the United States who received a call on their residential telephone line or cell phone number with an artificial or prerecorded message, as indicated by the following call disposition codes: (1) "Drop Message" (if using the Mojo dialer); (2) "ATTENDED_TRANSFER" (if using the Storm dialer); and (3) "VOICEMAIL" (if using a PhoneBurner dialer) in the call records listed in Appendix A and made by a Coldwell Banker-affiliated Agent for the time period beginning June 11, 2015, to present.

> **Artificial or Prerecorded Message Mojo Subclass ("Prerecorded Message Mojo Subclass")**: All persons in the United States who received a call on their residential telephone line or cell phone number with an artificial or prerecorded message, as indicated by the call disposition code "Drop Message" in the call records listed in Appendix A and made by a Coldwell Banker-affiliated Agent using a Mojo dialer for the time period beginning June 11, 2015, to present.

Collectively, the NDNCR Class, the Internal DNC Class, the Prerecorded Message Class, and the Prerecorded Message Mojo Subclass are the "Class" or the "Classes."

These classes are objectively defined and will allow the Court to readily identify members. Although the Ninth Circuit has expressly rejected an ascertainability requirement at the class

1   certification stage, *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1123 (9th Cir. 2017), in this case Class

2   members have already been identified based on the underlying phone records.

### A. Common Questions Predominate

4       The commonality requirement under Rule 23(a) "requires the plaintiff to demonstrate that the

5   class members 'have suffered the same injury.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)

6   (citation omitted). The "claims must depend on a common contention" that is "capable of classwide

7   resolution—which means that determination of its truth or falsity will resolve an issue that is central

8   to the validity of each one of the claims in one stroke." *Id.* Commonality "is a 'relatively light burden'

9   that 'does not require that all the questions of law and fact raised by the dispute be common . . . or

10  that the common questions of law or fact predominate over individual issues.'" *Esparza v. SmartPay

11  Leasing, Inc.*, No. 17-cv-03421-WHA, 2019 WL 2372447, at *2 (N.D. Cal. June 5, 2019). This inquiry

12  often overlaps in significant part with the predominance inquiry under Rule 23(b)(3). *Wolin v. Jaguar

13  Land Rover N. Am., LLC*, 617 F.3d 1168, 1172 (9th Cir. 2010).

14      The predominance requirement tests whether "proposed classes are sufficiently cohesive to

15  warrant adjudication by representation," *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir.

16  2016) (citation omitted), by testing whether "the main issues in a case" present common or

17  individualized issues. *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001). "An

18  individual question is one 'where members of a proposed class will need to present evidence that

19  varies from member to member,' while a common question is one where 'the same evidence will

20  suffice for each member to make prima facie showing [or] the issue is susceptible to generalized, class-

21  wide proof.'" *Tyson Foods v. Bouaphakeo*, 136 S.Ct. 1036, 1045 (2016) (quoting 2 W. Rubenstein,

22  Newberg on Class Actions § 4:50, 196–97 (5th ed. 2012)); *Torres*, 835 F.3d at 1134 (same). "[M]ore

23  important questions apt to drive the resolution of the litigation are given more weight in the

24  predominance analysis over individualized questions which are of considerably less significance to the

25  claims of the class." *Torres*, 835 F.3d at 1134.

26      Here, common questions will drive the resolution of the class members' TCPA claims. The

27  most important common questions, across the classes, include: (1) whether Realogy Agents and the

28  dialing services they engaged, such as Defendant Mojo's dialing services, called numbers on the

NDNCR; (2) whether the Realogy Defendants complied with the TCPA's internal do not call rules; (3) whether Realogy Agents or the dialing services they engaged, such as Defendant Mojo's dialing services, placed calls to residential and mobile numbers using an artificial voice or prerecorded message; (4) whether the telemarketing calls and prerecorded messages by Realogy's Agents were intended to encourage the purchase of Realogy's services; and (5) whether Realogy is vicariously liable for the telemarketing conduct of its Agents.

