UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SARAH BUMPUS, et al., *individually, and on behalf of all similarly situated persons,*<br><br>Plaintiffs,<br><br>v.<br><br>REALOGY BROKERAGE GROUP LLC (F/K/A NRT LLC), et al.,<br><br>Defendants. | Case No. 3:19-cv-03309-JD<br><br>**ORDER RE CLASS CERTIFICATION**<br><br>Re: Dkt. No. 155 |

Named plaintiffs Sarah Bumpus, Micheline Peker, and Cheryl Rowan seek certification of multiple classes for Telephone Consumer Protection Act (TCPA) claims against defendants Realogy and Mojo. Dkt. No. 154-3.[1] Realogy operates large real estate conglomerates, which include brands like Coldwell Banker and Sotheby International Realty. Dkt. No. 118 at ¶ 1. Realogy contracts with thousands of real estate agents across the country to identify and reach out to leads for residential sales. *Id*. at ¶ 2. Mojo Dialing Solutions (Mojo) is an autodialing and lead generation platform used by real estate agents, including Realogy's agents. *Id*. at ¶ 35.

Named plaintiffs, Sarah Bumpus, Cheryl Rowan, and Micheline Peker are individual home owners in California, Minnesota, and Florida. *Id*. at ¶¶ 17, 19, 21. Plaintiffs allege that they received unwanted calls from Realogy Agents affiliated with Coldwell Banker asking them to list their homes for sale. *Id*. at ¶¶ 157, 175, 181. Plaintiffs Rowan and Peker also received prerecorded messages from Realogy agents. *Id*. at ¶¶ 177, 181. Plaintiffs allege that the unwanted calls violated the TCPA.

---

[1] The motion for class certification, Dkt. No. 155, was filed with redactions and an administrative motion to seal, Dkt. No. 154. The Court cites to the unredacted, sealed version of the motion, Dkt. No. 154-3, throughout. A separate order on the sealing requests has been filed. *See* Dkt. No. 217.

The parties' familiarity with the record is assumed.  Certification is granted in part.

## DISCUSSION

### I. CLASS CERTIFICATION

Plaintiffs ask to certify four classes under Federal Rule of Civil Procedure 23, subsections (b)(2) and (b)(3):

> (1) A "National Do Not Call Registry Nationwide" (NDNC) class under Rule 23(b)(2) and (b)(3) consisting of "[a]ll persons in the United States who received two or more calls made by a Coldwell Banker-affiliated Agent using a Mojo, PhoneBurner, and/or Storm dialer in any 12 month period on a residential landline or cell phone number that appeared on the National Do Not Call Registry for at least 31 days for the time period beginning June 11, 2015, to present;"
>
> (2) A "National Internal Do Not Call" (Internal DNC) class under Rule 23(b)(2) consisting of "[a]ll persons in the United States who received, in any 12-month period, two or more calls promoting Coldwell Banker's services and made by a Coldwell Banker-affiliated Agent to their residential landline or cell phone number, for the time period beginning June 11, 2015, to present;"
>
> (3) A "National Artificial or Prerecorded Message" (Prerecorded Message) class under Rule 23(b)(2) and (b)(3) consisting of "[a]ll persons in the United States who received a call on their residential telephone line or cell phone number with an artificial or prerecorded message, as indicated by the following call disposition codes: (1) 'Drop Message' (if using the Mojo dialer); (2) 'ATTENDED_TRANSFER' (if using the Storm dialer; and (3)  'VOICEMAIL' (if using a PhoneBurner dialer) in the call records listed in Appendix A and made by a Coldwell Banker-affiliated Agent for the time period beginning June 11, 2015, to present;" and
>
> (4) An "Artificial or Prerecorded Message Mojo" (Prerecorded Message Mojo) class under Rule 23(b)(2) and (b)(3) consisting of "[a]ll persons in the United States who received a call on their residential telephone line or cell phone number with an artificial or prerecorded message, as indicated by the call disposition code 'Drop Message" in the call records listed in Appendix A and made by a Coldwell Banker-affiliated Agent using a Mojo dialer for the time period beginning June 11, 2015, to present."

Dkt. No. 154-3 at 13.