These significant questions predominate and will all be proven using evidence common to the Classes, primarily evidence about the conduct of Realogy and its relationship with the Agents who made calls on Realogy's behalf. *See, e.g.*, *Chinitz v. Intero Real Estate Servs.*, No. 18-cv-05623-BLF, 2020 WL 7391299, at *13-15 (N.D. Cal. July 22, 2020); *Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*, No. 15-CV-6314-YGR, 2017 WL 1806583, at *6–7 (N.D. Cal. May 5, 2017) ("*Abante Rooter*"); *Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292, 1306 (D. Nev. 2014) (finding that vicarious liability question met commonality requirement because actual authority depended on relationships among defendants, ratification depended on defendants' conduct, and apparent authority depended on objective reasonable person analysis); *Whitaker v. Bennett Law, PLLC*, No. 13-cv-03145-L-NLS, 2014 WL 5454398, at *5 (S.D. Cal. Oct. 27, 2014) (commonality met where "[t]he core issue to be resolved" was whether defendant used a prerecorded or artificial voice message to make unsolicited calls). TCPA claims, by their nature, involve large numbers of plaintiffs and a common course of conduct that affected each class member in the same way. *See, e.g.*, *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 655-56 (4th Cir. 2019) ("The problems that so often plague class actions under Rule 23(b)(3) are wholly absent from this scheme . . . . Put simply, a plaintiff suing under § 227(c)(5) is likely to be in the same position as a great many other people and can rely largely on common proof to make out his claim.").

### 1. Common Evidence Will Show That Realogy Agents Made Calls That Violate the TCPA.

To demonstrate for the NDNCR Class members, who are bringing a claim against the Realogy Defendants, that (1) more than one telemarketing call was made on behalf of the Realogy Defendants (2) within a 12-month period (3) to a non-business number that was placed on the NDNCR at least 32 days before the call was made, (4) during the period from June 11, 2015, to the present, Plaintiffs

will rely on Ms. Verkhovskaya's aggregate analysis of records of Realogy-affiliated Agents' calls. Ms. Verkhovskaya's analysis has determined that 245,302 unique telephone numbers on the NDNCR received 1,196,835 calls on behalf of the Realogy Defendants that violated 47 C.F.R. § 64.1200(c)(2) and (e). *See* Ex. 18 (Verkhovskaya Corrected Rep.) ¶ 125.

Plaintiffs will rely on the same analysis to demonstrate for the Internal DNC Class members, which are bringing a claim against the Realogy Defendants, that (1) more than one call for telemarketing purposes was made on behalf of Realogy (2) within a 12-month period (3) to a nonbusiness telephone number (4) without Realogy sufficiently instituting procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of Realogy. Plaintiffs will also use common evidence to show that Realogy did not sufficiently implement a company-specific do not call list or train its Agents on how to comply with the TCPA. *Supra* at § III(B).

Finally, for the claims of the Prerecorded Message Classes (which are against the Realogy Defendants, with a subclass bringing claims against Mojo), to show that (1) a residential landline or mobile number was called on the Realogy Defendants' behalf (2) using an artificial or prerecorded voice, *see* 47 U.S.C. § 227(b)(1)(B), Plaintiffs will use common evidence of disposition codes from computer dialers, including Defendant Mojo's dialer, which indicate when Realogy Agents made calls using artificial or prerecorded voices. Records produced by Mojo and non-party calling services indicate that 201,001 unique telephone numbers received 264,104 calls using a prerecorded or artificial voice, on the Realogy Defendants' behalf. *See* Ex. 18 (Verkhovskaya Corrected Rep.) at ¶ 128. And Mojo's records indicate that Mojo initiated 163,543 telephone calls to 134,149 telephone numbers using a prerecorded or artificial voice. *Id.* at ¶ 129. This aggregate evidence will allow Plaintiffs to establish violations on a class-wide basis, without the need for individualized inquiries.

        a.   <u>Common Evidence Will Show That All Calls Were Made on Behalf of The Realogy Defendants.</u>

Common evidence will show the unlawful calls made to all Class members were made on the Realogy Defendants' behalf. This common evidence includes call records that can be analyzed in aggregate form, the Realogy Defendants' policies regarding Agents identifying themselves on sales

1    calls, standardized form contracts, and the Realogy Defendants' nationwide Agent training programs.