The Court has written extensively on the standards for class certification, which informs the discussion here.  *See, e.g., Sapan v. Yelp, Inc.*, No. 18-cv-3240-JD, 2021 WL 5302908 (N.D. Cal. Nov. 15, 2021); *Meek v. SkyWest, Inc.*, --- F. Supp. 3d ---, 2021 WL 4461180 (N.D. Cal. Sep. 29, 2021).  A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)

2

1  (quotations omitted).  The overall goal is "to select the metho[d] best suited to adjudication of the
2  controversy fairly and efficiently." *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 568 U.S.
3  455, 460 (2013) (internal quotations omitted) (modification in original).  Plaintiffs must show that
4  their proposed classes satisfy all four requirements of Rule 23(a), and at least one of the
5  subsections of Rule 23(b).  *Comcast*, 569 U.S. at 33 (2013); *Zinser v. Accufix Research Inst., Inc.*,
6  253 F.3d 1180, 1186 (9th Cir. 2001), *amended by* 273 F.3d 1266 (9th Cir. 2001).  As the parties
7  seeking certification, plaintiffs bear the burden of showing that the requirements of Rule 23 are
8  met for each of their proposed classes.  *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th
9  Cir. 2012).

The Court's class certification analysis "must be rigorous and may entail some overlap with the merits of the plaintiff's underlying claim," but the merits questions may be considered only to the extent that they are "relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen*, 568 U.S. at 465-66 (internal quotations and citations omitted).  The class certification procedure is decidedly not an alternative form of summary judgment or an occasion to hold a mini-trial on the merits.  *Alcantar v. Hobart Service*, 800 F.3d 1047, 1053 (9th Cir. 2015).  The decision of whether to certify a class is entrusted to the sound discretion of the district court.  *Zinser*, 253 F.3d at 1186.

### A.    Numerosity (23(a)(1))

Rule 23(a)(1) requires that a proposed class be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Although numerosity typically is not a flashpoint of disagreement, defendants take issue on several grounds with plaintiffs' representation that there are thousands of members in each of the proposed classes.  This representation is based primarily on an analysis prepared by plaintiffs' expert witness, Anya Verkhovskaya.  *Id*. at 7-8.  Mojo and Realogy contend that Verkhovskaya's work should be afforded little or no consideration.  Dkt. No. 186 at 2-14 (Mojo); Dkt. No. 183 at 16-19 (Realogy).

As a starting consideration, defendants have an uphill climb on numerosity.  The call records in this case, which catalog millions of calls, plainly indicate that at least hundreds, and in

all probability thousands, of people were called. This alone puts Mojo and Reaology in a doubtful posture on numerosity.

The specific complaints they levy against Verkhovskaya's work do not improve their position. In effect, Realogy and Mojo challenge the reliability and soundness of Verkhovskaya's analysis and opinions under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Defendants filed *Daubert* motions in connection with summary judgment, *see* Dkt. Nos. 202 and 206, but not for the class certification proceedings. Why this was done is not clear, but in any event, the Court will take up the "gatekeeper" issues of admissibility as warranted here. *Daubert*, 509 U.S. at 590-91.

There is no "definitive checklist or test" used to evaluate the reliability of proposed expert testimony. *Daubert*, 509 U.S. at 593-94. The question is whether Verkhovskaya has provided a reliable, valid, and generally accepted method for identifying which phone numbers belong to putative class members, or whether her approach is "junk science" akin to predicting criminality by feeling the bumps on a person's head. *General Electric Co. v. Joiner*, 522 U.S. 136, 153 n.6 (1997) (Stevens, J., concurring in part). This is a flexible inquiry. *See Brickman v. Fitbit, Inc.*, Case No. 3:15-cv-02077-JD, 2017 WL 6209307, at *3 (N.D. Cal. Dec. 8, 2017) (citing *Murray v. S. Route Mar. SA*, 870 F.3d 915, 922 (9th Cir. 2017)). Relevant factors include: "(1) whether the theory can be and has been tested, (2) whether the theory has been peer reviewed and published, (3) what the theory's known or potential error rate is, and (4) whether the theory enjoys general acceptance in the applicable scientific community." *Id.* (quoting *Murray*, 870 F.3d at 922). These factors provide guidance but are not a straightjacket, and "the reliability analysis remains a malleable one tied to the facts of each case." *Id.* (quoting *Murray*, 870 F.3d at 922). The goal is to ensure "that the expert employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1189 (9th Cir. 2019) (internal quotation and citation omitted).