2        As an initial step, the call records in this case can be reliably filtered on a class-wide basis to

3    exclude any calls made by Agents before or after the time of their affiliation with Coldwell Banker,

4    ensuring calls made on behalf of other real estate agencies are not part of the case. *See* Ex. 18

5    (Verkhovskaya Corrected Rep.) at ¶¶ 57, 83. And common evidence will show the remaining calls—

6    all those made to Class members by Coldwell Banker-affiliated Agents—were made on behalf of the

7    Realogy Defendants.

8        Specifically, Plaintiffs will offer common evidence—such as aggregable call data, standardized

9    form contracts, standardized training delivered to all Agents, and a uniform mandatory policy

10   applicable nationwide—that the calls made to Class members by Agents using Coldwell Banker's

11   resources and call leads, affiliated with Coldwell Banker, contractually bound to sell real estate in

12   Coldwell Banker's name, and required to turn over a portion of the proceeds from their sales of real

13   estate to Coldwell Banker, were made on the Realogy Defendants' behalf. *See supra* at § III(B); *see infra*

14   at pp. 19-20 (discussing apparent authority). Plaintiffs will also offer expert testimony supporting the

15   same conclusion. *E.g.*, Ex. 30 (Snyder Rebuttal Rep.) at ¶¶ 13–19.

16        b.   <u>Common Evidence Will Show That the Realogy Defendants Knew Or
            Were Willfully Ignorant of Their Agents' TCPA Violations.</u>

17

18        Common evidence will also establish that the Realogy Defendants' actions—and conspicuous

19   inaction—"demonstrate[] indifference to ongoing violations and a conscious disregard for compliance

     with the law." *Krakauer*, 925 F.3d at 662.

20

21        This evidence includes the Realogy Defendants' standardized training and their universal

22   failure to monitor compliance or hold realtors accountable to the TCPA or their own internal policies.

23   *See supra* at § III(B). The Realogy Defendants exercised ultimate control over the contents of these

24   training materials and practices via policy that was uniform across the country. *E.g.*, Ex. 6 (Murtagh

25   Tr.) at 48:7–49:2, 61:12–15 (confirming that the Do Not Contact policy applies nationwide); *id.* at

26   130:8–131:3 (testifying that Coldwell Banker's affiliation with a real estate Agent █████████

     █████████████████████████████████████████████████████████; Ex. 7 (Crane

27   Tr.) at 53:15–17 ██████████████████████████████

28

Common evidence likewise shows that the Realogy Defendants approached Coldwell Banker's company-specific do-not-call list with the same willful ignorance. *See supra* at § III(B). Plaintiffs will offer common proof that Realogy Defendants took the same approach to all of their Agents' unlawful telemarketing calling practices. *See supra* at § III(B).

c. <u>Common Evidence Will Show That Calls Placed by Agents of The Realogy Defendants, Including Those Placed Using Defendant Mojo's Platform, Were Telemarketing Calls.</u>

Plaintiffs will prove on a class-wide basis that the calls placed by Coldwell Banker Agents were telemarketing calls. Plaintiffs will rely on common evidence including the nature of the commercial dialers used by Coldwell Banker Agents, the lead lists of residential contacts obtained by those Agents, and the way that Agents use those lead lists. *See supra* at § III(C)-(D). This includes expert testimony regarding the way that real estate computer dialers function. *E.g.*, Ex. 30 (Snyder Rebuttal Rep.) at ¶¶ 13-19.

For example, Victor Vasu, a California Coldwell Banker Agent, purchased multiple subscriptions from Cole, Kai Data Systems (which does business as Vulcan 7), and Mojo to obtain telephone numbers by geographic area and listing type, with no suggestion that he had personal relationships or prior dealings with any leads. *See* Ex. 31 (Vasu Subpoena Response) at PDF page 6 (invoice for subscription including "LAND+CELL&EMAIL" data for the Los Angeles County market area); *id.* at PDF page 7 (requesting telephone numbers for all for-sale-by-owner listings within 5 miles of zip code 92660 and all expired listings in Orange County, California). He then used multiple dialers to cold call these leads. His call logs from the Mojo and Vulcan 7 dialers indicate that he loaded lists of hundreds of thousands of numbers into the dialers, and then called those numbers, often multiple times. *See* Ex. 32 (excerpt from Vasu Vulcan 7 log); Ex. 33 (excerpt from Vasu Mojo log); *see also* Ex. 34 (example Kerry Martin lead list); Ex. 35 (Mar. 30, 2021 email from Jennifer Lind to Chris Mitchell re Cold Realty Resource). Vasu's usage of these lead lists and dialers is representative of how Realogy Agents use them.