Rule 702 is not directed to "the correctness of the expert's conclusions but the soundness of [her] methodology." *Brickman*, 2017 WL 6209307, at *4 (quoting *Daubert v. Merrell Dow Pharm., Inc. (Daubert II)*, 43 F.3d 1311, 1318 (9th Cir. 1995)). If the method is valid and reliable,

4

and fits the case, it will be admitted; attacks on the quality of the data the expert used, the application of the methodology to the data, and the overall persuasiveness of the expert's opinions are matters for cross-examination. *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1237-38 (9th Cir. 2017) (citing *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (en banc) and *Daubert*, 509 U.S. at 596). The "district judge is a gatekeeper, not a fact finder." *Primiano v. Cook*, 598 F.3d 558, 564-65 (9th Cir. 2010) (internal quotation and citation omitted).

Verkhovskaya's methods are not particularly complicated. She analyzed several call log files produced by PhoneBurner, Inc., WAVV Communications, LLC, Mojo, and Realogy. Dkt. No. 155-1 ¶ 45. She removed calls made outside of the class period, and phone numbers that were outside of North America or were duplicates. *Id*. at ¶ 52. She identified calls that were completed and had non-zero durations, and were made on behalf of Realogy based on a list of names of Realogy agents. *Id*. at ¶¶ 54-58. Verkhovskaya identified numbers that were on the National Do Not Call Registry and used conventional methods to determine whether any of those numbers received two or more calls within a 12-month period after being on the National Do Not Call Registry for more than 32 days. *Id*. at ¶¶ 60-61. Verkhovskaya reasonably assumed that the phone numbers were residential because Reaology agents were instructed to call residential real estate owners. *Id*. at ¶ 70. Verkhovskaya used a LexisNexis database to identify numbers associated with businesses or the government. *Id*. at ¶¶73-77. She used similar methods to identify numbers that received prerecorded messages. *Id*. at ¶¶ 82-86.

Verkhovskaya concluded that thousands of unique numbers received calls, and equated the numbers to unique individuals who would qualify as class members in one or more of the proposed classes. Defendants make no objection to using the unique numbers as proxies for individuals, and common sense also supports this treatment. Verkhovskaya determined that 245,302 unique numbers fell into the NDNC class as residential numbers that were placed on the NDNC at least one month before receiving two or more calls within a twelve month period. *Id*. at ¶ 80. The NDNC class is also coextensive with the Internal DNC class, which includes individuals who received promotional calls from Realogy agents on their residential telephone or cellphone lines during the class period. Dkt. No. 154-3 at 13. Verkhovskaya also determined that

201,001 unique numbers received prerecorded messages which would qualify them for inclusion in the Prerecorded Message class. Dkt. No. 155-1 at ¶ 84. Of those, 163,543 unique numbers received prerecorded messages that were made using Mojo's dialing system, qualifying them for inclusion in the Prerecorded Message Mojo class. *Id.* at ¶ 85.

This analysis is based on evidence in the record, entails reasonable and appropriate methods, and yields reliable results that establish numerosity. The blunderbuss of challenges that Mojo and Realogy fire at Verkhovskaya do not lead to a different conclusion. They question at length her ability to match phone numbers to names. *See* Dkt. No. 186 at 6-14. But for present purposes, namely the determination of whether Verkhovskaya's report is adequate to demonstrate numerosity, matching names to numbers is not a material concern. What matters for numerosity is that the report readily demonstrates that the proposed classes are comprised of hundreds of thousands of individuals. To the extent defendants are suggesting a question of ascertainability, that factor is not a requirement of certification. *See Briseno v. ConAgra Foods, Inc.*, 844 F.3d at 1121, 1124-25 & n.4 (9th Cir. 2017).

Mojo and Realogy also say that Verkhovskaya: (1) did not exclude calls that lacked prerecorded messages, Dkt. No. 186 at 7-8, Dkt. No. 163 at 19; (2) did not exclude non-residential and landline calls, Dkt. No. 186 at 9; (3) used a phonetic sound matching and indexing algorithm called Soundex that was not well-suited to matching Realogy agents to calls, *Id.* at 9, Dkt. No. 183 at 19; (4) described a method that cannot be replicated, Dkt. No. 186 at 12-14, Dkt. No. 183 at 19. Dkt. No. 186 6-14; and (5) did not comply with Rule 26(a)(2)(B) by failing to identify all of the call log data she relied upon. Dkt. No. 186 at 2-5; Dkt. No. 183 at 18.