Plaintiffs' evidence will confirm what common sense dictates based on the nature of the power dialers and the lead lists real estate Agents purchase and use: all the dialer-initiated calls made to class

1    members were telemarketing calls. *See supra* §§ III.C–D. There is no reason for a realtor to use an

2    automated, power dialing platform to make personal calls, and no evidence that any Coldwell Banker

3    Agent ever did.

4             d.   <u>Common Evidence Will Show That Mojo Initiated the Telemarketing</u>
     <u>Calls of Realogy Agents Using Its Dialing Platform.</u>

5          Plaintiffs will also prove on a class-wide basis that Mojo initiated the calls made through its

6    dialing platform by Realogy Agents. Mojo's cloud-based "power dialer" functions the same way with

7    respect to all class members: using a predictive dialing algorithm, it "automatically dials telephone

8    numbers from [a] stored list of numbers" fed into it by Realogy Agents. Ex. 29 (Snyder Rep.) at ¶¶ 26,

9    35–56; *supra* part III(D). Mojo knows how Realogy Agents use its platform: it sells lead lists to Agents

10   knowing that those lists include numbers registered on the National Do Not Call Registry, it provides

11   scripts to Agents to make those calls, and it programs its dialer to allow Agents to mask or spoof caller

12   IDs and send prerecorded voice messages. *See supra* Part III(D). Thus, common evidence regarding

13   Mojo's business and the functionality of its software will establish that Mojo initiated the calls made

14   by Realogy Agents using the Mojo platform for the purpose of TCPA liability.

15            e.   <u>Defendants Will Mount Common Defenses to the Claims of All Class</u>
     <u>Members.</u>

16

17         In response to the overwhelming evidence of wrongdoing by its real estate Agents, the Realogy

18   Defendants' primary defense will likely be that all Coldwell Banker realtors are "independent

19   contractors," for whom the Realogy Defendants bear no responsibility. Even if it were true that an

20   employer could "independent contract" tort liability away by simply changing the title and benefits of

21   its employees—and it is not, *Krakauer*, 925 F.3d at 660—that question would be addressed by common

22   legal analysis and common, class-wide proof.

23         "A defendant is vicariously liable for violations of the TCPA where common law principles of

24   agency would impose it." *Jones v. Royal Admin. Servs., Inc.*, 887 F.3d 443, 450 (9th Cir. 2018). Here,

25   whether the Realogy Defendants are liable for the acts of their real estate Agents can be determined

26   in a single class-wide stroke. First, common evidence will establish that the Realogy Defendants are

27   liable for their real estate Agents' acts under a theory of apparent agency. Apparent agency attaches

28   "when a third party reasonably believes the actor has authority to act on behalf of the principal and

1    that belief is traceable to the principal's manifestations." Restatement (Third) Of Agency § 2.03. Under

2    the doctrine of apparent agency, the principal is liable for the acts of the apparent agent, even if it did

3    not actually give authority to the agent. *Id.* § 2.03, cmt. a.

4        Each class member who received an unwanted call from a Coldwell Banker Agent "naturally

5    and reasonably assume[d] that the agent ha[d] authority to do acts consistent with the agent's

6    position," such as to make or coordinate marketing calls on behalf of Coldwell Banker. *Id.* § 3.03, cmt.

7    b. This is because the Realogy Defendants manifested the apparent agency of their real estate Agents

8    by placing them in the position of a Coldwell Banker Agent and authorizing them to transact business

9    in Coldwell Banker's name. *See supra* at § III(A). Common evidence will show that Agents in turn

10   conveyed this authority to call recipients by identifying their affiliation with Coldwell Banker on cold

11   calls as a standard practice, as required under Coldwell Banker's nationwide uniform mandatory Do

12   Not Contact policy. *Id.* "Because the inquiry is limited to how a reasonable person would perceive the

13   calls at issue, there is no need to determine how individual class members perceived the calls." *Chinitz*,

14   2020 WL 7391299, at *14.