Overall, these objections go to the weight that should be given to Verkhovskaya's opinions and not to their exclusion as junk science, especially to the extent that they attack Verkhovskaya's data. *See In re Capacitors Antitrust Litig.*, No. 17-md-2801-JD, 2020 WL 870927, at *2 (N.D. Cal. Feb. 21, 2020). For example, for the prerecorded message calls, Mojo says that the "Drop Message" label, which identifies when a prerecorded message has been left, could be unreliable because it is set up by individuals and subject to user error. Dkt. No. 186 at 8. Realogy and Mojo also say Verkhovskaya's reliance on LexisNexis databases to identify business numbers is

questionable because LexisNexis is an unreliable source of data. Dkt. No. 186 at 9-11; Dkt. No. 183 at 19. Mojo and Realogy further say that Soundex, the software Verkhovskaya used to compare the call records to the list of Realogy agents, is unreliable. Dkt. No. 186 at 9; Dkt. No. 183 at 18-19. These challenges go to the weight, but not the admissibility, of her opinions. Realogy and Mojo will have a full opportunity to vigorously cross-examine Verkhovskaya at trial. The possibility of decertification may arise if cross-examination provides a basis for it.

The same holds true for Mojo objections to Verkhovskaya's inclusion of zero-duration calls with the "Drop Message" label, and non-residential and landline numbers. Dkt. No. 186 at 8-9. These challenges are additionally questionable because it is unclear why including landline numbers is a problem. The class definitions entail "residential telephone line[s] or cell phone number[s]," which does not inherently exclude landline numbers from consideration. For the non-residential numbers, Realogy's agents specifically targeted residential real estate owners, and called numbers provided by Realogy's vendor, Cole Realty. Dkt. No 154-14 at 89:9-18. It also bears noting that defendants did not proffer evidence indicating that business numbers were called in any appreciable volume, and certainly did not point to anything in the record that might cast doubt on numerosity on this score. For the zero-duration drop message concern, even if the Court were to credit Mojo's suggestion that at least a third of calls were not long enough for a prerecorded message to be delivered, that would not forestall numerosity because that would still leave thousands of calls to numbers that qualify for inclusion in the class.

As a closing objection, Mojo and Realogy say that Verkhovskaya's conclusions should be ignored because (1) her final results require additional analysis not described in her report, and (2) she failed to comply with Rule 26(a) when she did not identify all the data she analyzed. Dkt. No. 186 at 12-14; Dkt. No. 183 at 18-19. With respect to the first point, Mojo says that its experts could not replicate Verkhovskaya's results using her exhibits, which were mainly a list of telephone numbers rather than a complete data set. Dkt. No. 186 at 12-13. That appears to be precisely why Mojo's experts could not replicate the results. They focused on the exhibits and not the full data set that Verkhovskaya actually used. The suggestion that Verkhovskaya did not produce all the data she relied upon is not supported by the record.

### B. Typicality and Adequacy (23(a)(3)-(4))

Rule 23(a) requires the named plaintiffs to demonstrate that their claims are typical of the putative class, and that they are capable of fairly and adequately protecting the interests of the class. Fed. R. Civ. P. 23(a)(3)-(4). Plaintiffs say that all named plaintiffs and class members were called by Realogy agents to solicit real estate business while their numbers were registered on the Do Not Call Registry. *See* Dkt. No. 154-3 at 22. The named plaintiffs also state that there are no affirmative defenses that make their claims atypical. *Id*. Additionally, plaintiffs say that the named plaintiffs and counsel for plaintiffs have no conflicts of interest with class members and that counsel for plaintiffs will vigorously prosecute the claims. *Id*. at 23.

Mojo and Realogy dispute typicality and adequacy only for named plaintiffs Sarah Bumpus and Micheline Peker. Bumpus is the sole class representative for the NDNC class and the Internal DNC class. Dkt. No. 154-3 at 1. Realogy says that Bumpus gave consent to NRT West, a subsidiary of Realogy, to be called. Dkt. No. 183 at 27. But plaintiffs have proffered evidence showing that plaintiff Bumpus repeatedly told Realogy agents not to call her again when they started calling her to list her home with them. Dkt. No. 190-1 at ECF 30. This evidence, which is largely undisputed, overcomes Realogy's objections.