15       Whether the Realogy Defendants are liable under a theory of *respondeat superior* is also

16   susceptible to common proof. Courts in the Ninth Circuit consider various factors to determine

17   whether a principal has enough authority to control their Agents to invoke *respondeat superior* liability.

18   *See Jones*, 887 F.3d at 450 (listing ten non-exhaustive factors). Here, the Realogy Defendants'

19   relationship with affiliated Agents is defined by standardized contracts, and the Realogy Defendants

20   provide standardized training and sales and marketing tools to Agents. *Supra* at § III(A). Common

21   evidence will show that the Realogy Defendants did in fact have and exercise significant control over

22   Agents, who are all engaged in the Realogy Defendants' core business: residential real estate sales.

23       Moreover, whether the Realogy Defendants ratified their Agents' phone prospecting activities

24   can be answered by common proof indicating that the Realogy Defendants had "knowledge of

25   material facts" or "actual knowledge" of their Agents' calling practices and accepted the benefit of

26   those practices. Restatement (Third) Of Agency § 4.01. Their "[f]ailure to object" to these practices

27   despite encouraging aggressive cold calling qualifies as a manifestation when, as here, its Agents "are

28   likely to draw such an inference from silence." *Id.* § 4.01, cmt. f. Alternatively, common evidence

1  indicates the Realogy Defendants' ratification of their Agents' TCPA violations through willful

2  ignorance. This form of ratification requires showing that the Realogy Defendants "'had knowledge

3  of facts that would have led a reasonable person to investigate further.'" *Henderson v. United Student*

4  *Aid Funds, Inc.*, 918 F.3d 1068, 1075 (9th Cir. 2019) (quoting Restatement (Third) of Agency § 4.06

5  cmt. d). Despite the evidence of pervasive calling practices that might violate the TCPA, the Realogy

6  Defendants did not monitor or investigate, and instead "continued to accept the benefits" of their

7  Agents' cold-calling while remaining silent about legal obligations under the TCPA. *Id.*

8      Finally, Mojo will mount a common defense as to all claims based on expert testimony that its

9  dialer did not initiate the calls or legal argument that it should not be liable for the unlawful real estate

10 calls it initiated. But as explained above, Plaintiffs will demonstrate Mojo's liability for these calls on a

11 class-wide basis, with common evidence including Mojo's testimony and Plaintiffs' expert's testimony

12 concerning the function of Mojo's dialer platform and Mojo's knowledge and facilitation of Agents'

13 cold-calling. *See supra* Part III(D).

14      f.   <u>Class-Wide Relief Can Be Proven on a Common Basis.</u>

15      Class-wide damages can be proven on a common basis, as required under *Comcast v. Behrend*,

16 569 U.S. 27 (2013). Here, class members' damages all derive from the same event: Realogy Agents'

17 pervasive and continuing practice of making telemarketing calls that violate the TCPA. Damages can

18 be calculated easily by using the analysis of Plaintiffs' expert, who will determine the number of calls

19 made in violation of the TCPA within the relevant timeframe. *See* Ex. 18 (Verkhovskaya Corrected

20 Rep.) at ¶¶ 124-132. From there, all that is required to establish damages is to multiply the damages

21 provided by the statute by the number of illegal calls. This calculation is formulaic and feasible.

22      Likewise, the need for and suitability of injunctive relief can be proven on a common basis.

23 Defendants' violations of the TCPA continue to this day—the Realogy Defendants have neither

24 modified their business practices nor implemented more stringent compliance practices.

25      **B.  Plaintiffs' Classes and Subclass Satisfy Numerosity**

26      A class must be "so numerous that joinder of all members is impractical." Fed. R. Civ. P. 23(a)(1).

27 No specific number is required, but "[g]enerally, 40 or more members will satisfy the numerosity

28 requirement." *Dunakin v. Quigley*, 99 F. Supp. 3d 1297, 1327 (W.D. Wash. 2015) (citation omitted).

1    Here, there are thousands of members in each of the proposed Classes and the subclass. *See supra* at §

2    III(E). Numerosity is therefore satisfied.

3              **C.  Plaintiffs' Claims Are Typical of the Class Members' Claims**

4              Typicality is satisfied if "the claims or defenses of the representative parties are typical of the claims

5    or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The purpose of the typicality requirement is to

6    assure that the interest of the named representative aligns with the interests of the class." *Wolin v.*

7    *Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (quoting *Hanon v. Dataproducts*

8    *Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). Typicality exists when the class representative and the class

9    are injured by the same course of conduct. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir.