For Peker, Mojo says the evidence indicates that she has no memory of the calls she received, had an existing relationship with Coldwell Banker, and the Realogy agent who called Peker did not engage in telemarketing. Dkt. No. 186 at 22-21. Mojo also says that Peker is not an adequate class representative because she is not willing to travel to California to attend trial. *Id*. at 22. Peker is one of two class representatives for the Prerecorded Message Class and the sole class representative for the Prerecorded Message Mojo Sublcass. *See* Dkt. No. 154-3 at 1.

These challenges are not well taken. Mojo does not cite to any good law holding that Peker was required to remember a call from a Realogy agent to have a TCPA claim or represent a class. Our circuit has indicated to the contrary in an unpublished memorandum decision. *See Romero v. Dep't Stores Nat'l Bank*, 725 F. App'x 537, 539 (9th Cir. 2018) (unpublished)). For Mojo's claim that the calls in question were not "telemarketing calls," the record shows that Realogy agents used Mojo's dialing system for sales prospecting. Dkt. No. 188-1 at ECF 26-27.

8

It is the purpose of the calls, and not Mojo's characterization of them, that counts. *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012). Further, the statutory provision relevant to the prerecorded message classes does not require that the calls specifically be telemarketing calls; it is a violation to "initiate any telephone call" and leave a prerecorded message. 47 U.S.C. § 227(b)(1)(B); *see also Romero*, 725 F. App'x at 539.

To the extent defendants suggest that Peker had an existing business relationship with Realogy, it appears to be true that she had a contract with a Realogy agent for less than six months. Dk. No. 187-18 at 73:8-21. But that contract was terminated, and Mojo presents no evidence showing that Peker agreed to be contacted by Realogy agents before or after that. Mojo also mischaracterizes Peker's unwillingness to travel for trial. The deposition transcript does not show that Peker is altogether unwilling to travel for trial but that she expressed concern over the COVID-19 pandemic. Dkt. No. 188-1 at ECF 87-88.

Defendants have not made a persuasive challenge to typicality or adequacy. Consequently, these elements of Rule 23(a) are met.

### C. Commonality (23(a)(2)) and Predominance (23(b)(3))

The commonality requirement under Rule 23(a)(2) is satisfied when "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Because "any competently crafted class complaint literally raises common questions," the Court's task is to look for a common contention "capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Alcantar*, 800 F.3d at 1052 (internal quotations and citations omitted). What matters is the "capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (internal quotations omitted) (emphasis in original). This does not require total uniformity across a class. "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). The commonality standard imposed by Rule 23(a)(2) is, however, "rigorous." *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 512 (9th Cir. 2013).

9

Rule 23(b)(3) sets out the related but nonetheless distinct requirement that the common questions of law or fact predominate over the individual ones. This inquiry focuses on whether the "common questions present a significant aspect of the case and [if] they can be resolved for all members of the class in a single adjudication." *Hanlon*, 150 F.3d at 1022 (internal quotations and citation omitted); *see also Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). Each element of a claim need not be susceptible to classwide proof, *Amgen*, 568 U.S. at 468-69, and the "important questions apt to drive the resolution of the litigation are given more weight in the predominance analysis over individualized questions which are of considerably less significance to the claims of the class." *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016). Rule 23(b)(3) permits certification when "one or more of the central issues in the action are common to the class and can be said to predominate, . . . even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson*, 577 U.S. at 453 (internal quotations omitted).

"Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)," *Comcast*, 569 U.S. at 34, and the main concern under subsection (b)(3) is "the balance between individual and common issues." *In re Hyundai and Kia Fuel Economy Litigation*, 926 F.3d 539, 560 (9th Cir. 2019) (en banc) (internal quotations omitted). The Court finds it appropriate to assess commonality and predominance in tandem, with a careful eye toward ensuring that the specific requirements of each are fully satisfied. *See*, *e.g.*, *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1120-21 (9th Cir. 2017).

### 1. Liability

#### a. Realogy Classes (NDNC Class, Internal DNC Class, and Prerecorded Message Class)

Realogy raises another grab bag of objections to commonality and predominance, and whether any individual call came within the TCPA for any of the proposed (b)(3) classes. Dkt. No. 183 at 20-26, 29-30.