10   2011); *See Bennett v. GoDaddy.com LLC*, No. CV-16-3908, 2019 WL 1552911, at *5 (D. Ariz. Apr. 8,

11   2019) ("Plaintiff and all putative class members suffered the same injury based on the same conduct

12   by Defendant in the form of unauthorized calls to their cellular telephone lines."); *McCurley v. Royal*

13   *Seas Cruises, Inc.*, 331 F.R.D. 142, 169-70 (S.D. Cal. 2019) (plaintiffs "raise claims and legal theories

14   typical of the class they seek to represent—a class of individuals who did not consent to receive calls

15   to their cellular phones made by or on behalf of Royal with a prerecorded voice and/or an ATDS").

16   "Typicality refers to the nature of the claim or defense of the class representative, and not to the

17   specific facts from which it arose or the relief sought." *Id.*

18             Here, Plaintiffs' and the Classes' claims arise from the same legal theory. Realogy Agents called

19   all Plaintiffs and Class members for the same reason – to solicit real estate business. Plaintiffs and the

20   Class members were called on numbers registered with the NDNCR, using a prerecorded voice

21   message, and/or after they told Realogy's Agents to stop calling them. Plaintiffs are members of all

22   the Classes they seek to represent, and Realogy and Mojo do not have any unique affirmative defenses

23   that could defeat typicality as to Plaintiffs. Realogy's and Mojo's liability turns on facts general to their

24   relationship with Realogy Agents, including their knowledge of and cooperation with ongoing TCPA

25   violative calls.

26             **D.  Plaintiffs and Their Counsel Adequately Represent the Class Members**

27             Adequacy is satisfied when the class representatives will "fairly and adequately protect the

28   interests of the class." Fed. R. Civ. P. 23(a)(4). Courts "must resolve two questions: '(1) do the named

plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)). In considering the adequacy of counsel, the court must consider "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A).

Plaintiffs have no antagonistic or conflicting interest with the members of the proposed Classes. To the contrary, they have demonstrated their commitment to the Classes by actively participating in the litigation. They worked with counsel to develop the Classes' claims, responded to requests for production and interrogatories, and were deposed.

Plaintiffs have experienced and capable counsel who have been appointed to represent classes in numerous class actions, including TCPA cases, and will vigorously prosecute the class claims. Ex. 37 (Tycko & Zavareei LLP firm resume); Ex. 38 (Reese LLP firm resume); Ex. 39 (Kaufman P.A. firm resume); *see also Ikuseghan v. Multicare Health Sys.*, No. C 14-5539 BHS, 2015 WL 4600818, at *6 (W.D. Wash. July 29, 2015) (finding adequacy satisfied where plaintiff's counsel served as counsel "in other class action lawsuits, including a previous TCPA case"). Counsel have devoted a significant amount of time and money to the case, including pursuing third-party discovery, reviewing thousands of documents, taking multiple depositions, and engaging experts to provide testimony regarding the critical issues in this case. Soneji Decl. ¶¶ 44. The adequacy requirement is therefore satisfied.

### E.  The Requirements of Rule 23(B)(2) Are Met

Rule 23(b)(2) requires a plaintiff to show that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). To meet the requirements of (b)(2), plaintiff must only make a showing of cohesiveness of the class claims, *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998), and show that "class members seek uniform relief from a practice applicable to all of them," *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010).

Here, Realogy acted on grounds that apply generally to the Internal DNC Class by failing to maintain the TCPA's minimum standards related to an internal do-not-call list before directing Realogy Agents to make telemarketing calls. There is a single result that would provide relief to all members of the classes: injunctive relief requiring Realogy to create and maintain minimum standards with respect to its internal do not call list.

### F. A Class Action Is a Superior Method for Resolving Plaintiffs' and the Class Members' TCPA Claims

Rule 23(b)(3)'s second prong requires a finding that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). "A district court must evaluate this issue in comparative terms…." *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1304-05 (11th Cir. 2021).