The TCPA makes it unlawful for any person to "initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the

10

prior express consent of the called party," 47 U.S.C. § 277(b)(1)(B) (Prerecorded Message Class), to initiate telephone solicitation to "a residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry," 47 U.S.C. § 277(c)(2); 47 C.F.R. § 64.1200(c)(2) (NDNC Class), and to initiate "any call for telemarketing purposes to a residential telephone subscriber unless" the caller "has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls," 47 U.S.C. § 277(c)(2); 47 C.F.R. § 64.1200(d) (Internal DNC Class). A person can "make" a call under the TCPA directly or vicariously through an agency relationship with the person who made the call. *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 877-79 (9th Cir. 2014)). "[A] defendant may be held vicariously liable for TCPA violations where the plaintiff establishes an agency relationship, as defined by federal common law, between the defendant and a third-party caller." *Id*. at 879.

Plaintiffs focus on common evidence to show that Realogy agents made unwanted calls on behalf of Realogy. *See* Dkt. No. 154-3 at 16-17. While plaintiffs have not been crystal clear about the basis of the vicarious liability, they advance a ratification theory in their motion papers. *Id*. at 17-18. "Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." *Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068, 1073 (9th Cir. 2019). Ratification of a third party's acts may be accomplished by "knowing acceptance of the benefit" of the third party's actions or through willful ignorance. *Id*.

In addition to relying on Verkhovskaya's report to demonstrate that calls were made by Realogy agents while they were affiliated with Coldwell Banker, *see* Dkt. No. 154-3 at 17; Dkt. No. 155-1 ¶¶ 57-58, plaintiffs say that they can prove the calls were made on behalf of Realogy based on Realogy's policies and training programs. Dkt. No. 154-3 at 16-17. Realogy's training programs encouraged agents to develop new contacts and prospects by, among other actions, contacting homeowners who listed their properties "for sale by owner." Dkt. No. 154-6 at ECF 8. Realogy agents were required to sign a "Do Not Contact Policy," Dkt. No. 154-9; Dkt. No. 154-10 at 32:2-7, which required agents to state the company they worked for in each call. Dkt. No. 154-9 at 3. The "Do Not Contact Policy" clearly stated that numbers from the National Do Not Call

1    Registry and from Realogy's internal Do Not Call list should not be called for telemarketing

2    purposes, unless a homeowner had provided express written consent to be called. *Id*. at 2.

3          Plaintiffs also highlight common evidence to show that Realogy was willfully ignorant of

4    its agents violations of its "Do Not Contact Policy." Dkt. No. 154-3 at 5, 17. Realogy stated in its

5    "Do Not Contact Policy" that it would monitor agents' compliance with the policy. Dkt. No. 154-

6    9 at 1. Despite this, Realogy had no way to actually monitor its agents' compliance and there were

7    no consequences for an agent's non-compliance. Dkt. No. 154-14 at 101:13-17, 105:9-12, 205:7-

8    18. Realogy encouraged its agents to "keep it strictly an information call" so they did "not have to

9    adhere to DNC." Dkt. No. 154-17 at ECF 24. The evidence also shows that Realogy knew some

10   of the numbers on its call lists were on Do Not Call lists, but did not remove those numbers from

11   the lists. Dkt. No. 154-14 at 101:1-8.

12         This evidence indicates that plaintiffs' claims can be proved through common evidence,

13   and that common questions predominate. Realogy has not shown otherwise. It suggests that the

14   relationship between Realogy and each individual agent must be examined to determine whether

15   vicarious liability can be imposed. Dkt. No. 183 at 22-23. This overlooks the Do Not Contact

16   Policy and other common evidence applicable to all agents. Realogy tries to minimize the Policy

17   as merely summarizing federal law, but it expressly required that agents identify their affiliation

18   with Realogy's companies, and stated that Realogy would be monitoring compliance with the

19   policy.

20         Realogy says that there is no common evidence to show that the agents made

21   telemarketing calls in violation of the TCPA, and that individual issues will predominate that

22   question. *Id*. at 25, 29. To the contrary, plaintiffs highlight evidence indicating that Realogy

23   agents used commercial dialers and call lists with residential telephone numbers. Dkt. No. 154-3

24   at 18; Dkt. No. 155 at ECF 449-99. Plaintiffs add that no realtor would use automated commercial

25   dialers to make personal calls. Dkt. No. 154-3 at 19. Realogy has presented no evidence showing

26   that any calls were made for anything other than commercial purposes.

27         Realogy also says that individual issues exist for the affirmative defenses of express

28   consent and established business relationships under the TCPA, which preclude class certification.