Here, the proposed classes satisfy the superiority requirement because "common issues of law and fact predominate over any individualized issues" and "the large number of claims, along with the relatively small statutory damages, the desirability of adjudicating these claims consistently, and the probability that individual members would not have a great interest in controlling the prosecution of these claims, all indicate that a class action would be … superior …." *See Kron v. Grand Bahama Cruise Line, LLC*, 328 F.R.D. 694, 702 (S.D. Fla. 2018).

Unsurprisingly, courts routinely find class actions to be the superior method of adjudicating claims in the TCPA context. *See McCurley v. Royal Seas Cruises, Inc.*, 331 F.R.D. 142, 178-79 (S.D. Cal. 2019) ("Courts recognize that given these damages relative to the costs of litigation, a class action is a superior means of adjudicating TCPA claims against a defendant."); *Bee, Denning, Inc. v. Cap. All. Grp.*, 310 F.R.D. 614, 630 (S.D. Cal. 2015) ("In the context of the TCPA, the class action device likely is the optimal means of forcing corporations to internalize the social costs of their actions.").

Additionally, and although not required, certification of the proposed class is administratively feasible. *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1123 (9th Cir. 2017) ("We have never interpreted Rule 23 to require such a showing …."). "A plaintiff proves administrative feasibility by explaining how the district court can locate the remainder of the class after certification." *Cherry*, 986 F.3d at 1303. Plaintiffs' proposed classes are defined by the call logs produced by Storm, PhoneBurner, and

Mojo, which include specific call dispositions associated with the successful transmission of prerecorded and other calls. *See* Ex. 18 (Verkhovskaya Corrected Rep.) at ¶ 55. Using these call records and her proposed methodology, Plaintiffs' expert Mr. Verkhovskaya identified which of the phone numbers in the call logs prospectively qualify for class membership. *Id.* at ¶¶ 10–19. Class action treatment for Plaintiffs' and the other class members' claims is therefore superior to the alternatives.

**VI. Conclusion**

For the reasons set forth above, Plaintiffs respectfully request that the Court grant their Motion for Class Certification pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) and:

(i)    certify the NDNCR Class and appoint Plaintiff Sarah Bumpus as the class representative thereof;

(ii)    certify the Internal DNC Class and appoint Plaintiff Sarah Bumpus as the class representative thereof;

(iii)    certify the Prerecorded Message Class and appoint Plaintiffs Cheryl Rowan and Micheline Peker as the class representatives thereof;

(iv)    certify the Prerecorded Message Mojo Subclass and appoint Plaintiff Micheline Peker as the class representative thereof; and

(v)    appoint Tycko & Zavareei LLP, Reese LLP, and Kaufman P.A. as class counsel.

Date: August 20, 2021

**TYCKO & ZAVAREEI LLP**

By: _/s/ Sabita Soneji_
Sabita J. Soneji (State Bar No. 224262)
*ssoneji@tzlegal.com*
1970 Broadway, Suite 1070
Oakland, California 94612
Telephone: (510) 254-6808

**TYCKO & ZAVAREEI LLP**
Hassan A. Zavareei (State Bar No. 181547)
*hzavareei@tzlegal.com*
Mark Clifford (*pro hac vice*)
*mclifford@tzlegal.com*
Allison Parr (*pro hac vice*)
*aparr@tzlegal.com*
1828 L Street, Northwest, Suite 1000
Washington, District of Columbia 20036
Telephone: (202) 973-0900

**KAUFMAN P.A.**
Rachel E. Kaufman (State Bar No. 259353)
*rachel@kaufmanpa.com*
400 Northwest 26th Street
Miami, Florida 33127
Telephone: (305) 469-5881

**REESE LLP**
George V. Granade (State Bar No. 316050)
*ggranade@reesellp.com*
8484 Wilshire Boulevard, Suite 515
Los Angeles, California 90211
Telephone: (310) 393-0070

**REESE LLP**
Michael R. Reese (State Bar No. 206773)
*mreese@reesellp.com*
100 West 93rd Street, 16th Floor
New York, New York 10025
Telephone: (212) 643-0500

*Counsel for Plaintiffs Sarah Bumpus, David Gritz,*
*Micheline Peker, and Cheryl Rowan, and the Proposed*
*Classes*