Dkt. No 183 at 30. Realogy tries to show that plaintiffs Peker and Bumpus consented or had an established business relationship with Coldwell Banker, Dkt. No. 183 at 25, but as discussed, the evidence presented by plaintiffs shows any such relationship had terminated before the time of the telemarketing calls. *See* Dk. No. 187-18 at 73:8-21; Dkt. No. 190-1 at ECF 30. Realogy's reliance on some entirely speculative opinions by its expert witness, Jan Kostyun, do not bolster its contention. *See* Dkt. No. 165-1 at ECF 347-51.

Plaintiffs have demonstrated that the NDNC, Internal DNC, and Prerecorded Message classes satisfy the commonality and predominance requirements.

### b. Prerecorded Message Mojo Class

Mojo raises its own slew of objections to commonality and predominance that it says should preclude certification of the Prerecorded Message Mojo class. Dkt. No. 186 at 15-19, 22-23.

Mojo suggests that plaintiffs cannot show that Mojo "initiated" the calls within the meaning of the TCPA. *Id*. at 15-16. This echoes Mojo's motion to dismiss on the grounds that plaintiffs had not plausibly alleged that Mojo initiated the calls, which the Court denied. Dkt. No. 141.

The TCPA makes it illegal to "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party," with limited exceptions. 47 U.S.C. § 227(b)(1)(B). Although the statute does not provide its own definition of "initiate," the Federal Communications Commission (FCC) has provided its interpretation of the term. The FCC states that to determine whether an entity initiated a call, courts should "look to the totality of the facts and circumstances" to determine "1) who took the steps necessary to physically place the call; and 2) whether another person or entity was so involved in placing the call as to be deemed to have initiated it, considering the goals and purposes of the TCPA." *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 FCC Rcd. 7961, 7980 (2015). Liability may also be imposed for facilitating TCPA violations of others. *Id*. For example, "whether a person who offers a calling platform service for the use of others has knowingly allowed its client(s) to use that platform for unlawful purposes

13

may also be a factor in determining whether the platform provider is so involved in placing the calls as to be deemed to have initiated them." *Id*. at 7980-81.

Plaintiffs' evidence indicates that they can prove Mojo's liability for initiating the calls because Mojo provided lead lists, which contained thousands of residential telephone numbers that could be used to determine who to call. Dkt. No. 154-3 at 6. Mojo's Sales Training Manual shows that it offered a "lead store" which could provide users with numbers for homeowners of expired and off market properties and "for sale by owner" properties, as well as providing a reverse lookup function to find additional numbers. Dkt. No. 154-12 at ECF 12-13. Realogy agents used Mojo's "power dialer" to make high-volume calls to homeowners whose numbers were on the lead lists. Dkt. No. 154-13 at 50:11-51:2. The dialer also allowed realtors to change their caller ID in order to call a number multiple times. Dkt. No. 155-1 at ECF 37. Plaintiffs also rely on Verkhovskaya's report to show that they can identify telephone numbers that were dialed using Mojo's dialer and to which prerecorded messages were given. Dkt. No. 155-1 at ¶¶ 82-85.

Even so, Mojo says that individual inquires are required because each Realogy agent may have used the dialer differently. Dkt. No. 186 at 16. In response, plaintiffs contend that because Mojo's dialer was used to place the call, no further analysis is necessary to determine that Mojo "initiated" the call. Dkt. No. 188 at 12. This is directly contrary to the FCC's interpretation and the interpretation of cases since. *See In re Rules & Regulations*, 30 FCC Rct. at 7980; *Glasser v. Hilton Grand Vacations Co.*, 948 F.3d 1301, 1312 (11th Cir. 2020) (finding company that made autodialers could not be held liable for its employees use of those dialers because they required human choice and initiation of the autodialer). Although plaintiffs' evidence shows that Mojo provided lead lists and the dialer, plaintiffs have not adduced any evidence that shows Mojo initiated the calls on a classwide basis. Consequently, class certification for the Prerecorded Message Mojo Subclass is denied.

### 2. Damages

Under *Comcast*, 569 U.S. at 35, plaintiffs bear the burden of providing a damages model showing that "damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." The TCPA provides for statutory damages of $500 for each negligent violation and

14

1    $1500 for each willful violation. 47 U.S.C. § 227(b)(3). Plaintiffs say that Verkhovskaya's report

2    provides a way to calculate the number of TCPA violations, which Realogy and Mojo do not

3    contest. Consequently, plaintiffs have adequately provided a damages model for their proposed

4    classes. Defendants make no other objections with respect to damages.

### 3.    Superiority

The final certification question is whether the ends of justice and efficiency are served by certification. Rule 23(b)(3) requires a finding that proceeding as a class is superior to other ways of adjudicating the controversy, which in this case would mean individual actions by each putative class member. There can be no doubt here that a class is the superior method of handling these TCPA claims. The recovery for each violation is relatively small, and it is not likely for class members to recover large amounts individually if they prevailed. No reasonable person is likely to pursue these claims on their own, especially given the cost and other resources required to litigate against a company like Realogy, which has already retained multiple experts and shown that it is committed to strongly defending this case. This all "vividly points to the need for class treatment." *Just Film*, 847 F.3d at 1123.

### D.    Injunctive Relief (23(b)(2))

Plaintiffs seek to certify the Internal DNC class solely as an injunctive relief class under Rule 23(b)(2). Dkt. No. 154-3 at 13. They also seek to certify the NDNC, Prerecorded Message, and Prerecorded Message Mojo classes under both Rule 23(b)(3) and Rule 23(b)(2). Dkt. No. 190 at 15. They request injunctive relief in the form of a requirement that Realogy create and maintain minimum standards for its internal do not call list. Dkt. No. 154-3 at 24.

A (b)(2) class may be certified when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "Class certification under Rule 23(b)(2) is appropriate only where the primary relief sought is declaratory or injunctive." *Zinser*, 253 F.3d at 1195. The primary use of Rule 23(b)(2) classes has been the certification of civil rights class actions, but courts have certified many different kinds classes under Rule 23(b)(2). *See Parsons v. Ryan*, 754 F.3d 657, 686 (9th Cir. 2014). The Rule 23(a)

15

1   requirements of numerosity, commonality, typicality, and adequacy must also be shown for a Rule
2   23(b)(2) class. *Zinser*, 253 F.3d at 186. As discussed, plaintiffs have met their burden for proving
3   the Rule 23(a) requirements for the NDNC, Internal DNC, and Prerecorded Message classes but
4   not for the Prerecorded Message Mojo Class.

5   Realogy objects that plaintiffs primarily seek monetary relief on their claims, making
6   certification of a (b)(2) class inappropriate. Dkt. No. 165 at 31. That is certainly not true for the
7   Internal DNC class, for which plaintiffs seek only injunctive relief and no monetary relief. For the
8   other classes, it is true that certification under Rule 23(b)(2) is not appropriate for claims where
9   monetary relief predominates. *In re Capacitors Antitrust Litig.*, No. 17-md-2801-JD, 2020 WL
10  6462393, at *8 (N.D. Cal. Nov. 3, 2020). That is not to say that injunctive relief is ruled out for
11  the (b)(3) classes. Rather, such relief may be awarded in addition to a monetary recovery.
12  Consequently, a (b)(2) class is certified only for the Internal DNC class.

### CONCLUSION

14  The Court certifies the NDNC class and Prerecorded Message class under Rule 23(b)(3).
15  The Court certifies the Internal DNC class under Rule 23(b)(2). Certification is denied for a
16  Prerecorded Message Mojo class.

17  Plaintiff Sarah Bumpus is appointed class representative of the NDNC class and Internal
18  DNC class. Plaintiffs Cheryl Rowan and Micheline Pecker are appointed class representatives of
19  the Prerecorded Message class. Tycko & Zavareei LLP, Reese LLP, and Kaufman P.A. are
20  appointed as class counsel for all three classes.

21  Plaintiffs are directed to file by April 22, 2022, a proposed plan for dissemination of notice
22  to the classes. Plaintiffs will meet and confer with defendants at least 10 days in advance of
23  submitting the plan so that the proposal can be submitted on a joint basis, to the fullest extent
24  possible.

25  A status conference is set for May 26, 2022, at 10:00 a.m. in Courtroom 11, 19th Floor,
26  San Francisco. The parties are directed to file a joint statement by May 19, 2022, with proposed
27  dates for the final pretrial conference and trial.

The parties are further referred to Magistrate Judge Hixon for a settlement conference to be held as his schedule permits.

**IT IS SO ORDERED.**

Dated:  March 23, 2022

JAMES DONATO
United States District Judge